1 FRANKLIN BROCKWAY GOWDY (Bar No.: 47918)
KENT M. ROGER (Bar No.: 95987)
2 MARK E. McKEEN (Bar No.: 130950)
GREGORY B. GENSKE (Bar No.: 197085)
3 BROBECK, PHLEGER & HARRISON LLP
One Market – Spear Street Tower
4 San Francisco, California 94105
Telephone:   (415) 442-0900
5 Facsimile:   (415) 442-1010

6 SALVATORE PICARIELLO (Bar No.: 190442)
BROBECK, PHLEGER & HARRISON LLP
7 38 Technology Drive
Irvine, California 92618-5301
8 Telephone:   (949) 790-6300
Facsimile:   (949) 790-6301
9

10 Attorneys for Plaintiff
STEINBERG MOORAD & DUNN, INC.
11

10:56 am
FILED
CLERK, U.S. DISTRICT COURT
AUG 13 2001
CENTRAL DISTRICT OF CALIFORNIA
BY                     DEPUTY

12             UNITED STATES DISTRICT COURT

13             CENTRAL DISTRICT OF CALIFORNIA

**RSWL (BQRX)**

14 STEINBERG MOORAD & DUNN, INC., a ) Case No.  **01 - 07009** (BQRX)
California corporation,             )
15                                  )
16            Plaintiff,            ) **COMPLAINT FOR DAMAGES AND**
                                    ) **INJUNCTIVE RELIEF:**
16                                  )
17            v.                    ) **(1)  RACKETEER INFLUENCED**
                                    )      **AND CORRUPT**
17                                  )      **ORGANIZATIONS ACT (18**
18 DAVID L. DUNN, an individual;    )      **U.S.C. §1962(c));**
ATHLETES FIRST, LLC, a Delaware    ) **(2)  RACKETEER INFLUENCED**
18 corporation; DAVID C. HUNNEWELL, an )    **AND CORRUPT**
19 individual; CENTURION CAPITAL    )      **ORGANIZATIONS ACT (18**
MANAGEMENT, LLC, a Massachusetts   )      **U.S.C . §1962(d));**
20 limited liability corporation; PLATINUM ) **(3)  LANHAM ACT-FALSE**
EQUITY HOLDINGS, LLC, a            )      **ADVERTISING (15 U.S.C.**
21 Massachusetts limited liability corporation; )  **§1125(a));**
DONALD HOUSMAN, an individual;     ) **(4)  DECLARATORY RELIEF**
22 B.O.Y.Z., an entity of unknown origin, and )   **(28 U.S.C. 2201-02);**
DOES 1-10, inclusive,              ) **(5)  BREACH OF CONTRACT;**
23                                  ) **(6)  FRAUD;**
             Defendants.           ) **(7)  UNFAIR COMPETITION;**
24                                  ) **(8)  MISAPPROPRIATION OF**
                                    )      **TRADE SECRETS;**
25                                  ) **(9)  INTENTIONAL**
                                    )      **INTERFERENCE WITH**
26                                  )      **CONTRACT;**
                                    ) **(10) INTENTIONAL**
27                                  )      **INTERFERENCE WITH**
28                                  )      **PROSPECTIVE ECONOMIC**

ENTERED ON ICMS
AUG 1 4 2...
CV

**ORIGINAL**

1

08/13/01  MONROE                    11:33:38 AM
LA  I-1                    Receipt # 045810
=====NO REFUND WITHOUT RECEIPT=====
CASE # 01-7009
      06500    Filing Fee   Civil
      51000    Special Fund F/F  60.00
                              90.00

==== T O T A L ====        90.00

CHECK TENDERED $          $150.00

CHECK 5198

THANK YOU



| | |
|---|---|
| 1 | ADVANTAGE;<br>(11) BREACH OF FIDUCIARY |
| 2 | DUTY;<br>(12) ACCOUNTING; |
| 3 | (13) MISLEADING ADVERTISING<br>(Cal. Bus. & P. Code §17500); |
| 4 | (14) CONSPIRACY;<br>(15) UNJUST ENRICHMENT; |
| 5 | (16) CONSTRUCTIVE TRUST; AND<br>(17) AIDING AND ABETTING A |
| 6 | BREACH OF FIDUCIARY DUTY |
| 7 | JURY TRIAL DEMANDED |

8

9        Plaintiff Steinberg, Moorad & Dunn, Inc., a California corporation, alleges as

10   follows:

11                                    **I. JURISDICTION AND VENUE**

12          1.      This Court has subject matter jurisdiction over all causes of action

13   asserted in this Complaint by virtue of 28 U.S.C. § 1331 (federal question jurisdiction), 18

14   U.S.C. § 1964(c) (RICO), and 28 U.S.C. § 1367 (supplemental jurisdiction).

15          2.      This Court has personal jurisdiction over all of the Defendants in this

16   action in that, as described in detail below, each Defendant is either an individual residing

17   in the Central District of California or each Defendant does sufficient business in the

18   Central District of California or otherwise has sufficient minimum contacts with the Central

19   District of California so as to render the exercise of jurisdiction by this Court permissible

20   under traditional notions of fair play and substantial justice.

21          3.      Venue is proper in this Court by virtue of 28 U.S.C. §1391(b)(2) in

22   that, as described in detail below, a substantial part of the events or omissions upon which

23   this Complaint is based occurred within this judicial district, and Dunn's employment

24   contract, as hereinafter described, specifies venue in Los Angeles. Alternatively, venue is

25   proper in this Court by virtue of 28 U.S.C. § 1391(b)(3) in that Defendants Dunn and

26   Athletes First are found within this judicial district. Alternatively, venue is proper in this

27   Court by virtue of 18 U.S.C. § 1965 (a) with respect to the claims based upon 18 U.S.C.

28   § 1962 in that this is a district in which some of the Defendants reside, are found, have

OCOLIB1\GG2\
240492.04
(55KC041.DOC)

1    agents or transact business.

## II. THE PARTIES

3        4.      Plaintiff Steinberg, Moorad & Dunn, Inc. ("SMD") is a corporation
4    organized and existing under the laws of the State of California, with its principal place of
5    business in Newport Beach, California.  SMD is a subsidiary of Assante Corporation
6    ("Assante"), a corporation organized and existing under the laws of Canada.  SMD is the
7    successor-in-interest to Steinberg & Moorad, a professional law corporation, and was also
8    formerly known as "Steinberg & Moorad, Inc."  SMD provides, and has historically
9    provided, agency and management services to, among others, professional athletes in
10    various sports, including many high-profile athletes in the National Football League
11    ("NFL").  For almost twenty-five years, SMD and its predecessors have had a well-known
12    reputation of being the nation's premiere sports agency.

13        5.      Defendant David L. Dunn ("Dunn") is an individual residing in
14    Orange County, California.  During the period of January 1991 until the time of his
15    purported resignation in February 2001, Dunn was an employee, partner and then an officer
16    of SMD.  At the time of his purported resignation, Dunn was the Executive Vice President
17    of SMD.  As described in detail below, as a trusted employee, partner and officer of SMD,
18    Dunn had access to and knowledge of SMD's trade secrets, confidential client information
19    and other proprietary information, all valuable intellectual property protected by law
20    (collectively, "Proprietary Information").  At all relevant times, Dunn has owed a duty of
21    loyalty and a duty to act in SMD's best interests and to place SMD's best interests above
22    any interests, including his own, which would conflict with SMD's interests.  Dunn also
23    owes a duty of confidentiality to SMD, pursuant to which he is prohibited from using or
24    communicating SMD's Proprietary Information received from SMD, or acquired during the
25    course of his employment with SMD, on his own account or on behalf of any other entity.
26    These duties arise from, among other things, SMD's repose in Dunn's integrity of its trust,
27    confidence and control, and Dunn's voluntary acceptance of that trust, confidence and
28    control.  As set forth in detail below, Dunn, acting in concert with the named defendants

1    and others, planned and participated in the formation of defendant Athletes First LLC

2    ("Athletes First"), and conducted and participated in the affairs of Athletes First to unfairly

3    and illegally compete in the business of providing agency and management services to

4    professional athletes. Since on or before February 20, 2001 Dunn has been the Chief

5    Executive Officer of Athletes First.

6           6.     Defendant Athletes First, LLC is a corporation duly organized and

7    licensed under the laws of the State of Delaware, with its principal place of business in

8    Newport Beach, California. As set forth in detail below, Athletes First was originally

9    conceived by Dunn and others in 1999 as a *de facto* competitive agency to SMD and was

10   thereafter named and formally organized in or before February 2001 by Dunn and others

11   acting in concert with him to illegally and unfairly compete with SMD in the business of

12   providing agency and management services to professional athletes. Athletes First also

13   provides professional services to entities such as NASCAR.

14          7.     Defendant David C. Hunnewell ("Hunnewell") is an individual

15   residing in the Boston, Massachusetts area. He is the father-in-law of non-party Brian G.

16   Murphy. As set forth in detail below, Hunnewell, acting in concert with Dunn and others,

17   helped conceive, plan and participate in the formation of Athletes First, and conducted and

18   participated in the affairs of Athletes First to illegally and unfairly compete with SMD in

19   the business of providing agency and management services to professional athletes.

20          8.     Defendant Centurion Capital Management, LLC ("Centurion") is a

21   Massachusetts limited liability corporation with its principal place of business in

22   Foxborough, Massachusetts. As set forth in detail below, Centurion, acting in concert with

23   Dunn, Hunnewell, and others, planned and participated in the formation of Athletes First,

24   and conducted and participated in the affairs of Athletes First to illegally and unfairly

25   compete with SMD in the business of providing agency and management services to

26   professional athletes. SMD is further informed and believes, and on that basis alleges, that

27   Centurion has, at all relevant times, been owned, operated and/or controlled by Hunnewell.

28          9.     Defendant Platinum Equity Holdings, LLC ("PEH") is a limited

4

COMPLAINT

1    liability company organized under the laws of Massachusetts with its principal place of

2    business in Cambridge, Massachusetts. SMD is informed and believes, and on that basis

3    alleges that, as set forth in detail below, PEH, acting in concert with Dunn, Hunnewell,

4    Centurion and others, participated in the formation of Athletes First, and conducted and

5    participated in the affairs of Athletes First to illegally and unfairly compete with SMD in

6    the business of providing agency and management services to professional athletes. SMD

7    is informed and believes, and on that basis alleges, that PEH has, at all relevant times, been

8    affiliated with Hunnewell.

9         10.    Defendant Donald Housman ("Housman") is an individual residing in

10   New Jersey, and is the uncle-in-law of non-party Brian G. Murphy. As set forth in detail

11   below, Housman, acting in concert with Dunn, Hunnewell, Centurion, PEH and others,

12   participated in the formation of Athletes First, and conducted and participated in the affairs

13   of Athletes First to illegally and unfairly compete with SMD in the business of providing

14   agency and management services to professional athletes.

15        11.    Defendant B.O.Y.Z. ("BOYZ") is an entity with its principal place of

16   business in New Jersey. SMD is currently unaware of the particular form of BOYZ,

17   whether corporate or otherwise. SMD is informed and believes, and on that basis alleges,

18   that BOYZ is owned, operated and/or controlled by Housman. As set forth in detail below,

19   BOYZ, acting in concert with Dunn, Hunnewell, Centurion, PEH, Housman and others,

20   participated in the formation of Athletes First, and conducted and participated in the affairs

21   of Athletes First to illegally and unfairly compete with SMD in the business of providing

22   agency and management services to professional athletes. SMD is informed and believes,

23   and on that basis alleges that Housman owns, operates and/or controls BOYZ.

24        12.    Non-party Brian G. Murphy ("Murphy") is an individual residing in

25   Orange County, California. During the period of May 1999 until the time of his resignation

26   in February 2001, Murphy was a trusted employee of SMD. At the time of his resignation,

27   Murphy was the Vice President of Football Operations of SMD. As described in detail

28   below, as a trusted employee and Vice President of SMD, Murphy had access to and

1   knowledge of SMD's Proprietary Information. At all times during his employment,

2   Murphy had a duty of loyalty and a duty to act in SMD's best interest and to place SMD's

3   best interests above any interests, including his own, which would conflict with SMD's

4   interests. Murphy also owes a duty of confidentiality to SMD, pursuant to which he is

5   prohibited from using or communicating SMD's Proprietary Information received from

6   SMD, or acquired during the course of his employment with SMD, on his own account or

7   on behalf of any other entity. These duties arise from, among other things, SMD's repose

8   in Murphy's integrity of its trust, confidence and control, and Murphy's voluntary

9   acceptance of that trust, confidence and control. As set forth in detail below, Murphy

10  acting in concert with Dunn, Hunnewell, Centurion, PEH, Housman, BOYZ and others,

11  planned and participated in the formation of Athletes First, and conducted and participated

12  in the affairs of Athletes First to illegally and unfairly compete with SMD in the business of

13  providing agency and management services to professional athletes. Since on or before

14  February 20, 2001, Murphy has been the Chief Operating Officer of Athletes First.

15          13.     Non-party John "Joby" Branion is an individual residing in Orange

16  County, California. During the period of October 1996 until the time of his resignation in

17  February 2001, Branion was a trusted employee of SMD. At the time of his resignation,

18  Branion was a Contract Advisor for football and basketball for SMD. As described in

19  detail below, as a trusted employee of SMD, Branion had access to and knowledge of

20  SMD's Proprietary Information. At all times during his employment, Murphy had a duty of

21  loyalty and a duty to act in SMD's best interest and to place SMD's best interests above

22  any interests, including his own, which would conflict with SMD's interests. Branion also

23  owes a duty of confidentiality to SMD, pursuant to which he is prohibited from using or

24  communicating SMD's Proprietary Information received from SMD, or acquired during the

25  course of his employment with SMD, on his own account or on behalf of any other entity.

26  These duties arise from, among other things, SMD's repose in Branion's integrity of its

27  trust, confidence and control, and Branion's voluntary acceptance of that trust, confidence

28  and control. As set forth in detail below, Branion, acting in concert with Dunn, Hunnewell,

OCOLIB1\GG2\
240492.04
(55KC041.DOC)

6

COMPLAINT

1    Centurion, PEH, Housman, BOYZ, Murphy and others, planned and participated in the

2    formation of Athletes First, and conducted and participated in the affairs of Athletes First to

3    illegally and unfairly compete with SMD in the business of providing agency and

4    management services to professional athletes. Since on or before February 20, 2001,

5    Branion has been a managing member of Athletes First.

6          14.    Non-party Carmen Wallace ("Wallace") is an individual residing in

7    Orange County, California. During the period of July 1997 until the time of his resignation

8    in February 2001, Wallace was a trusted employee of SMD. At the time of his resignation,

9    Wallace was a client service manager for football and basketball for SMD. As described in

10    detail below, as a trusted employee of SMD, Wallace had access to and knowledge of

11    SMD's Proprietary Information. At all times during his employment, Wallace had a duty

12    of loyalty and a duty to act in SMD's best interest and to place SMD's best interests above

13    any interests, including his own, which would conflict with SMD's interests. Wallace also

14    owes a duty of confidentiality to SMD, pursuant to which he is prohibited from using or

15    communicating SMD's Proprietary Information received from SMD, or acquired during the

16    course of his employment with SMD, on [his] own account or on behalf of any other entity.

17    These duties arise from, among other things, SMD's repose in Wallace's integrity of its

18    trust, confidence and control, and Wallace's voluntary acceptance of that trust, confidence

19    and control. As set forth in detail below, Wallace, acting in concert with Dunn, Hunnewell,

20    Centurion, PEH, Housman, BOYZ, Murphy, Branion and others, planned and participated

21    in the formation of Athletes First, and conducted and participated in the affairs of Athletes

22    First to illegally and unfairly compete with SMD in the business of providing agency and

23    management services to professional athletes. Since on or before February 20, 2001

24    Wallace has been an employee of Athletes First.

25          15.    Non-party Domenic Mantella ("Mantella") is an individual residing in

26    Orange County, California. During the period of March 1998 until the time of his

27    resignation in February 2001, Mantella was a trusted employee of SMD. At the time of his

28    resignation, Mantella was an office assistant for SMD. As described in detail below, as a

OCOLIB1\GG2\
240492.04
(55KC041.DOC)

1 trusted employee of SMD, Mantella had access to and knowledge of SMD's Proprietary

2 Information. At all times during his employment, Mantella had a duty of loyalty and a duty

3 to act in SMD's best interest and to place SMD's best interests above any interests,

4 including his own, which would conflict with SMD's interests. Mantella also owes a duty

5 of confidentiality to SMD, pursuant to which he is prohibited from using or communicating

6 SMD's Proprietary Information received from SMD, or acquired during the course of his

7 employment with SMD, on his own account or on behalf of any other entity. These duties

8 arise from, among other things, SMD's repose in Mantella's integrity of its trust,

9 confidence and control, and Mantella's voluntary acceptance of that trust, confidence and

10 control. As set forth in detail below, Mantella, acting in concert with Dunn, Hunnewell,

11 Centurion, PEH, Housman, BOYZ, Murphy, Branion, Wallace and others, planned and

12 participated in the formation of Athletes First, and conducted and participated in the affairs

13 of Athletes First to illegally and unfairly compete with SMD in the business of providing

14 agency and management services to professional athletes. Since on or before February 20,

15 2001, Mantella has been an employee of Athletes First. Since on or before February 20,

16 2001, Mantella has been an employee of Athletes First.

17       16. Non-party Erin Bohrnstedt ("Bohrnstedt") is an individual residing in

18 Orange County, California. During the period of April 2000 until the time of her

19 resignation in February 2001, Bohrnstedt was a trusted employee of SMD. At the time of

20 her resignation, Bohrnstedt was an administrative assistant for SMD. As described in detail

21 below, as a trusted employee of SMD, Bohrnstedt had access to and knowledge of SMD's

22 Proprietary Information. At all times during her employment, Bohrnstedt had a duty of

23 loyalty and a duty to act in SMD's best interest and to place SMD's best interests above

24 any interests, including her own, which would conflict with SMD's interests. Bohrnstedt

25 also owes a duty of confidentiality to SMD, pursuant to which she is prohibited from using

26 or communicating SMD's Proprietary Information received from SMD, or acquired during

27 the course of her employment with SMD, on her own account or on behalf of any other

28 entity. These duties arise from, among other things, SMD's repose in Bohrnstedt's

8

OCOLIB1\GG2\
240492.04
(55KC041.DOC)

COMPLAINT

1  integrity of its trust, confidence and control, and Bohrnstedt's voluntary acceptance of that

2  trust, confidence and control. As set forth in detail below, Bohrnstedt, acting in concert

3  with Dunn, Hunnewell, Centurion, PEH, Housman, BOYZ, Murphy, Branion, Wallace,

4  Mantella, and others, planned and participated in the formation of Athletes First, and

5  conducted and participated in the affairs of Athletes First to illegally and unfairly compete

6  with SMD in the business of providing agency and management services to professional

7  athletes. Since on or before February 20, 2001, Bohrnstedt has been an employee of

8  Athletes First.

9          17.    SMD is informed and believes, and on that basis alleges, that in

10  perpetrating the wrongful conduct herein alleged, each Defendant was the agent of each

11  other Defendant, and each was acting in the course and scope of said agency at all times

12  relevant to this Complaint. Defendants ratified, approved and accepted all or part of the

13  wrongful acts of his or its co-Defendant agents, such that each Defendant is jointly and

14  severally liable for the acts and omissions of each other Defendant. Each of the Defendants

15  knowingly and willingly entered into and embarked upon the wrongful course of action

16  described herein.

17          18.    SMD is informed and believes, and on that basis alleges, that in

18  perpetrating the wrongful conduct herein alleged, each Defendant was the co-conspirator of

19  each other Defendant and the other nonparties, and each was acting in the course and scope

20  of said conspiracy at all times relevant to this Complaint. Defendants each ratified,

21  approved and accepted all or part of the wrongful acts of his or its co-conspirators, such

22  that each Defendant is jointly and severally liable for the acts and omissions of each other

23  Defendant. Each of the Defendants knowingly and willingly entered into and embarked

24  upon the wrongful course of action described herein.

25                      **III. GENERAL ALLEGATIONS**

26  **SMD'S SUCCESS AS AMERICA'S PREMIER SPORTS MANAGEMENT**
    **AGENCY**

27

28          19.    Leigh Steinberg ("Steinberg") founded SMD in 1975. SMD provides

9

**COMPLAINT**

an array of sophisticated services to famous professional athletes and others. Steinberg is widely recognized as the premier sports agent in this country, and was, for example, recently named one of the one hundred most influential persons in sports in the ENTIRE 20th century by *Sporting News*. For over twenty-five years, SMD and its predecessor entities have been America's premier sports agencies. SMD has had a significant impact upon American sports, especially professional football. SMD derives its revenues from the representation of professional athletes, college and professional sports organizations and others. From representing Steve Bartkowski in 1975 to Warren Moon, Troy Aikman, Mark Brunnell and other stars today, Steinberg and SMD have skillfully negotiated over one billion dollars in NFL contracts for clients. To obtain a competitive advantage over other sports agencies, SMD has invested large amounts of resources including, but not limited to, money, employee and partner time, in developing and compiling Proprietary Information including, but not limited to, formulae, techniques and methodologies which are neither known to the general public nor to other sports agencies and which provide a competitive advantage to SMD over its competitors. SMD's use of its Proprietary Information has allowed it to become, and maintain its status, until the execution of defendants' plans as described below, as, the premier sports management agency in America. By way of example, the Proprietary Information consists of the following:

A.     SMD has developed methods and analytical models that enable SMD's employees to creatively structure deals by determining limitations imposed upon a professional team by the applicable salary caps and similar restrictions.

B.     SMD has also developed statistical, financial and algebraic models to permit SMD's employees to more easily perform the analyses required in preparation for and during contract negotiations involving such restrictions.

C.     A portion of SMD's Proprietary Information consists of a significant amount of sensitive and confidential client information compiled over the years that not only permits SMD to provide continued excellent service to its existing client base but also serves as a mechanism for SMD to recruit new athletes as its clients.

10

COMPLAINT

1          20.     SMD takes reasonable steps to protect the Proprietary Information

2    including (a) restricting access to its facilities and computers, (b) restricting general access

3    by employees to Proprietary Information, and (c) requiring employees, as a condition of

4    employment, to review and agree to the terms of the SMD employee handbook and the

5    SMD Employee Proprietary Information and Inventions Agreement which, as detailed

6    below, require an employee to preserve and protect the confidentiality of the Proprietary

7    Information and to refrain from using, for the employee's benefit or others' benefit, SMD's

8    Proprietary Information. Furthermore, SMD's employees, through periodic staff meetings,

9    are reminded about their obligations with respect to SMD's Proprietary Information.

10   SMD's use of the Proprietary Information has allowed its revenues to continue to grow by

11   permitting SMD to achieve dramatic new levels of compensation for its clients. SMD's

12   success at establishing new levels of compensation also substantially enhances its ability to

13   attract and obtain new clients. Indeed, as of the beginning of 2001, SMD counted among

14   its clients more than eighty-six professional NFL athletes, including many of the league's

15   most talented and highest paid stars.

16   **DUNN'S EMPLOYMENT AT SMD**

17         21.     To fully serve his growing roster of superstar clients, Mr. Steinberg

18   brought several more lawyers into his firm. Jeffrey Moorad joined Mr. Steinberg in 1985

19   and later focused his prestigious practice on baseball clients such as Shawn Green and

20   Manny Ramirez. Defendant Dunn joined the firm in 1991 and was mentored in the art and

21   science of representing professional athletes by Mr. Steinberg. In 1996, Mr. Steinberg

22   invited Dunn, his friend of twenty years, to become his partner. In 1999, the firm name

23   was changed to Steinberg, Moorad & Dunn. Mr. Steinberg entrusted Dunn with his entire

24   football clientele and delegated to Dunn the responsibility for football contract negotiations,

25   player maintenance and any other issues pertaining to SMD's many football clients. In

26   furtherance of his employment and training SMD shared with Dunn all of SMD's

27   Proprietary Information. SMD assigned to Dunn responsibility for, among other things,

28   maintaining client relationships. As SMD's confidence in Dunn grew, Dunn took on

11

1    primary liaison responsibility for many SMD athlete clients. Furthermore, Dunn was

2    assigned supervisory responsibility over other SMD agents and employees, including SMD

3    employees Murphy, Branion and the other non-parties named herein. Among the duties

4    owed by Dunn to SMD was the duty to maintain the athlete/client relationships and the

5    employee relationships in SMD's best interests. As a result of extensive training provided

6    by Mr. Steinberg, and the delegation to Dunn of the serious responsibilities above

7    described, Dunn developed extensive and unique skills and became widely regarded as one

8    of the few superstar sports agents in America.

9          22.    On or about November 8, 1999, pursuant to an Agreement and Plan of

10   Merger with, among other parties, Assante, SMD, which was then doing business as

11   "Steinberg & Moorad, a professional law corporation," agreed to merge into a new Assante

12   subsidiary corporation, "Steinberg & Moorad, Inc." Pursuant to the merger transaction,

13   Assante acquired, among other things, the business and assets of SMD. Because the

14   professional sports agency business is a service business, an agency's key assets, in

15   addition to the company's existing and prospective clients, are the individuals who have

16   and develop relationships with professional sports figures. In large part due to this

17   consideration, as a condition to the merger, Assante insisted that Dunn, whose services

18   were considered valuable, personal and unique, enter into an Employment Agreement with

19   SMD, providing for a five-year term, and an Assignment Agreement, assigning all rights

20   under all of SMD-related player representation agreements to SMD. It was also agreed that

21   Dunn's well recognized name, and the goodwill associated therewith, would be added to

22   the Steinberg and Moorad moniker; hence SMD. These steps were taken to ensure that

23   Dunn was bound by contract for at least five years to remain with SMD and to not compete

24   against SMD - thereby helping to secure SMD's value as the premiere sports agency

25   business in the country for the foreseeable future. Dunn understood the importance of these

26   agreements to Assante and SMD, and promised to be bound by them, and in return, he

27   received the substantial compensation described below, including a $2 million signing

28   bonus. SMD is now informed and believes, and on that basis alleges, as explained below,

12

COMPLAINT

1    that Dunn never intended to honor his commitments under these agreements and was then

2    planning to leave SMD with Murphy and others to start a competing sports agency.

3            23.     Assante, in entering into the Agreement and Plan of Merger with

4    SMD, negotiated and bargained to acquire, among other things, SMD's then-existing client

5    base, as well as SMD's future client base. The parties to the merger agreement, as well as

6    the employees of SMD, including Dunn, understood the importance of both preserving

7    SMD's existing client base, and of expanding that client base in the future, and understood

8    and acknowledged Dunn's importance in attaining those twin objectives, as Dunn's

9    contracts with SMD demonstrate.

10           24.     On October 27, 1999, Dunn entered into an Employment Agreement

11   with Steinberg & Moorad, then a professional law corporation, agreeing that Dunn would

12   be employed by that entity prior to the effective date of the merger with Assante, which

13   was on or about November 8, 1999, and would thereafter be employed by Assante

14   subsidiary Steinberg, Moorad & Dunn, Inc., for a period of five years (subject to extension

15   under certain circumstances), binding Dunn to remain an employee of, and prohibiting him

16   from competing against, SMD through at least December 31, 2004.

17           25.     The Employment Agreement provided Dunn with lucrative

18   compensation — including a $2 million signing bonus — in exchange for his promise to

19   remain an employee of SMD through at least December 31, 2004. Specifically, the

20   Agreement provided, in pertinent part, as follows:

21           A.      "As an inducement to [Dunn] to agree to become employed by

22   [SMD] pursuant to this Agreement, immediately at or prior to the Merger Effective Time

23   [SMD] shall pay [Dunn] a lump sum cash incentive signing bonus in the amount of Two

24   Million Dollars ($2,000,000) . . . ."

25           B.      In addition to the cash incentive-signing bonus, the

26   Employment Agreement further provided for annual base salaries of $175,000 for the year

27   2000, $200,000 for the years 2001 through 2003, and $225,000 for the year 2004.

28           C.      The Employment Agreement further provided for a 1999 Profit

13

OCOLIB1\GG2\
240492.04
(55KC04!.DOC)

1    Sharing Bonus that could, under no circumstances, be less than $400,000 for the 1999

2    calendar year.

3                    D.      "As an additional inducement to [Dunn] to become employed

4    by [SMD] hereunder, during the second through fifth full calendar years of the term (i.e.,

5    the years 2001 through 2004), [SMD] shall pay [Dunn] an annual bonus . . . as follows: (1)

6    for the year 2001, the bonus shall be $250,000; (2) for the year 2002, the bonus shall be

7    $300,000; and (4) [sic] for the years 2003 and 2004, the bonus shall be $400,000."

8                    E.      The Employment Agreement further provided that Dunn "shall

9    hold the title of Executive Vice President" of Steinberg, Moorad & Dunn, Inc.

10                   F.      Pursuant to the Employment Agreement and the related Non-

11   Competition, Non-Disclosure and Non-Solicitation Agreement, "Steinberg & Moorad, a

12   professional law corporation," changed its name to "Steinberg, Moorad & Dunn, Inc., with

13   such name change to be effective as soon as reasonably possible" following the merger.

14           26.    In addition to the lucrative benefits conferred upon Dunn under the

15   Employment Agreement, he was given additional benefits under other related contracts.

16   "[A]s an additional inducement to the long-term employment of [Dunn] by [SMD]" the

17   shareholders of SMD entered into a Long-Term Incentive Agreement with Dunn on

18   November 8, 1999, providing for additional compensation to Dunn, worth potentially as

19   much as $4 million, in the form of a "Variable Payment Participation Bonus," designed to

20   confer additional compensation upon Dunn in addition to that compensation set forth

21   above. The Long-Term Incentive Agreement specifically provided that the additional

22   compensation provided thereunder "shall constitute incentive compensation paid on behalf

23   of [SMD] to induce [Dunn] to remain employed by [SMD] throughout the" five-year term

24   of the Employment Agreement. As part of these agreements, Assante also guaranteed

25   Dunn a minimum long term incentive of $2.5 million and obtained an option to extend the

26   term of Dunn's employment contract until December 31, 2007.

27           27.    Dunn also undertook numerous duties and responsibilities under his

28   agreements with SMD. Specifically, under the Employment Agreement, Dunn agreed as

OCOLIB1\GG2\
240492.04
(55KC041.DOC)

1     follows:

2                  A.     During the five-year term, the Agreement required Dunn to

3     "devote his best efforts and substantially all of his business time to the performance of such

4     duties related to [SMD]'s business activities as are reasonably assigned to him from time to

5     time by" SMD.

6                  B.     Regarding representation agreements that may have been

7     entered into with SMD clients in Dunn's own name, or pursuant to which Dunn may

8     receive any benefit, Dunn agreed that "(i) [Dunn] hereby waives all present and future

9     rights and privileges in and to such contracts in favor of [SMD] and hereby presently

10    assigns to [SMD] to the extent legally permitted all such present and future legal and

11    equitable rights and privileges, including all legal rights, rights to cash flow, and rights to

12    fees, and agrees not to encumber or assign any of such rights; (ii) the right to the economic

13    benefits of such contracts, including all consideration to be received in connection with

14    such contracts is hereby presently assigned by [Dunn] to [SMD] and any amounts paid to

15    [Dunn] shall be held in trust by [Dunn] for the benefit of [SMD]; . . . [and] (iv) upon receipt

16    by [Dunn], any such consideration [received by Dunn under such contracts] shall be

17    immediately remitted to [SMD]."

18                 C.     Upon termination of the Employment Agreement, Dunn further

19    agreed "to take all steps deemed necessary or desirable by [SMD] and Assante to

20    irrevocably assign such contracts" to SMD.

21                 D.     Dunn agreed to "regard and preserve as confidential all

22    Confidential Information that has been or will be obtained by or on behalf of [Dunn] in the

23    course of [Dunn] having been associated with the Assante Group . . . whether [Dunn]

24    possesses such information within [Dunn's] memory or in writing or in some other physical

25    form."

26                 E.     Dunn further agreed to "refrain from directly or indirectly

27    disclosing, divulging or disseminating" any confidential information obtained during his

28    employment with SMD.

15

OCOLIB1\GG2\
240492.04
(55KC04!.DOC)

F.      Dunn further agreed to "not, without prior written authorization from Assante, use for [Dunn's] own benefit or purposes, or for the benefit or purposes of any third party, any" confidential information obtained during Dunn's employment with SMD.

G.      Dunn further agreed that in the event of his termination, he would "not remove from the premises of any member of the Assante Group . . . any document, object or record containing or reflecting any Confidential Information, or any photocopy or other reproduction thereof," and agreed to "promptly deliver to [SMD] all documents, objects and records containing or reflecting, Confidential Information which are in" Dunn's possession or control, and Dunn acknowledged "that all such documents, objects and records containing or reflecting Confidential Information are the exclusive property of the Assante Group."

H.      Dunn further agreed that, during the term of his Employment Agreement (through at least December 31, 2004), and in the 24 months thereafter, he would not "carry on or be engaged in . . . any business which is the same as or similar to or conflict with or competitive with any Assante Group business."

I.      Finally, Dunn agreed to a series of restrictive, and explicit, negative covenants concerning solicitation of SMD's existing, prospective or future clients and employees, as follows:

> "[Dunn] shall not at any time during the [five-year] Term or during the [24-month] Post-Termination Non-Competition period, directly or indirectly, either individually or in partnership or jointly or in conjunction with any Person or Persons as principal, agent, shareholder or in any other manner whatsoever:
>
> approach or solicit a Client or Prospective Client, with the intent to provide services or products to such Client or Prospective Client, render services to a client or Prospective Client, or attempt to direct away from [SMD] or the Assante Group any Client or Prospective Client or any known associate or affiliate of any Client or Prospective Client, on his own behalf or on behalf of any other Person with respect to business of any nature or kind which is competing with the business of the company or any Assante Group Business, or be associated with or advise any Person soliciting or servicing any Client or

16

1    Prospective Client of [SMD] or the Assante Group whether or
     not [Dunn] served such Client or Prospective Client during the
2    continuance of his employment by [SMD];

3    induce or attempt to induce any individual employed or
     otherwise engaged by [SMD] or the Assante Group to terminate
4    his employment or engagement with [SMD] or such member of
     the Assante Group or hire any such employee;
5
     solicit from a Client or Prospective Client of [SMD] or the
6    Assante Group, or from any known associate of any Client or
     Prospective Client, any business of any nature or kind similar to
7    the business of [SMD]; or

8    solicit, employ or utilize, in any manner whatsoever, the
     services of any individuals employed or otherwise engaged by
9    [SMD] or the Assante Group."

10   28.    To ensure that Assante, through its merger with SMD, acquired all of

11   the value associated with SMD's existing client base, Dunn and SMD also entered into an

12   Assignment Agreement dated November 8, 1999. The Assignment Agreement assigned the

13   rights to all contracts with SMD clients irrevocably to SMD. Additionally, Dunn assigned

14   to SMD all rights to any contract or agreement with any client of SMD that arose out of or

15   related to his employment. Specifically:

16          A.     The Assignment Agreement provided that Dunn "absolutely

17   and irrevocably assigns and waives in favor of Steinberg & Moorad, Inc. . . . to the fullest

18   extent legally permitted, all present and future rights and privileges (legal and equitable) in

19   and to all client representation agreements with" all clients of SMD as of November 8,

20   1999, "including without limitation, all legal rights, rights to cash flow, and rights to fees."

21          B.     The Assignment Agreement further provides for the complete

22   and irrevocable assignment of all future rights and privileges to be derived from "any

23   contract or agreement with any Client of [SMD] or [Dunn] created from time to time which

24   arises out of or relates to [Dunn]'s employment by [SMD] and to which [Dunn] is a party

25   or beneficiary."

26          C.     To the extent Dunn might ever come to be in receipt or

27   possession of any proceeds derived from any of the contracts that are the subject of the

28   Assignment Agreement, Dunn further agreed that "any amounts paid to [Dunn] shall be

                                        17

1    held in trust by (Dunn] for the benefit of [SMD]."

2              D.    Dunn further agreed that he "has not assigned and will not

3    assign, all or any portion of the Contracts to any third party."

4              E.    Dunn further agreed that "[u]pon the termination of [Dunn]'s

5    employment with [SMD], [Dunn] agrees to take all steps deemed necessary or desirable by

6    Assante to irrevocably assign the Contracts to the extent possible . . . to [SMD] or an

7    individual designated by Assante."

8    **MURPHY'S EMPLOYMENT AT SMD.**

9              29.    Murphy was one of the SMD employees for whom Dunn was given

10   supervisory responsibilities. Before his employment at SMD, Murphy had been employed

11   by the Boston law firm of Ropes & Gray where, among other things, he had familiarity

12   with cases involving employee sponsored, targeted raids, the mis-use of proprietary

13   information and the breach of non-competition agreements. Ambitious and determined to

14   become a sports agent whose fame would eclipse that of Mr. Steinberg, Murphy sought

15   employment at SMD with the assistance of letters of recommendation from a Ropes &

16   Gray partner, non-party Douglas Meal ("Meal"), who was Murphy's mentor, and

17   Hunnewell. Hunnewell, by letter sent by facsimile transmission and through the United

18   States mail, recommended Murphy to Mr. Steinberg as "a man of his word." Murphy

19   thereafter received and accepted an offer of employment from SMD. Before accepting the

20   offer from SMD, Murphy confidentially consulted with Meal concerning his plans, and

21   concerning his obligations to SMD.

22             30.    Murphy commenced employment with SMD on May 3, 1999 and

23   signed SMD's Employee Handbook, acknowledging that his obligations as an employee

24   were therein set forth and agreeing to be governed by its contents. The Employee

25   Handbook provided a "best efforts" obligation for employees and also a reiteration of all

26   employees' obligations to safeguard confidential information and trade secrets. The

27   Employee Handbook also provided, and Murphy expressly acknowledged, that all

28   computer and other e-mail and data-processing equipment, including his SMD-supplied

18

1    laptop computer were SMD property subject to inspection without notice, and that

2    documents created or stored on SMD's electronic resources would not be considered

3    private or confidential.

4         31.   On or about July 8, 1999, Murphy entered into an Employee

5    Proprietary Information and Inventions Agreement with SMD. Although the agreement

6    had been sent to him for execution in April of 1999, Murphy deliberately delayed signing

7    the agreement until after commencing employment, so he could later claim that the

8    agreement lacked consideration and was, therefore, unenforceable. Murphy's Proprietary

9    Information and Inventions Agreement provided:

10         A.   During the term of his employment with SMD, Murphy agreed

11    that he "will hold in strictest confidence and will not disclose, [or] use … any of [SMD's]

12    Proprietary Information (defined below), except as such disclosure … may be required in

13    connection with my work" for SMD.

14         B.   Murphy also agreed and "assign[ed] to SMD any rights I have

15    or acquire in such Proprietary Information and recognize[d] that all Proprietary Information

16    shall be the sole property" of SMD and that SMD "shall be the sole owner of the trade…

17    secrets and all other rights" related to SMD's proprietary information.

18         C.   Murphy also agreed that he understood that SMD "has received

19    and in the future will receive from third parties confidential or proprietary information

20    ("Third Party Information") subject to a duty on [SMD's] part to maintain the

21    confidentiality of such information and to use it only for certain limited purposes" and

22    Murphy therefore promised that during the term of my [Employment] and thereafter, I will

23    hold Third Party Information in the strictest confidence and will not disclose (to anyone

24    other than [SMD] personnel who need to know such information in connection with their

25    work for [SMD]) or use, except in connection with my work for [SMD] Third Party

26    Information unless expressly authorized…."

27         D.   Murphy also agreed that he would "assist [SMD] in every

28    proper way to obtain and, from time to time, enforce …. Proprietary Rights relating to"

19

**COMPLAINT**

SMD's property.

E.      Murphy also agreed "that the names of addresses of the [SMD]'s clients, customers and contractors and all other confidential information relating to those clients, customers and contractors, including the identity, compensation, fee arrangements, buying habits and special needs, are provided in confidence and constitute trade secrets of [SMD] and the unauthorized use of disclosure of any of [SMD]'s trade secrets obtained by me during the term of my Relationship with [SMD] constitutes unfair competition. I promise and agree not to engage in any unfair competition with [SMD]."

F.      Murphy further agreed not to, for a period of three years following the termination of his relationship with SMD, "directly or indirectly make known to any person, firm or corporation the names or addresses of clients, customers, or contractors of [SMD] or any other information pertaining to them, including, but not limited to client compensation and fee arrangements or directly or indirectly solicit, induce, recruit or encourage any employee ... of [SMD] to terminate his/her relationship with [SMD] for any reason ... either for myself or for any other person or entity...."

G.      Murphy also promised not to, for a period of three years following the termination of his relationship with SMD, "solicit the business of any client, contractor, customer or licensor of [SMD] (other than on behalf of SMD]), or to solicit any licensee of [SMD's] products, services or marks, ...with respect to any business, products or services that are competitive to the products or services offered by [SMD]...."

H.      Murphy also agreed "that all client contractor and customers lists statistical and biographical information, products, materials, and any other source information developed by me during my Relationship with [SMD] are and shall remain the sole property of [SMD], and under no circumstances may be used in any way, retained sold or reproduced by any means by me, and I shall have no intellectual property rights, including but not limited to trade secrets, ... to said products and materials."

I.      Murphy also agreed that during the term of his employment with SMD, he would not "directly or indirectly, either as. ...consultant, employee,

20
**COMPLAINT**

employer agent, principal, shareholder officer ... or in any other individual or representative capacity ... engage, participate, or assist in the any business that offers or sells any services ... that are competitive with or conflict in any way with any services or products currently or potentially offered" by SMD.

J.    Murphy agreed that during the term of his employment with SMD, he would not "for his own account of any other person, willfully and intentionally interfere with the relationship of [SMD] (or any of its subsidiaries or affiliates) with any person who at any time during the time of my employment was an employee, ... other, customer" of SMD.

K.    Murphy also agreed not to "engage in competition with [SMD] at any time after the termination of my employment, while making use of [SMD]'s trade secrets or any Proprietary Information."

L.    Murphy also agreed that, upon leaving the employ of SMD, he would "deliver to SMD all drawings, photographs, charts, graphs, notebooks, memoranda, client, customer and every other lists computer disks, tapes or printouts, sound recordings, and other printed typewritten or handwritten documents, ... and any other material containing or disclosing any trade secrets or Firm Inventions, third party information, or Proprietary Information of [SMD]."

M.    Finally, Murphy further promised that SMD "shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief," in light of Murphy's express acknowledgement that his "services are personal and unique."

As described more fully below, when Murphy executed this agreement, he had no intention of fulfilling the promises therein contained.

32.    As the year 2000 commenced, Murphy was appointed as Vice President of Football Operations. He thereafter managed SMD's recruiting and supervised SMD's "rookie training." (Rookie training occurred after college stars have retained SMD's professional services. The players would then come to Newport Beach, California

21

OCOLIB1\GG2\
240492.04
(55KC041.DOC)

1    where SMD provided strength, speed and conditioning coaching and psychological

2    counseling to prepare the rookies for the all-important "NFL Combine" in late February.

3    The Combine is where NFL teams observe the rookies' workouts to decide who to select in

4    the (lucrative) early rounds of the NFL draft.)  Murphy also functioned as a "key member"

5    of the football negotiating team, helped "maintain" SMD's client relationships (together

6    with Dunn and Branion) and was SMD's Special Projects Coordinator.  He was also Mr.

7    Steinberg's "right hand man".  In furtherance of his employment and training and in

8    reliance on Murphy's above described promises, SMD shared with Murphy all of SMD's

9    Proprietary Information.

10   **BRANION'S EMPLOYMENT AT SMD**

11           33.     Branion was one of the SMD employees for whom Dunn was given

12   supervisory responsibility.  On or about August 29, 1997, Branion entered into an

13   Employee Proprietary Information and Inventions Agreement with SMD.  In consideration

14   for Murphy's employment with SMD, Murphy undertook numerous duties and

15   responsibilities.  Specifically, Branion agreed as follows:

16                   A.     During the term of his employment with SMD, Branion agreed

17   that he "will hold in strictest confidence and will not disclose, [or] use ... any of [SMD's]

18   Proprietary Information (defined below), except as such disclosure ... may be required in

19   connection with my work for" SMD.

20                   B.     Branion also agreed and "assign[ed] to SMD any rights I have

21   or acquire in such Proprietary Information and recognize[d] that all Proprietary Information

22   shall be the sole property" of SMD and that SMD "shall be the sole owner of the trade...

23   secrets and all other rights" related to SMD's proprietary information.

24                   C.     Branion also agreed that he understood that SMD "has received

25   and in the future will receive from third parties confidential or proprietary information

26   ("Third Party Information") subject to a duty on [SMD's] part to maintain the

27   confidentiality of such information and to use it only for certain limited purposes" and

28   Branion therefore promised that during the term of my [Employment] and thereafter, I will

22

**COMPLAINT**

1    hold Third Party Information in the strictest confidence and will not disclose (to anyone
2    other than [SMD] personnel who need to know such information in connection with their
3    work for [SMD]) or use, except in connection with my work for [SMD] Third Party
4    Information unless expressly authorized...."

5            D.    Branion also agreed that he would "assist [SMD] in every
6    proper way to obtain and, from time to time, enforce ... Proprietary Rights relating to"
7    SMD's property.

8            E.    Branion also agreed "that the names of addresses of the
9    [SMD]'s clients, customers and contractors and all other confidential information relating
10   to those clients, customers and contractors, including the identity, compensation, fee
11   arrangements, buying habits and special needs, are provided in confidence and constitute
12   trade secrets of [SMD] and the unauthorized use of disclosure of any of [SMD]'s trade
13   secrets obtained by me during the term of my Relationship with [SMD] constitutes unfair
14   competition. I promise and agree not to engage in any unfair competition with [SMD]."

15           F.    Branion further agreed not to, for a period of three years
16   following the termination of his relationship with SMD, "directly or indirectly make known
17   to any person, firm or corporation the names or addresses of clients, customers, or
18   contractors of [SMD] o r any other information pertaining to them, including, but not
19   limited to client compensation and fee arrangements or directly or indirectly solicit, induce,
20   recruit or encourage any employee ... of [SMD] to terminate his/her relationship with
21   [SMD] for any reason ... either for myself or for any other person or entity...."

22           G.    Branion also promised not to, for a period of three years
23   following the termination of his relationship with SMD, "solicit the business of any client,
24   contractor, customer or licensor of [SMD] (other than on behalf of SMD]), or to solicit any
25   licensee of [SMD's] products, services or marks, ...with respect to any business, products
26   or services that are competitive to the products or services offered by [SMD]...."

27           H.    Branion also agreed "that all client contractor and customers
28   lists statistical and biographical information, products, materials, and any other source

23

**COMPLAINT**

1   information developed by me during my Relationship with [SMD] are and shall remain the

2   sole property of [SMD], and under no circumstances may be used in any way, retained sold

3   or reproduced by any means by me, and I shall have no intellectual property rights,

4   including but not limited to trade secrets, … to said products and materials."

5          I.     Branion also agreed that during the term of his employment

6   with SMD, he would not "directly or indirectly, either as …. consultant, employee,

7   employer agent, principal, shareholder officer … or in any other individual or

8   representative capacity … engage, participate, or assist in the any business that offers or

9   sells any services … that are competitive with or conflict in any way with any services or

10   products currently or potentially offered" by SMD.

11         J.     Branion agreed that during the term of his employment with

12   SMD, he would not "for his own account of any other person, willfully and intentionally

13   interfere with the relationship of [SMD] (or any of its subsidiaries or affiliates) with any

14   person who at any time during the time of my employment was an employee, … other,

15   customer" of SMD.

16         K.     Branion also agreed not to "engage in competition with [SMD]

17   at any time after the termination of my employment, while making use of [SMD]'s trade

18   secrets or any Proprietary Information."

19         L.     Branion also agreed that, upon leaving the employ of SMD, he

20   would "deliver to SMD all drawings, photographs, charts, graphs, notebooks, memoranda,

21   client, customer and every other lists computer disks, tapes or printouts, sound recordings,

22   and other printed typewritten or handwritten documents, … and any other material

23   containing or disclosing any trade secrets or Firm Inventions, third party information, or

24   Proprietary Information of [SMD]."

25         M.     Finally, Branion further promised SMD "shall have the right to

26   enforce this Agreement and any of its provisions by injunction, specific performance or

27   other equitable relief," in light of Branion's express acknowledgement that his "service are

28   personal and unique."

24

**COMPLAINT**

1        34.    Branion also entered into also entered into an Assignment Agreement,

2    dated November 8, 1999. The Assignment Agreement assigned the rights to all contracts

3    related to his work at SMD irrevocably to SMD. Specifically:

4        A.    The Assignment Agreement provided that Branion "absolutely

5    and irrevocably assigns and waives in favor of Steinberg & Moorad, Inc. . . . to the fullest

6    extent legally permitted, all present and future rights and privileges (legal and equitable) in

7    and to all client representation agreements with" all clients of SMD as of November 8,

8    1999, "including without limitation, all legal rights, rights to cash flow, and rights to fees."

9        B.    The Assignment Agreement further provided for the complete

10    and irrevocable assignment of all future rights and privileges to be derived from "any

11    contract or agreement with any Client of [SMD] or [Branion] created from time to time

12    which arises out of or relates to [Branion]'s employment by [SMD] and to which [Branion]

13    is a party or beneficiary."

14        C.    To the extent Branion might ever come to be in receipt or

15    possession of any proceeds derived from any of the contracts that are the subject of the

16    Assignment Agreement, Branion further agreed that "any amounts paid to [Branion] shall

17    be held in trust by [Branion] for the benefit of [SMD]."

18        D.    Branion further agreed that he "has not assigned and will not

19    assign, all or any portion of the Contracts to any third party."

20        E.    Branion further agreed that "[u]pon the termination of

21    [Branion]'s employment with [SMD], [Branion] agrees to take all steps deemed necessary

22    or desirable by Assante to irrevocably assign the Contracts to the extent possible . . . to

23    [SMD] or an individual designated by Assante."

24    **WALLACE'S EMPLOYMENT AT SMD.**

25        35.    Wallace was one of the SMD employees for whom Dunn was given

26    supervisory responsibilities. Wallace commenced employment on July 14, 1997, and

27    signed SMD's Employee Handbook, acknowledging that his obligations as an employee

28    were therein set forth and agreeing to be governed by its contents. The Employee

1     Handbook provided a "best efforts" obligation for employees and also a reiteration of all

2     employees' obligations to safeguard confidential information and trade secrets. The

3     Employee Handbook also provided and Wallace expressly acknowledged - that all

4     computer and other e-mail and data-processing equipment - including his SMD-supplied

5     computer were firm property subject to inspection without notice, and that documents

6     created or stored on SMD's electronic resources would not be considered private or

7     confidential.

8            36.     On or about August 29, 1997, Wallace entered into an Employee

9     Proprietary Information and Inventions Agreement with SMD. In consideration for

10    Wallace's employment with SMD, Wallace made the same contractual promises as were

11    set forth in paragraph 31 A–M above regarding Murphy.

12    **MANTELLA'S EMPLOYMENT AT SMD.**

13           37.     Mantella was one of the SMD employees for whom Dunn was given

14    supervisory responsibilities. Mantella commenced employment and signed SMD's

15    Employee Handbook on March 3, 1998, acknowledging that his obligations as an employee

16    were therein set forth and agreeing to be governed by its contents. The Employee

17    Handbook provided a "best efforts" obligation for employees and also a reiteration of all

18    employees' obligations to safeguard confidential information and trade secrets. The

19    Handbook also provided and Mantella expressly acknowledged - that all computer and

20    other e-mail and data-processing equipment - including his SMD-supplied computer were

21    firm property subject to inspection without notice, and that documents created or stored on

22    SMD's electronic resources would not be considered private or confidential.

23           38.     On or about March 3, 1998, Mantella entered into an Employee

24    Proprietary Information and Inventions Agreement with SMD. In consideration for

25    Mantella's employment with SMD, Mantella made the same contractual promises as were

26    set forth in paragraph 31 A-M above regarding Murphy.

27    **BOHRNSTEDT'S EMPLOYMENT AT SMD.**

28           39.     Bohrnstedt was one of the SMD employees for whom Dunn was given

0COLJB1\GG2\
240492.04
(55KC041.DOC)

1    supervisory responsibilities. Bohrnstedt commenced employment on April 6, 2000, and, on

2    information and belief, signed SMD's Employee Handbook, acknowledging that her

3    obligations as an employee were therein set forth and agreeing to be governed by its

4    contents. The Employee Handbook provided a "best efforts" obligation for employees and

5    also a reiteration of all employees' obligations to safeguard confidential information and

6    trade secrets. The Handbook also provided and Bohrnstedt expressly acknowledged - that

7    all computer and other e-mail and data-processing equipment - including his SMD-supplied

8    laptop computer were SMD property subject to inspection without notice, and that

9    documents created or stored on SMD's electronic resources would not be considered

10   private or confidential.

11          40.    Upon information and belief, on or about April 6, 2000, Bohrnstedt

12   entered into an Employee Proprietary Information and Inventions Agreement with SMD.

13   In consideration for Bohrnstedt's employment with SMD, Bohrnstedt, on information and

14   belief, made the same contractual promises as were set forth in paragraph 31 A-M above

15   regarding Murphy.

16          41.    During late 2000 and early 2001, Messrs. Dunn, Murphy, Branion,

17   Wallace, Mantella and Ms. Bohrnstedt comprised virtually the entire professional staff

18   serving SMD's football clients.

19   **DEFENDANTS DUNN, CENTURION, HUNNEWELL, PEH, HOUSMAN, AND**
     **BOYZ, ACTING IN CONCERT WITH MURPHY, BRANION, WALLACE,**
20   **MANTELLA AND BOHRNSTEDT, CONCEIVE, JOIN AND/OR CARRY**
     **FORWARD A SCHEME TO DESTROY SMD.**
21

22          42.    As set forth in detail below, Dunn — acting in concert with

23   Hunnewell, Centurion, PEH, Housman, BOYZ and Non-Parties Murphy, Branion, Wallace,

24   Mantella and Bohrnstedt — formed a plan to resign, without notice, from SMD to form and

25   operate a competing sports management agency, along with fellow employees Murphy,

26   Branion and others. The scheme included an express plan to misappropriate SMD's

27   confidential client information, trade secrets and other proprietary and confidential

28   information, and to use such information and trade secrets to divert SMD's business to

27

1    Dunn and a new business venture, and in breach of Dunn's employment agreement, Dunn
2    and Branion's Assignment Agreements, Murphy, Branion, Wallace, Mantella and
3    Bohrnstedt's Proprietary Information and Employment Agreements and Dunn, Murphy,
4    Branion, Wallace, Mantella and Bohrnstedt's confidential relationships with SMD, duties
5    of loyalty to SMD and fiduciary duties to SMD. Pursuant to this scheme, Dunn, Murphy
6    and Branion actively solicited existing and prospective SMD clients — primarily NFL
7    football players — in or before about February 2001, and that Dunn, acting in concert with
8    Hunnewell, PEH, Housman, BOYZ and Non-Parties Murphy and Branion, formed a
9    Delaware corporation, "Athletes First, LLC," in or about January of 2001, as the enterprise
10   through which they would implement their plan. Critical to this scheme was Dunn and
11   Murphy, and their conspirators and agents, engaging in extortion, by planning and
12   threatening to expose to the public certain alleged salacious and/or misleading details of the
13   life of Mr. Steinberg so he, SMD, and Assante would refrain from enforcing SMD's rights
14   with respect to SMD's valuable Proprietary Information and by doing so give Dunn,
15   Murphy and Branion, and their conspirators and agents a property interest in SMD's
16   valuable Proprietary Information. The extortion scheme also involved an effort to "sell
17   back" to Assante for multiple millions of dollars the "football practice" of SMD that had
18   been misappropriated by Defendants' wrongful acts. This scheme to obtain and exploit
19   SMD's Proprietary Information was effected by use of the mails and/or wires, through
20   fraud perpetrated on SMD's clients, extortion, false advertising, unfair competition and
21   through the interstate transportation of stolen property.

22          43.    At or before the time of his joining SMD in May of 1999, Murphy
23   formed the opinion that Mr. Steinberg was well past the prime of his career. Knowing that
24   Mr. Steinberg had entrusted his entire football practice to Dunn, Murphy quickly
25   established a relationship with Dunn and schemed to avoid the binding effect of his
26   Employee Proprietary Information and Inventions Agreement. Almost immediately after
27   the formation of this relationship, Dunn and Murphy began discussing a concerted plan to
28   leave SMD to start their own sports agency.

28

OCOLIB1\GG2\
240492.04
(55KC041.DOC)

44.     Throughout the year 2000, the discussions between Dunn and Murphy to create their new sports agency intensified.  In July 2000, Dunn and Murphy met in Hawaii and Dunn "shared the firm's secrets," consisting of alleged salacious information about Steinberg and SMD, with Murphy.

45.     In September 2000, Murphy communicated with Hunnewell by telephone to discuss the formation of a specific plan to establish a competing firm in order to "crush" SMD and Mr. Steinberg.  Hunnewell counseled that a carefully conceived plan to crush Mr. Steinberg and SMD would have to be developed.  In the weeks and months that followed, Hunnewell, Murphy, Dunn and others formulated their plan to "crush" Mr. Steinberg, to drive him "insane," to steal away SMD's business, its clients, its Proprietary Information and its entire football practice, and then to blackmail Mr. Steinberg and SMD to not enforce their legal rights and remedies by expressly and repeatedly threatening to reveal salacious information about Mr. Steinberg, as well as SMD's General Counsel.

46.     In October of 2000, Murphy proposed that SMD specially hire his college roommate, as well as Jean Meissner, then an associate at the Ropes & Gray law firm.  SMD is informed and believes, and on that basis alleges, that Murphy sought to have SMD hire Meissner so she could assist Dunn, Murphy and Hunnewell with their plan to crush Mr. Steinberg and SMD.  Meissner later, in the spring of 2001, assisted the Defendants in arranging for and completing the financing for Athletes First from PEH, Housman and BOYZ.

47.     As part of his ongoing responsibilities as Vice President of Football Operations, and in November of 2000, Murphy participated in SMD's negotiations with its key rookie training and conditioning coach.  On or about December 1, 2000, and in furtherance of the plan, Dunn, Hunnewell and he had formulated, Murphy specially "edited" that coach's contract with SMD to permit the coach to more easily work for another competing agency in the ensuing months.

48.     As the year 2000 came to a close, Dunn ceased his heretofore normal

29

**COMPLAINT**

OCOLIB1\GG2\
240492.04
(55KC041.DOC)

1    year end efforts to collect commissions from SMD's football clients. At the same time,

2    Dunn, Murphy, Branion and others began spending extraordinary amounts of SMD money

3    – to enhance their personal relationships with SMD's clients – and to begin persuading such

4    clients to terminate SMD's services and move their business to their planned, new agency.

5         49.    On January 2, 2001, Murphy had a heated dispute with Mr. Steinberg

6    over SMD's (and Murphy's) failure to recruit a particular college athlete. In furtherance of

7    the co-conspirators' plan, Murphy began the process of accessing and misappropriating

8    SMD's Proprietary Information. Among the information involved was SMD's highly

9    confidential "Formulae for 2001 NFL Contracts."

10         50.    On or about January 17, 2001, Murphy continued his misappropriation

11    of SMD's Proprietary Information through the creation of a special list of SMD's rookie

12    clients that contained proprietary personal contact information.

13         51.    On or about January 18, 2001 Murphy, through telephone

14    conversations with Hunnewell and Dunn, discussed and defined their plans to crush Mr.

15    Steinberg and SMD. By return e-mail, Hunnewell summarized and confirmed those

16    discussions and described in detail the "plan" to "crush" Mr. Steinberg and SMD. This

17    e-mail, which Hunnewell entitled the "Opportunity of a Lifetime" set forth the status of the

18    co-conspirators' efforts and intentions as of January 18th. It noted that Dunn was "bringing

19    a client base" and that financing, existing clients and other SMD personnel were all lined

20    up to execute Dunn, Murphy and Hunnewell's plan to destroy SMD. "You have all the

21    pieces to the puzzle. Put it together first, then make your move," Hunnewell wrote. "Make

22    sure everything is in place and the new firm is ready to function fully the day you open the

23    doors."

24         52.    Dunn and Murphy were both lawyers. They knew that their plan was

25    unlawful and involved the intentional violation of SMD's contractual and property rights.

26    They recognized the need to develop a strategy to prevent SMD from promptly asserting

27    these rights. On January 21, 2001 Murphy generated a memorandum on SMD's computer

28    system that further outlined the co-conspirators' intentions. This memo was copied to

30

COMPLAINT

OCOLIB1\GG2\
240492.04
(55KC04!.DOC)

1    Dunn and mailed, e-mailed or faxed to Murphy's "mentor," Meal, and set forth a plan for

2    "our endeavor." The memorandum states:

3            A.    That Mr. Steinberg has a fine reputation as the "world's best

4    sports agent" and that SMD has "the best collection of clients."

5            B.    That Murphy and Dunn know a number of salacious secrets

6    concerning Mr. Steinberg's private life and such knowledge "could prove useful in

7    negotiating a settlement."

8            C.    The memo suggests that Dunn, Murphy and others had already

9    solicited SMD's clients to leave and proudly predicts the consequences: "The truth is, this

10    whole 'mutiny' could destroy his (Steinberg's) career . . . . The simple fact that over forty

11    of his clients — including Bledsoe — *are* leaving him will destroy his reputation."

12            D.    The memo also identifies SMD's General Counsel as "our

13    number one problem," because of his perceived diligence in protecting SMD's legal rights,

14    but notes that the co-conspirators possess salacious information about him ". . . that is

15    heavy ammunition if it ever becomes necessary."

16        53.    The Murphy to Meal and Dunn memorandum also sets forth a detailed

17    gameplan to effect the wholesale theft of SMD's Proprietary Information. It describes

18    "items that we need from the office," including "all relevant salary information," "copies of

19    all files we are taking with us," "Incriminating Evidence Against Leigh and SMD" and

20    "Rolodexes, Client Contracts."

21        54.    At this precise time, Murphy and Dunn have admitted discussing their

22    plan to leave SMD and to form Athletes First. In furtherance of these plans, Murphy

23    agreed to perform a financial analysis to determine how much money they would make

24    from taking SMD's Proprietary Information and converting SMD's clients. On January 21,

25    2001, Murphy created an SMD client list entitled "January Budget." This spreadsheet

26    listed most of SMD's football clients, their contract status and their estimated five-year earn

27    outs, together with anticipated annual commissions to Athletes First totaling over $3

28    million.

OCOLIB1\GG2\
240492.04
(55KC041.DOC)

55.     On February 2, 2001, in furtherance of their plan for theft and extortion, Murphy again accessed and used SMD's Proprietary Information by creating a document entitled "Projections" which listed SMD's clients and their projected signing bonuses and resulting commissions. Attached to Projections was a matrix for monitoring and keeping track of their solicitation of SMD's clients. Later that week, while Murphy and Dunn were spending thousands of dollars of SMD's money to recruit SMD's clients for Athletes First at a luxury hotel in Hawaii, Murphy and Dunn created another schedule— "Money"—that set forth similar SMD Proprietary Information and also contained a solicitation matrix. In telephone conversations during this time, Murphy used the "Money" document to provide SMD financial information to Hunnewell, who was handling financial issues for Athletes First and arranging financing for this illegal enterprise. Murphy also disclosed to Hunnewell certain SMD cost data for use in setting up the financial pro-formas for Athletes First and its investors.

56.     SMD is informed and believes, and on that basis alleges, that Hunnewell and Centurian thereafter used and disclosed such information to defendants PEH, Housman and BOYZ for the purpose of obtaining funding to enable Dunn, Murphy and the others to carry out their unlawful scheme. Hunnewell and Centurion used the wires and/or mails in this effort.

57.     During the week of February 5, 2001, Murphy, Dunn and Hunnewell reduced their concerted plan to writing, and appropriately titled it "Gameplan," in two editions, plus a "To Do" list. It is apparent from the "Gameplan" that Meal and perhaps others at Ropes & Gray participated in the creation and execution of the plan, apparently in exchange for some "equity for legal services." The Gameplan was created by Murphy on his SMD computer and was updated during the second week of February to show the progress achieved on the co-conspirators' plan. It lists a detailed scheme by certain Defendants and non-parties Murphy, Branion, Wallace, Mantella and Bohrnstedt to steal SMD's Proprietary Information, steal SMD's clients and "gather" salacious information to blackmail Mr. Steinberg, SMD and Assante — all in the manner prescribed in the

32

1    January 21st Murphy to Meal and Dunn Memorandum.

2    **Defendants Execute Their Plan to Blackmail Mr. Steinberg, SMD and Assante and**
3    **Prevent Prompt Legal Action**

4           58.    After the end of the business day on February 16, 2001, Dunn, Murphy

5    and Bohrnstedt submitted letters of resignation without notice to SMD. Shortly thereafter,

6    Mantella and Wallace did the same. In furtherance of the Defendants' plan, these

7    individuals misappropriated a substantial amount of written SMD Proprietary Information,

8    including but not limited to the following:

9                  A.    the "Money" spreadsheet "with key notes on every client";

10                  B.    telephone logs of communications with SMD clients;

11                  C.    records of client communications with SMD clients for the

12    years 2000 and 2001;

13                  D.    documents relating to recruiting, contract analysis and

14    maintenance for the years 2000 and 2001;

15                  E.    NFL Draft Analyses and Reports;

16                  F.    Client Rolodex and Employee List;

17                  G.    Key Club Compilations;

18                  H.    Salacious and "Incriminating Evidence" concerning

19    Mr. Steinberg;

20                  I.    SMD's proprietary recruiting "packets";

21                  J.    SMD formulae for salary cap negotiations; and

22                  K.    SMD's client rosters.

23    SMD did not grant permission to Dunn, Murphy Branion, Carmen Wallace, Domenic

24    Mantella and Erin Bohrnstedt to remove this material from SMD's offices.

25           59.    Before and after February 16, 2001, Dunn, Murphy and Branion, in

26    furtherance of Defendants' scheme, actively recruited and solicited many of the players

27    who were existing SMD clients, and whose names, contract terms and other information

28    appeared in the SMD Proprietary Information, to terminate their existing relationships with

1    SMD and to retain Dunn, Murphy and Branion and their new competing sports
2    management business Athletes First, as their agent.  In the process of such recruiting and
3    soliciting, Dunn, Murphy, Branion and others made false, misleading and derogatory
4    representations concerning Mr. Steinberg and SMD to persuade SMD clients to terminate
5    the services of SMD and Mr. Steinberg.  In furtherance of Defendants' plan, Dunn, Murphy
6    and Branion also solicited SMD's key employees, convincing some of them to resign and
7    go to work for Athletes First.

8         60.    Dunn, Murphy and Branion's solicitation efforts have been successful
9    to this point.  As to existing clients, Dunn, or those acting in concert with him, have
10   persuaded well over 50% of SMD's NFL clients to terminate their contracts with SMD and
11   sign agreements with Athletes First.  These terminations were induced by Dunn, Murphy
12   and Branion and others and include such superstars as Drew Bledsoe, Corey Dillon, Darren
13   Woodson, Jevon Kearse, Derrick Rodgers, Reggie McGrew and Amani Toomer.  These
14   SMD clients have entered into new contractual relationships with Dunn, Murphy, Branion
15   and Athletes First, appointing Dunn and Branion as agents employed by Athletes First to
16   represent them in future NFL-related negotiations.  Other athletes have left SMD, as a
17   result of Defendants' actions, to hire third parties to act as their player representatives in the
18   future.

19        61.    SMD had successfully recruited a number of new NFL "Rookie"
20   clients, and reasonably anticipated that all of these players would generate substantial
21   revenue to SMD from the negotiation of player contracts for the 2001 NFL football season
22   and beyond.  SMD incurred significant expenses and committed substantial human
23   resources in recruiting and training these clients.  SMD is informed and believes, and based
24   thereon alleges, that Dunn, Murphy, Branion and others timed their departure from SMD so
25   that SMD incurred all of the expenses involved in recruiting and training these rookie
26   clients and Defendants, through their wrongful acts, obtained the revenue for Athletes First.

27        62.    SMD is informed and believes, and based thereon alleges, that
28   Defendants have used SMD's Proprietary Information in the course of their wrongful

34
COMPLAINT

1  solicitation of these SMD clients, prospective clients and SMD employees.

2  63.     In furtherance of Defendants' "Gameplan" (as memorialized in the

3  January 21st Memorandum), on February 18, 2001, Murphy telephoned Anita Wortzman,

4  Assante's Corporate Counsel at her home in Winnipeg, Canada. In that telephonic

5  communication, Murphy made threats to expose to the press and to existing and potential

6  clients of SMD specific salacious and negative information about Mr. Steinberg if SMD

7  attempted to enforce its written contracts with Dunn, Murphy and Branion and the other

8  departing SMD employees. When Wortzman indicated that such conduct constituted

9  blackmail, Murphy made no response. SMD is informed and believes, and on that basis

10 alleges, that Meal – who received the January 21st Memorandum detailing the "Gameplan"

11 and describing "our endeavor" to threaten the use of secret, salacious information against

12 Mr. Steinberg to drive him "insane" and to achieve a negotiated settlement — also

13 participated in this February 18th call to Ms. Wortzman.

14 64.     In furtherance of Defendants' "Gameplan" and "our endeavor,"

15 Murphy thereafter telephoned Martin Weinberg, Assante's Chief Executive Officer. In

16 those discussions, Murphy made threats to expose to the press and existing and potential

17 clients of SMD salacious information about Mr. Steinberg if Assante or SMD attempted to

18 enforce its written contracts with Dunn, Murphy and Branion and the other departing SMD

19 employees. Dunn described in detail the salacious information that Murphy threatened to

20 reveal. Murphy also indicated that he, Dunn and Branion might sell back Assante's

21 football business to it at a substantial premium and Assante, by doing so, could prevent the

22 dissemination of the salacious material about Mr. Steinberg and SMD.

23 65.     On Monday, February 19, 2001, in telephone conferences with Ms.

24 Wortzman and Mr. Weinberg, Murphy restated his prior threats to expose to the press and

25 existing and potential clients of SMD salacious information about Mr. Steinberg if SMD

26 and Assante attempted to enforce their legal rights. During that conversation, Murphy

27 further stated that Dunn, Murphy and Branion had actively recruited and solicited many of

28 SMD's clients. As to existing clients, Mr. Murphy stated that, given such recruitment and

35

OCOLIB1\GG2\
240492.04
(55KC041.DOC)

1    solicitation, he believed that 70 to 80 percent of SMD's existing NFL clients had

2    terminated or would terminate their relationships with SMD and enter into representation

3    agreements with members of Athletes First. On or about February 24, 2001 Murphy sent

4    via the wires a memorandum addressed to Ms. Wortzman and Mr. Weinberg, wherein

5    Murphy stated that "[i]n terms of clients, you must know that contrary to Leigh's

6    [Steinberg] thoughts, we have commitments from a large majority of the clients and have

7    not contacted several others who would certainly commit."

8         66.    On or about February 20, 2001, and as a result of the aforementioned

9    blackmail, Murphy's February 24th memorandum characterized forward-looking

10   relationship of the parties as a "joint venture." In the face of these threats, SMD/Assante

11   agreed to enter into a "stand-still" agreement and to commence negotiations regarding the

12   possible future re-employment of the departed SMD employees, at greatly increased

13   compensation.

14        67.    Between approximately February 23, 2001 and late May, 2001,

15   SMD/Assante pursued extensive negotiations with Dunn, Murphy and Branion to

16   restructure existing financial and administrative relationships with SMD/Assante. As part

17   of those discussions, an Assante press release was eventually prepared, initialed and

18   approved by Mr. Dunn referencing Mr. Dunn's new position as a "Director of Football".

19   That press release, dated March 5, 2001 and titled "ASSANTE INITIATES BRANDING

20   OF SPORTS REPRESENTATION FIRMS", was provided to the press and contained the

21   following quote from Dunn:

22        "Leigh [Steinberg] has been my mentor throughout my professional
          career. His vision for a fully integrated sports representation firm that
23        provides the best of services to its clients has become a reality. I am
          thrilled to be part of this dynamic team."
24

25        68.    During this period of negotiation Dunn promised that he would

26   continue to act on SMD's behalf and in SMD's best interests while the parties worked to

27   resolve their disputes. Specifically, Dunn agreed that he would continue to service SMD's

28   clients and prospective clients, and that all of his activities would be for the benefit of

36

COMPLAINT

1  SMD, and not himself personally. Pursuant to this agreement, Dunn continued to service

2  existing SMD clients, and purportedly continued to assist in recruiting prospective clients

3  for SMD.

4                  69.     On March 8, 2001, Ms. Wortzman faxed a letter to Mr. Dunn

5  regarding the parties' negotiations regarding proposed changes to the employment

6  agreements of Dunn, Murphy and Branion which provided in pertinent part:

7         "Following your resignation, we agreed that you would be reinstated
       and that you would continue to service SMD's clients and prospective

8         clients while we negotiated these changes to your contract. We agreed
       to this with the express intent and understanding that all of your

9         activities would be for the benefit of SMD, and not yourself
       personally. The purpose of this letter is to reiterate our position that

10        you are authorized to deal with SMD's football clients only on behalf
       of and for the benefit of SMD. Any conduct by you which is contrary

11        to the best interests of SMD is not excused by reason of the fact that
       we are currently engaged in contract negotiations with you. If these

12        discussions do not lead to an amicable resolution of the matter, we
       would hold you personally liable for the full extent of any damage that

13        you have caused SMD, and we would seek all available judicial
       remedies, including injunctive relief."

14

15                 70.     In response to this letter, Dunn's counsel immediately sent a letter via

16 the United States mail to reiterate Defendants' extortion plan by stating: "In the event that

17 this dispute is litigated, I believe that information that is embarrassing to both SMD and

18 Assante will be revealed during the course of discovery and will undoubtedly have a

19 negative effect on SMD's relationship with existing clients." The blackmail continued.

20                 71.     In response to these threats, SMD/Assante refrained from taking legal

21 action and continued to pursue a quiet settlement. There were exchanges of detailed term

22 sheets, employment proposals, and extensive correspondence, as well as face-to-face

23 meetings in Los Angeles, Newport Beach and Winnipeg, Canada. Murphy, Dunn and

24 Meal – the author and recipients of the January 21st memorandum – participated in most of

25 these communications. On April 2, 2001, Ms. Wortzman received a letter from Dunn's

26 counsel stating, in pertinent part: "During the past few weeks, the parties certainly have

27 engaged in detailed discussions and have exchanged various drafts of the proposed contract

28 that should pave the way for the rescission of Dunn's resignation." For example, along

37

1    with proposals from Mr. Dunn suggesting multi-million dollar increases in his

2    compensation, SMD and Assante received written compensation proposals by facsimile

3    transmission from Murphy dated May 2, 2001 and Branion dated May 3, 2001. These

4    proposals also suggest greatly increased payments to them. Under threat of blackmail

5    SMD/Assante agreed to these extortionate demands, but such agreement was met with still

6    further demands.

7        72.    While being blackmailed by Dunn, Murphy, Branion and others, SMD

8    was also defrauded into believing Dunn, Murphy and Branion were negotiating with SMD

9    and Assante in good faith regarding a resolution of all disputes between the parties.

10   However, SMD is informed and believes, and on that basis alleges, that Dunn, Murphy and

11   Branion's participation in this process was a ruse designed to create opportunities for these

12   individuals to further solicit SMD's clients and employees and to secure additional funding

13   for the operation of Athletes First. Specifically, during, the course of the parties' settlement

14   negotiations, Dunn, Murphy and Branion, and those acting in concert with them, used false

15   and misleading representations to NFL clients of SMD to induce them to sign letters

16   purportedly terminating their existing relationships with SMD; Dunn, Murphy, Branion and

17   Athletes First represented to third parties that they represented these athlete clients,

18   notwithstanding the fact that they were, and by virtue of contractual assignment are,

19   presently under contract with SMD; and, upon information and belief, Dunn encouraged

20   existing athlete clients of SMD not to make payments of fees that were owed to SMD under

21   those athletes' contracts with SMD. Due to the overreaching and ever-changing demands

22   made by Dunn, Murphy and Branion, SMD, Assante, Mr. Steinberg and Mr. Moorad

23   finally decided that they would not longer be victimized by Defendants' extortion.

24       73.    On May 29, 2001, SMD filed a complaint in the Superior Court of the

25   State of California in and for the County of Orange against Murphy seeking monetary

26   damages and injunctive relief.

27       74.    On May 29, 2001, SMD filed a complaint in the Superior Court of the

28   State of California in and for the County of Los Angeles against Dunn and Athletes First

38

**COMPLAINT**

OCOLIB1\GG2\
240492.04
(55KC04!.DOC)

1    seeking monetary damages and injunctive relief.  SMD filed motions for injunctive relief

2    several days later.

3        75.    On June 7, 2001, Dunn's counsel notified SMD that he had a

4    substantial number of SMD documents that had been in the possession of Athletes First

5    personnel.  Counsel's letter included an "Inventory List of SMD Documents In the

6    Possession of Athletes First and/or its Employees."  None of these documents had been

7    voluntarily provided to Athletes First.  SMD thereafter demanded the return of all of its

8    documents, and they were returned in July.

9        76.    In or about June of 2001, computer forensic specialists hired by

10   SMD's counsel discovered the "Opportunity of a Lifetime" e-mail, the Murphy to Meal and

11   Dunn Memorandum and the "Gameplan" documents on the computer assigned to Murphy

12   while he was employed at SMD.  This discovery of critical documents was not made until

13   after the original lawsuit against Dunn, Murphy and Athletes First was filed and after SMD

14   had submitted its motions for a preliminary injunctive relief.

15       77.    In early July, after the above-described motions for preliminary

16   injunctions had been filed, SMD retained new counsel in the firm of Brobeck, Phleger &

17   Harrison LLP.

18       78.    In or about June, Dunn and Athletes First began maintaining a website

19   located at "AthletesFirst.net".  In this website, Dunn and Athletes First, in furtherance of

20   their wrongful conduct alleged herein, commercially advertised by describing their

21   services, list of charities they support, list of clients, and other purported factual

22   information.  The Athletes First website contains false and misleading information and is

23   being used to further solicit SMD clients to Athletes First.

24       79.    On July 3, 2001, SMD's new counsel wrote a letter to Andrew Kim

25   and Douglas Butz, then counsel to Dunn, Murphy and Athletes First, asking them to remind

26   Dunn and Murphy of their on-going fiduciary and confidentiality obligations under their

27   respective Employment Agreement and Proprietary Information and Inventions Agreement.

28   SMD's counsel specifically noted that "Those agreements specifically prohibit the

39

**COMPLAINT**

1  unauthorized disclosure or use of SMD's confidential information. Confidential

2  information includes information about any alleged problems or deficiencies concerning

3  SMD's personnel and/or claimed irregularities in the methods of manner in which SMD

4  provides services to its clients. Under California law, disclosure of such information

5  learned in the course of employment to the detriment of a former employer constitutes

6  misappropriation of trade secrets--in addition to a clear breach of contract and unfair

7  competition. The further publication and misuse of SMD's trade secrets would subject

8  Messrs. Dunn and Murphy to civil and criminal liability under Cal. Civ. Code Section 3426

9  and Cal. Penal Code Section 499c." The Murphy to Meal and Dunn Memorandum had

10  noted that SMD's main competitor could and would use the therein described negative and

11  salacious information about Mr. Steinberg to destroy SMD's business, which, among other

12  things, established the trade secret value of the information.

13      80.     On July 13, 2001, SMD's counsel wrote to counsel for Dunn: "I am

14  advised the you have made a number of false, derogatory and/or defamatory statements to

15  the media concerning Assante Corp., SMD and certain of their principals. These

16  regrettable and widely-disseminated statements appear to have been made in furtherance of

17  a conspiracy to intimidate Assante and SMD into not enforcing their legal rights against the

18  Defendants in this matter. I must remind you of the precise limitations on the propriety and

19  legality of such statements, as embodied in section 47 of the Civil Code and Rule 5-120 of

20  the State Bar Rules of Professional Conduct. I further remind you that confidential

21  information about my clients learned by Mr. Dunn comprise trade secrets that may not be

22  lawfully disclosed by him or his counsel."

23      81.     On or about July 12, 2001, in continuing pursuit of Defendants'

24  extortion plan, Dunn sent a letter using the wires to Assante's Chief Executive Officer,

25  Martin Weinberg, attaching a proposal relating to discovery proceedings in litigation

26  against Dunn. In providing this proposal, Dunn threatened again to divulge certain

27  information about Mr. Steinberg and SMD by stating: "This is one last attempt to avoid

28  putting in the public arena the issues we have discussed regarding SMD."

40

1          82.     On or about July 15, 2001 in execution of their extortion scheme

2    defendants published certain irrelevant but inflammatory information about Mr. Steinberg

3    in connection with the filing of their declarations in response to SMD's motion for a

4    preliminary injunction against Dunn and Athletes First. Specific salacious information was

5    intentionally and broadly republished by agreement between Dunn, Murphy, Branion,

6    Bohrnstedt, Wallace and Athletes First in cooperation with PEH in order to carry out the

7    plan to "crush" Mr. Steinberg and SMD and thereby increase the competitive position of

8    Athletes First and the value of Defendants' various investments in Athletes First.

9          83.     On or about Friday, July 13, 2001, after a hearing in the Los Angeles

10   Superior Court regarding a discovery dispute between some of the parties in this action,

11   SMD's Of Counsel had a discussion with David Dunn's sister, Beth Dunn, of the law firm

12   of Butz Dunn DeSantis & Bingham, counsel for Dunn. During that conversation, Ms.

13   Dunn advised SMD's Of Counsel that in the course of defending against SMD's claims,

14   Dunn, Murphy and Branion would additional disclose additional, negative and salacious

15   information about Mr. Steinberg.

16         84.     In or about late July, 2001, Ms. Dunn met with the wife of Mr.

17   Steinberg and repeated Defendants' threat that in the course of defending against SMD's

18   claims, Dunn, Murphy and Branion would disclose negative and salacious information

19   about Mr. Steinberg. Counsel for SMD was not notified in advance of Ms. Dunn's direct

20   communication to the wife of their client.

21                          **FIRST CLAIM FOR RELIEF**
                            (Violation of 18 U.S.C. §1962 (c))
22

23         85.     SMD realleges, and incorporate herein by this reference paragraphs 1

24   through 84, inclusive, as though fully set forth herein as constituting and describing

25   Defendants' schemes and artifices to misappropriate SMD's Proprietary Information, and

26   to defraud and obtain money and property by means of extortion, grand theft, fraudulent

27   pretenses, representations and promises, and to otherwise injure SMD, Assante, Mr.

28   Steinberg, Mr. Moorad, and SMD's professional athlete clients.

                                             41
                                        **COMPLAINT**

1        86.    SMD is informed and believes, and on that basis alleges that Athletes

2    First is a corporation formed under the laws of the State of Delaware and is an "enterprise"

3    within the meaning of 18 U.S.C. § 1961(4), whose activities affect interstate and foreign

4    commerce. Defendants Dunn, Hunnewell and Housman are individuals and Defendants

5    Centurion, PEH and BOYZ are persons within the meaning of 18 U.S.C. § 1961(3). Dunn

6    was associated with, participated in and controlled the affairs of the enterprise, by, among

7    other things, planning its creation, owning a controlling share of its stock and serving as its

8    Chief Executive Officer. Hunnewell was associated with, participated in and controlled the

9    affairs of the enterprise by planning its creation, managing its financial interests and

10   managing its strategic direction. Housman and BOYZ were associated with, participated in

11   and controlled the affairs of the enterprise by funding its existence and owning a substantial

12   equity interest therein. PEH was associated with, participated in and controlled the affairs

13   of the enterprise by funding its existence, owning a substantial equity interest therein and

14   directing a portion of its public relations.

15       In the alternative,

16       87.    SMD is informed and believes, and on that basis alleges that SMD's

17   football operations was an "enterprise" within the meaning of 18 U.S.C. § 1961(4) whose

18   activities affected interstate commerce. This association in fact had an ongoing, informal

19   organization which functioned as a continuing unit for a common purpose. This enterprise

20   had a separate structure and objective apart from Defendants' pattern of racketeering.

21   Dunn is a "person" within the meaning of 18 U.S.C. § 1961(3). Dunn was associated with

22   and helped to conduct the affairs of the enterprise by directing, assisting, employing,

23   managing and/or funding its actions.

24       In the alternative,

25       88.    SMD is informed and believes, and on that basis alleges that Murphy,

26   Hunnewell and Meal were an "enterprise" within the meaning of 18 U.S.C. § 1961(4)

27   whose activities affected interstate commerce. This association in fact had an ongoing,

28   informal organization which functioned as a continuing unit for a common purpose. This

OCOLIB1\GG2\
240492.04
(55KC04!.DOC)

1    enterprise had a separate structure and objective apart from Defendants' pattern of

2    racketeering.  Dunn, Athletes First, Centurion, Housman, BOYZ and PEH are each

3    "persons" within the meaning of 18 U.S.C. § 1961(3).  Dunn, Athletes First, Centurion,

4    Housman, BOYZ and PEH were associated with and helped to conduct the affairs of the

5    enterprise by directing, assisting, employing, managing and/or funding its actions.

6              89.    Beginning at least as early as October 1998 and continuing to the

7    present, in furtherance of and for the purpose of executing the Defendants' above-described

8    schemes and artifices to misappropriate SMD's Proprietary Information, and to defraud and

9    obtain money and property by means of extortion, grand theft, fraudulent pretenses,

10   representations and promises, Defendants, in the Central District of California and

11   elsewhere, on numerous occasions used and caused to be used mail depositories of the

12   United States Postal Service by both placing and causing to be placed letters and other

13   mailable matter in the depositories and by removing and causing to be removed letters and

14   other mailable matter from the depositories.  Each such use of the mails in connection with

15   schemes and artifices to misappropriate SMD's Proprietary Information, and to defraud and

16   obtain money and property by means of extortion, grand theft, fraudulent pretenses,

17   representations and promises constitutes a separate and distinct violation of 18 U.S.C.

18   § 1341.

19             90.    Beginning at least as early as October 1998 and continuing to the

20   present in furtherance of and for the purpose of executing the above-described Defendants'

21   schemes and artifices to misappropriate SMD's Proprietary Information, and to defraud and

22   obtain money and property by means of extortion, grand theft, fraudulent pretenses,

23   representations and promises, Defendants, in the Central District of California and

24   elsewhere, on numerous occasions used and caused to be used wire communications in

25   interstate and foreign commerce, by both making and causing to be made wire

26   communications.  Each such use of a wire communications in connection with the above-

27   described schemes and artifices to defraud and obtain money and property by means of

28   extortion, grand theft, fraudulent pretenses, representations and promises.

OCOLIB1\GG2\
240492.04
(55KC041.DOC)

1           91.    Beginning at least in January of 2001 and continuing until the present

2    in furtherance of and for the purpose of executing the above-described Defendants'

3    schemes and artifices to misappropriate SMD's Proprietary Information, and to defraud and

4    obtain money and property by means of extortion, grand theft, fraudulent pretenses,

5    representations and promises, Defendants in the Central District of California and

6    elsewhere, did knowingly and willfully transport in interstate commerce, goods (in the form

7    of SMD's Proprietary Information) with a value of more than $5000, knowing that such

8    goods had been stolen and procured by fraud.  Each such act constitutes a separate and

9    distinct violation of 18 U.S.C. § 2314.

10           92.    Beginning at least in February of 2001 and continuing until the present

11    in furtherance of and for the purpose of executing the above-described Defendants'

12    schemes and artifices to misappropriate SMD's Proprietary Information, and to defraud and

13    obtain money and property by means of extortion, grand theft, fraudulent pretenses,

14    representations and promises, Defendants in the Central District of California and

15    elsewhere, did knowingly and willfully receive, possess, conceal of goods with a value of

16    more than $5000, knowing that such goods had been stolen and procured by fraud.  Each

17    such act constitutes a separate and distinct violation of 18 U.S.C. § 2315.

18           93.    Beginning in at least October 1998 and continuing until the present in

19    furtherance of and for the purpose of executing Defendants' schemes and artifices to

20    misappropriate SMD's Proprietary Information, and to defraud and obtain money and

21    property by means of extortion, grand theft, fraudulent pretenses, representations and

22    promises, Defendants in the Central District of California and elsewhere, by various acts

23    did knowingly and willingly induce SMD, Assante and Mr. Steinberg to part with property

24    in the form of money and SMD's Proprietary Information through extortionate means and

25    in doing so Defendants adversely affected interstate commerce.  Each such act constitutes a

26    separate and distinct violation of 18 U.S.C. § 1951.

27           94.    Beginning in at least July of 1999 and continuing until the present in

28    furtherance of and for the purpose of executing Defendants' schemes and artifices to

1  misappropriate SMD's Proprietary Information, and to defraud and obtain money and

2  property by means of extortion, grand theft, fraudulent pretenses, representations and

3  promises, Defendants in the Central District of California and elsewhere, by various acts

4  did knowingly and willingly seek to obtain the property of SMD, in the form of money and

5  SMD's Proprietary Information, through the wrongful use of fear through the use of threats

6  to expose certain negative and salacious information about Mr. Steinberg and SMD.

7        95.    From September of 2000 and continuing until the present, in the

8  Central District of California and elsewhere Defendants repeatedly engaged in acts

9  indictable under 18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1343 (relating to

10  wire fraud), 18 U.S.C. § 2314 (transportation of stolen goods), 18 U.S.C. § 2315 (receipt of

11  stolen goods), 18 U.S.C. § 1951 (Hobbs Act) and California Penal Code § 518 (extortion),

12  used the United States mails and other communications in interstate and foreign commerce

13  in connection with these acts and thereby continually engaged in a racketeering activity

14  within the meaning of 18 U.S.C. 1961 (1) (B) in the course of this above–described

15  scheme.  SMD is informed and believes, and on that basis alleges that these activities

16  included, but were not limited to the following:

17        A.    In October 1998, Murphy and Hunnewell's tender of letters and

18  other materials through use of the mails in order to fraudulently induce SMD to hire

19  Murphy, without disclosing Murphy's intention to later misappropriate SMD's Proprietary

20  Information to create a competing agency, and his intention to not be bound by or honor the

21  Proprietary Information Agreement or the Employee Handbook later acknowledged and

22  signed by him.

23        B.    On in formation and belief, in April and May 1999, Murphy's

24  use of the mails in connection with his transmission of his executed acknowledgment of the

25  SMD Employee Handbook to SMD without any intention of being bound by such

26  acknowledgment in furtherance of his plan to misappropriate SMD's Proprietary

27  Information to create a competing agency.

28        C.    Beginning in at least August 2000 and continuing to the present,

1    Dunn, Murphy, Branion, Wallace, Mantella, and Bohrnstedt's use of the wires and mails to

2    improperly solicit SMD's clients to terminate their contractual relationship with SMD and

3    to enter into a contractual relationship with a new, competing agency.

4            D.    Beginning in at least August 2000 and continuing through the

5    present, Dunn, Murphy and Branion's transportation of stolen goods in the form of SMD's

6    Proprietary Information in connection with visits to SMD clients to improperly solicit

7    SMD's clients to terminate their contracts and enter into a contractual relationship with

8    Athletes First.

9            E.    In September 2000, Murphy and Hunnewell's use of the wires

10   and mails in connection with their development of a written plan to form Athletes First and

11   "crush" SMD.

12           F.    During the period January 2001 and continuing to the present,

13   use of the wires by Murphy to communicate misappropriated SMD's Proprietary

14   Information in connection with the contents of the "Money" document containing, among

15   other things, Proprietary Information about SMD's projected revenues.

16           G.    On or about January 18, 2001, Hunnewell's use of the wires to

17   transmit information concerning the formation of the specific gameplan plan to

18   misappropriate SMD's Proprietary Information and blackmail SMD, Assante and

19   Mr. Steinberg.

20           H.    On or about January 21, 2001, Murphy's use of the wires to

21   communicate the plan to misappropriate SMD's Proprietary Information and blackmail

22   SMD, Assante and Mr. Steinberg.

23           I.    During the week of February 5, 2001, Murphy, Dunn and

24   Hunnewell's use of the wires and/or mail to communicate their "Gameplan" in writing.

25           J.    On February 18, 2001, Murphy's use of the wires to contact

26   Ms. Wortzman to threaten to expose to the press and existing and potential clients of SMD

27   specific negative personal information about Mr. Steinberg and SMD, if SMD or Assante

28   attempted to enforce its written contracts with Dunn, Murphy and Branion and the other

46

COMPLAINT

1   departing SMD employees.

2           K.      On February 19, 2001 and thereafter Murphy and Dunn's use of

3   the wires to telephone Marty Weinberg, Assante's Chief Executive Officer, to threaten to

4   expose to the press and existing and potential clients of SMD specific negative personal

5   information about Mr. Steinberg and SMD, if SMD or Assante attempted to enforce its

6   written contracts with Dunn, Murphy and Branion and the other departing SMD employees.

7           L.      Beginning at least in March 2001 and continuing to the present,

8   Housman, BOYZ, PEH, Hunnewell and Centurion's use of the wires and mail to receive

9   Proprietary Information and to provide funding for Athletes First to continue its scheme as

10  herein alleged.

11          M.      Beginning in February 2001 and continuing until April 2001,

12  Defendants' use of the wires and mails in connection with Defendants' conduct over the

13  course of several months in which they purported to engage in good faith negotiations to

14  resolve this dispute informally while at the same time, changing their demands to Assante

15  and SMD so as to cause SMD to stay out of touch with its "former" clients for a long

16  period of time, all with the intent of stalling to consolidate their positions with various

17  SMD clients.

18          N.      Beginning in at least February 2001 and continuing until the

19  present in furtherance of and for the purpose of executing the Defendants' schemes and

20  artifices to misappropriate SMD's Proprietary Information, and to defraud and obtain

21  money and property by means of extortion, grand theft, fraudulent pretenses,

22  representations and promises, Defendants in the Central District of California, by various

23  acts, have willfully and knowingly commercially advertised by describing Athletes First

24  services, list of supported charities, list of clients, and other factual maters.  Said

25  advertising is false and misleading because it takes credit for SMD's services,

26  achievements, and other conduct.  Defendants' false statements have actually deceived or

27  have the tendency to deceive a substantial segment of their audience.  Defendants'

28  deception is material, in that it is likely to influence a player's decision to terminate their

47

1 relationship with SMD and retain Defendants' services. Defendants have profited and

2 gained a business advantage from the use of this false advertising, all at the expense of

3 SMD's business, goodwill and reputation. Defendants have caused its false statements to

4 enter interstate commerce, including but not limited to its website located at

5 "AthletesFirst.net" in violation of 15 U.S.C. § 1125(a).

6           O.     On or about July 12, 2001, Dunn's use of the wires and United

7 States Mail to send a letter to Assante's Chief Executive Officer, Marty Weinberg,

8 threatening to divulge certain information about Mr. Steinberg and SMD to the public in

9 furtherance of Defendants' plan of extortion.

10           P.     On or about Friday, July 13, 2001, Ms. Dunn advised SMD's

11 General Counsel that in the course of defending against SMD's claims, Dunn, Murphy and

12 Branion would disclose negative and salacious information about Mr. Steinberg.

13           Q.     On or about July 15, 2001 in partial execution of Defendants'

14 plan, Dunn, Murphy, Branion and Athletes First published certain irrelevant but

15 inflammatory information about Mr. Steinberg in connection with the filing of their

16 declarations in response to SMD's motion for a preliminary injunction against Dunn and

17 Athletes First. Defendants made use of PEH's public relations firm to widely disseminate

18 this false and/or salacious material.

19           R.     In late July of 2001, Ms. Dunn met with the wife of Mr.

20 Steinberg and repeated Defendants' threat that in the course of defending against SMD's

21 claims, Dunn, Murphy and Branion would publicly disclose negative and salacious

22 information about Mr. Steinberg.

23          96.     Defendants' repeated violations of 18 U.S.C. § 1341 (relating to mail

24 fraud); 18 U.S.C. § 1343 (relating to wire fraud), 18 U.S.C. § 2314 (transportation of stolen

25 goods), 18 U.S.C. § 2315 (receipt of stolen goods), 18 U.S.C. § 1951 (Hobbs Act) and

26 California Penal Code § 518 (extortion), extended over a period of years and involved

27 distinct and independent criminal acts. These violations were neither isolated nor sporadic

28 events, but involved the regular and repeated violation of the law to accomplish

48

1   Defendants' goals and desired ends. These acts were related by virtue of (a) common

2   participants in the persons of Dunn, Murphy, Branion, Housman, Hunnewell, PEH, BOYZ,

3   Centurion, Meissner, Meal, Wallace and Bohrnstedt, (b) common victims in the persons of

4   SMD, Assante, Mr. Steinberg, Mrs. Steinberg, Mr. Moorad and the athletes represented by

5   SMD, and (c) the common purpose and common result of misappropriating SMD's

6   confidential client information, trade secrets and other proprietary and confidential

7   information, and to use such information and trade secrets to divert SMD's business to

8   Athletes First at the expense of SMD, Assante, Mr. Steinberg, Mr. Moorad and the athletes

9   represented by SMD. As such, this conduct constitutes a pattern of racketeering activity

10  within the meaning of 18 U.S.C. 1961 (5).

11          97.    Defendants' repeated and continuing violations of 18 U.S.C. § 1341

12  (relating to mail fraud); 18 U.S.C. § 1343 (relating to wire fraud), 18 U.S.C. § 2314

13  (transportation of stolen goods), 18 U.S.C. § 2315 (receipt of stolen goods), 18 U.S.C.

14  § 1951 (Hobbs Act) and California Penal Code § 518 (extortion) were neither isolated nor

15  sporadic events, but involve a callous and calculated series of repeated violations of the law

16  in order to obstruct and impede SMD's effort to protect its Proprietary Information and to

17  enforce its employment agreements, Proprietary Information and Invention Agreements and

18  Assignment Agreements, and for the purpose of concealing and promoting Defendants'

19  criminal activity engaged in by them in the course of the continuing business of Athletes

20  First. These activities therefore constitute a further component of a pattern of racketeering

21  activity within the meaning of 18 U.S.C. § 1961 (5).

22          98.    Defendants' repeated and continuing violations of 18 U.S.C. § 1341

23  (relating to mail fraud); 18 U.S.C. § 1343 (relating to wire fraud), 18 U.S.C. § 2314

24  (transportation of stolen goods), 18 U.S.C. § 2315 (receipt of stolen goods), 18 U.S.C.

25  § 1951 (Hobbs Act) and California Penal Code § 518 (extortion) occurred over a substantial

26  period of time. Moreover, Defendants have made clear their intention to continue their

27  criminal activity into the future and make such conduct a part of their regular way of doing

28  business.

OCOLIB1\GG2\
240492.04
(55KC04\ DOC)

1    99.    Defendants' violation of 18 U.S.C. § 1962 (c) caused SMD to suffer

2    direct injury to its business and property in excess of $25 million.

3                          **SECOND CLAIM FOR RELIEF**
                          (Violation of 18 U.S.C. §1962 (d))
4                              (Against All Defendants)

5    100.    SMD realleges, and incorporates herein by this reference paragraphs 1

6    through 99, inclusive, as though fully set forth herein as constituting and describing

7    Defendants' schemes and artifices to misappropriate SMD's Proprietary Information, to

8    defraud and obtain money and property by means of extortion, grand theft, fraudulent

9    pretenses, representations and promises, and to otherwise injure, SMD, Assante, Mr.

10    Steinberg, Mr. Moorad, and SMD's professional athlete clients .

11    101.    From at least 1998, Dunn and Murphy, later joined by Branion,

12    Housman, Hunnewell, PEH, BOYZ, Centurion, and others acting in concert with them, in

13    the Central District of California and elsewhere, unlawfully conspired, confederated and

14    agreed with each other to violate 18 U.S.C. § 1962 (c) to conduct and participate directly

15    and indirectly in the conduct of the affairs of Athletes First in violation of 18 U.S.C.

16    § 1962 (d).

17    102.    Part of this conspiracy was that each of the Defendants personally

18    committed and agreed to commit two or more fraudulent and illegal racketeering acts and

19    conducted and agreed to conduct the affairs of Athletes First through the pattern of

20    racketeering activity in violation of 18 U.S.C. § 1962 (c) described above.

21    103.    In furtherance of the conspiracy and to effect the objects thereof,

22    Defendants committed and caused to be committed a series of overt acts, including the

23    following:

24    A.    fraudulently inducing SMD to hire Murphy;

25    B.    incorporating Athletes First;

26    C.    obtaining and providing funding for Athletes First;

27    D.    use of the mails, as described above, to misappropriate SMD's

28    Proprietary Information and to threaten, blackmail and extort money and property from

50

1    SMD;

2             E.    transportation of stolen and misappropriated SMD's Proprietary

3    Information across state lines for the purpose of improperly soliciting SMD's clients as

4    described above.

5         104.   Defendants' violation of 18 U.S.C. § 1962 (d) caused SMD to suffer

6    direct injury to its business and property in excess of $25 million.

7                              **THIRD CLAIM FOR RELIEF**
              (False Advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a))
8                               (Against Dunn and Athletes First)

9         105.   SMD realleges and incorporates herein by this reference each and

10   every allegation contained in paragraphs 1 through 104 above as though set forth in full

11   herein.

12        106.   SMD is informed and believes, and on that basis alleges, that Dunn

13   and Athletes First commercially advertised by describing their services, list of charities

14   they support, list of clients, and other factual maters. Dunn and Athletes First's advertising

15   is false and misleading because it takes credit for SMD's services achievements, and other

16   conduct.

17        107.   Dunn and Athletes First's false statements have actually deceived or

18   have the tendency to deceive a substantial segment of their audience and the public. This

19   deception is material, in that it is likely to influence a player's decision to terminate his

20   relationship with SMD and retain Dunn and Athletes First's services. Dunn and Athlete

21   First's false statements have also been willful.

22        108.   Dunn and Athletes First have profited and gained a business advantage

23   from the use of this false advertising, all at the expense of SMD's business, goodwill and

24   reputation.

25        109.   Dunn and Athletes First have caused their false statements to enter

26   interstate commerce, including but not limited to its website located at "AthletesFirst.net",

27   in violation of 15 U.S.C. § 1125(a).

28        110.   Dunn and Athletes First's false advertising has caused and will cause

                                          51
**COMPLAINT**

1   SMD damage and irreparable harm through the direct loss of customers and by the

2   lessening of goodwill associated with its services for which SMD has no adequate remedy

3   at law.

4       111.   SMD, therefore, is entitled to a preliminary and permanent injunction

5   against Dunn and Athletes First and their officers, directors, agents, servants, and

6   employees, and all those acting by or through them, or at their direction, enjoining Dunn

7   and Athletes First from further false advertising.

8
9

**FOURTH CLAIM FOR RELIEF**
(Declaratory Judgment- 28 U.S.C. §§ 2201-2202)
(Against All Defendants)

10      112.   SMD realleges and incorporates herein by this reference each and

11  every allegation contained in paragraphs 1 through 111 above as though set forth in full

12  herein.

13      113.   An actual and justiciable controversy has arisen between SMD and

14  Defendants concerning their respective rights and duties, as Defendants contend that

15  SMD's claims and causes of action contained herein are preempted by the federal labor

16  laws, including Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a)

17  and Section 9(a) of the National Labor Relations Act.

18      114.   SMD desires a judicial determination of its rights and duties.

19  Specifically, SMD seeks a declaration that:

20      A.   SMD may validly enter into a contract with a Contract Advisor

21  in which the Contract Advisor agrees to represent only certain players, or no players at all,

22  if he so chooses; and

23      B.   SMD's claims and causes of action do not refer to, implicate, or

24  require the interpretation of the collective bargaining agreement between the NFL

25  Management Council and the NFL Players Association.

26      115.   The declarations referenced above are necessary and appropriate at this

27  time so that all parties may determine their rights and obligations among themselves, and to

28  prevent Defendants' continued wrongful use and profit from SMD's valuable Proprietary

52

OCOLIB1\GG2\
240492.04
(55KC041.DOC)

1   Information.

**FIFTH CLAIM FOR RELIEF**
(Breach Of Contract)
(Against Dunn)

4   116.   SMD realleges, and incorporates herein by this reference, the

5   allegations in paragraphs 1 through 115 inclusive.

6   117.   SMD derives its revenues from the representation of professional

7   athletes and professional sports organization.  To obtain a competitive advantage over other

8   sports agencies, SMD has invested large amounts of resources including, but not limited to,

9   money, employee and partner time, in developing and compiling Proprietary Information

10   including, but not limited to, formulae, techniques and methodologies which are neither

11   known to the general public nor to other sports agencies.  SMD utilization of the

12   Proprietary Information has allowed it to become, and maintain its status as, a premier

13   sports management agency.  By way of example, the Proprietary Information consists of

14   the following:

15   A.   SMD has developed methods and analytical models that enable

16   SMD's employees to creatively structure deals by determining limitations imposed upon a

17   professional team by the applicable salary caps.

18   B.   SMD has also developed statistical, financial and algebraic

19   models to permit SMD's employees to more easily perform the analyses required in

20   preparation for and during contract negotiations.

21   C.   A portion of SMD's Proprietary Information consists of an

22   significant amount of sensitive and confidential client information compiled over the years

23   that not only permits SMD to provide continued excellent service to its existing client base

24   but also serves as a mechanism for SMD to recruit new athletes as its clients.

25   118.   SMD takes reasonable steps to protect the Proprietary Information

26   including restricting access to its facilities and computers, restricting general access by

27   employees to Proprietary Information, requiring employees, as a condition of employment

28   to review and agree to the terms of the SMD employee handbook and SMD Employee

53

**COMPLAINT**

1    Proprietary Information and Inventions Agreement which, as detailed below, require an

2    employee to preserve and protect the confidentiality of the Proprietary Information and to

3    refrain from using for the employee's benefit SMD's Proprietary Information.

4    Furthermore, SMD's employees, through periodic staff meetings, are reminded about their

5    obligations with respect to SMD's Proprietary Information,

6            119.    SMD has performed all conditions, covenants and promises required

7    on its part to be performed in accordance with the terms and conditions of the Employment

8    Agreement with Dunn and the Assignment Agreement with Dunn, except those conditions,

9    covenants and promises where SMD's performance thereof was either frustrated or

10   excused.

11           120.    Notwithstanding, his February 16, 2001 unilateral effort to terminate

12   it, Dunn is subject to the terms of his Employment Agreement and will be through

13   December 31, 2004, and in some instances, for 24 months thereafter. In taking the actions

14   and omissions alleged herein, including the delivery of his February 16, 2001 purported

15   resignation letter, Dunn breached his Employment Agreement with SMD, including,

16   breaching his promises: (1) not to engage in any competition with SMD, (2) not to solicit

17   any existing or prospective client of SMD, either for himself or any other entity, (3) not to

18   solicit any existing employees of SMD, either for himself or any other entity, (4) to hold in

19   the strictest confidence, and not to disclose to any person or use in any way, other than in

20   the furtherance of SMD's business, confidential client or third-party information acquired

21   during his employment with SMD, (5) to surrender to SMD all materials received from

22   SMD at the conclusion of his employment, including SMD's client lists, representation

23   agreements, and other confidential information regarding existing or prospective clients

24   and/or other people or entities in the professional sports industry, (6) not to, directly or

25   indirectly, during the five-year term of his Employment Agreement, or during the

26   succeeding 24 months, engage or assist in any business that offers any services that are

27   competitive in any way with those offered by SMD, and (7) not to engage in competition

28   with SMD following the termination of his employment with SMD while making use of

54

1  SMD's trade secrets or other proprietary information.

2      121.  In taking the actions and omissions to act alleged herein, Dunn also

3  breached his Agreement with SMD, including breaching his assignment to SMD of all

4  present and future rights in all client representation agreements, including the rights to cash

5  flow and fees paid under those agreements.

6      122.  As a direct and proximate result of these breaches of contract, SMD

7  has suffered actual damages for loss of valuable information, loss of competitive advantage

8  gained by said information, loss of relationships, clients and profits, lost agent and

9  personnel time, and legal costs and expenses. SMD is therefore entitled to damages in an

10  amount to be proven at trial.

11      123.  In addition to those damages that are quantifiable, SMD has suffered

12  actual and threatened harm which cannot be measured and for which there is no adequate

13  remedy at law. Specifically, SMD has been, and will continue to be, damaged by Dunn's

14  disparaging remarks, his wrongful use of SMD's trade secrets, confidential information and

15  other proprietary information, and Dunn's interference with existing and prospective client

16  relationships. SMD has also suffered harm to its business relationships, business reputation

17  and goodwill. Damages of this nature are ongoing and immeasurable. Accordingly, money

18  or legal damages cannot compensate SMD, and thus SMD is entitled to specific

19  performance of the terms of the contract described above.

20      124.  SMD is informed and believes, and based thereon alleges, that Dunn

21  has breached the negative covenants in his agreements, and unless enjoined therefrom by

22  Order of the Court, will continue to breach these covenants and will continue to divert the

23  benefit of SMD's information, clients and relationships to his own exclusive commercial

24  advantage. SMD therefore seeks an injunction in the form requested below:

25      Dunn shall not, at any time prior to December 31, 2004, directly
      or indirectly, either individually or in partnership or jointly or in
26      conjunction with any person or persons as principal, agent,
      shareholder, or in any other manner whatsoever (other than as a
27      passive investor of up to 5% of a publicly traded company in
      respect of which Dunn is not employed or engaged to provide
28      services), carry on or be engaged in or associated with, advise,

55

lend money to or grant the right to use Dunn's name or any part thereof to be used or employed by any person engaged in or associated with, any business which is the same as or similar to or competitive with SMD's business of providing management services to professional athletes.

In addition, SMD seeks an injunction mandating that Dunn, Athletes First, and all those acting in concert with Dunn and/or Athletes First, including but not limited to his or their agents, representatives, partners, employees and attorneys:

absolutely and Irrevocably assign and waive in favor of SMD all present and future rights and privileges (legal and equitable) in and to all client representation agreements with any professional athlete who was a client of SMD as of February 16, 2001, including, without limitation, all legal rights, rights to cash flow, and rights to fees, whether such rights are presently held in Dunn's name, or in the name of Athletes First, LLC, or in the name of any person or entity acting in concert with Dunn or Athletes First;

absolutely and irrevocably assign and waive in favor of SMD all present and future rights and privileges (legal and equitable) in and to all client representation agreements with any professional athlete entered into by Dunn, Athletes First, LLC, or any agent or employee of Dunn and/or Athletes First, LLC, entered into at any time as a result of Dunn's employment with SMD, including, without limitation, all legal rights, rights to cash flow, and rights to fees;

to the extent that any of them has come into receipt or possession of any revenues derived from the representation of any professional athlete who was a client of SMD as of February 16, 2001, or whose representation after February 16, 2001 resulted in any way from Dunn's employment with SMD, hold any amounts paid to Dunn, Athletes First, LLC and/or those acting in concert with Dunn or Athletes First, LLC, in trust for the benefit of SMD.

Unless enjoined by this Court, said breaches threaten to and will cause great and irreparable injury to SMD as the full extent of SMD's damages are not readily ascertainable, and therefore SMD has no adequate or other remedy at law for such acts and threatened acts.

125.   Dunn's agreements with SMD specifically provide for the payment by Dunn of the reasonable attorney's fees incurred by SMD. SMD therefore seeks an award of its attorney's fees if the Court finds that Dunn has breached his obligations under his agreements with SMD.

56
**COMPLAINT**

1

2

### SIXTH CLAIM FOR RELIEF
(Fraud)
(Against Dunn)

3

4

126.    SMD realleges, and incorporates herein by this reference, the
allegations in paragraphs 1 through 125 inclusive.

5

6

7

8

9

10

11

12

13

14

15

16

127.    SMD is informed and believes, and on that basis alleges that, in an
effort to induce SMD to enter into his employment agreement, his long term incentive
agreement and his assignment agreement on terms more favorable than SMD would
otherwise have agreed to, Dunn falsely and fraudulently promised to SMD and Assante that
he would not compete against SMD during the five year term of his employment agreement
and for a period of 24 months thereafter. At the time he made these promises and executed
these agreements, SMD is informed and believes that Dunn subjectively did not have the
intention of performing his obligations thereunder, yet he accepted, in exchange for his
false promises, the considerable remuneration described above, including the payment to
Dunn of a $2,000,000 signing bonus to compensate him for the transfer of goodwill into a
new company and the inclusion of his own surname in that venture's name. Dunn knew
these promises to be false and made them with the intent to defraud SMD.

17

18

19

20

21

22

23

24

128.    At the time, SMD entered into these agreements, and parted with
substantial consideration, SMD was ignorant of Dunn's secret intention not to perform, and
SMD could not, in the exercise of reasonable diligence, have discovered Dunn's secret
intention. In reliance on Dunn's promises to perform under his employment agreement,
SMD paid to Dunn a $2 million signing bonus, agreed to pay Dunn additional substantial
remuneration under his employment agreement, and agreed to change the firm's name to
add Dunn's surname, along with the attendant required changes to SMD's signage,
letterhead and other print materials.

25

26

27

28

129.    SMD's and Assante's reliance on the fraudulent promises was
justifiable, and they each devoted a substantial amount of time, money and resources
toward honoring the agreements with Dunn and towards developing SMD's trade name and

OCOLIB1\GG2\
240492.04
(55KC041.DOC)

**COMPLAINT**

1    goodwill, based on Dunn's false promises. Had SMD and/or Assante known the true facts,

2    they would not have devoted the substantial time, money, and resources that they did to

3    honor the agreements with Dunn and towards developing the SMD trade name and its

4    goodwill.

5        130.    As a direct and proximate result of Dunn's fraud and deceit, SMD has

6    suffered the loss of the significant damages described above, and continues to suffer

7    damages in an amount to be proven at trial.

8        131.    In making the false promises alleged herein, Dunn acted with fraud,

9    oppression and malice, and with callous and intentional disregard for SMD's and Assante's

10    interests, knowing and intending that his conduct would injure SMD. SMD is therefore

11    entitled to punitive damages in an amount sufficient to punish Dunn and to deter Dunn

12    from engaging in such conduct in the future.

13                    **SEVENTH CLAIM FOR RELIEF**
                (Common Law and Statutory Unfair Competition
14              Under Cal. Bus. & Prof. Code § 17200 *et seq.*)
                    (Against Dunn and Athletes First)
15

16        132.    SMD realleges, and incorporates herein by this reference, the

17    allegations of paragraphs 1 through 131, inclusive.

18        133.    SMD is a provider of sports agency and management services to

19    professional athletes. As a provider of such services, one of SMD's primary business goals

20    is to identify, obtain and retain professional athletes as clients for its services.

21        134.    In the course of its business, SMD and its employees routinely come to

22    possess sensitive and confidential information about people and entities in the professional

23    sports industry. This information includes confidential information about player contracts,

24    contract terms, contract negotiations and re-negotiations, players' and franchises' trading

25    needs, demands and preferences, and the strengths, weaknesses and business needs of those

26    players and franchises. SMD has taken and continues to take great efforts to maintain the

27    confidentiality of its proprietary and confidential client information, including insisting

28    upon explicit negative covenants requiring non-disclosure of SMD's trade secrets and

1   confidential client information in the employment agreement described above.

2       135.   SMD is informed and believes, and based thereon alleges, that Dunn,

3   in complete disregard of his fiduciary duties (including his duties as agent to his principal,

4   his duty of loyalty and his duty of confidentiality), his employment agreement, his

5   agreements not to disclose confidential information, and the laws regarding

6   misappropriation, wrongfully obtained SMD's trade secrets, confidential client information

7   and other Proprietary Information and removed that information, in both tangible and

8   intangible form, from SMD's Newport beach, California office.  SMD is further informed

9   and believes that Dunn and Athletes First have used and are continuing to use that

10  information without the consent or authorization of SMD, to compete with SMD and solicit

11  and divert clients from SMD to himself and/or Athletes First.

12      136.   SMD devotes substantial personnel, time, and resources to the

13  acquisition, development, servicing and growth of its clients and attendant proprietary and

14  confidential information about clients, non-client athletes and other people and entities in

15  the professional sports industry.  This highly confidential, Proprietary Information,

16  including the manner in which it is assimilated, compiled, analyzed and presented, is

17  neither commonly known nor easily discoverable by SMD's competitors.  SMD has only

18  been able to compile, combine and present this information through great time, effort, and

19  expense.  This information, and the manner in which it is presented, gives SMD a

20  significant and valuable competitive advantage in the marketplace.  Thus, the detailed,

21  proprietary client and industry information that SMD has gathered about its clients and

22  other athletes and entities in the marketplace is extremely valuable to SMD, and would be

23  to anyone in the professional sports management business.

24      137.   The acts and conduct of Dunn and Athletes First herein alleged

25  constitute unlawful acts of unfair competition at common law, and unlawful, unfair and

26  fraudulent business practices in violation of section 17200 *et seq*.  Specifically, and without

27  limitation, these Defendants' conduct caused violation of laws prohibiting conversion and

28  misappropriation, including laws at common law; violation of Labor Code Section 2860;

59

**COMPLAINT**

1    violation of laws prohibiting breaches of fiduciary duties of loyalty, confidentiality, and of

2    an agent's duties to his principal; violation of principles governing conflicts of interest,

3    including laws at common law and in the California Corporations Code; violation of laws

4    governing breach of negative covenants in employment and related contracts; violation of

5    laws prohibiting the solicitation of clients or clients using information which has been

6    wrongfully obtained, including laws at common law; violation of the Uniform Trade

7    Secrets Act, Civil Code Section 3426 *et seq.* and violation of laws promoting, fair

8    competition and prohibiting unfair competition, among others.

9           138.   SMD did not discover such unlawful acts and the identity of Dunn as a

10   participant in those wrongful acts until February 2001.  SMD did not discover the identity

11   of Athletes First until May 2001.  The Defendants' wrongful conduct continues to this day.

12          139.   Unless restrained and enjoined pursuant to Section 17203 of the

13   California Business and Professions Code, Dunn and Athletes First will continue to engage

14   in acts of unfair competition and violations of law, and will continue to take unfair

15   advantage of SMD's trade secrets, confidential client information and related proprietary

16   information about athletes and entities in the professional sports business which have been

17   misappropriated from SMD.  Therefore, Dunn, Athletes First, and all those acting in

18   concert or participation with either of them, including but not limited to his or their agents,

19   representatives, partners, employees and attorneys, should be preliminarily and

20   permanently enjoined from engaging in or performing any of the following acts:

21                  (i) Soliciting, directly or indirectly, orally or in writing, any
                    business of any kind from any client or prospective client of
22                  SMD whose identity was obtained by Dunn from SMD during
                    his employment with SMD; (ii) interfering in any way with
23                  SMD's existing client relationships; (iii) making any effort to
                    divert the benefit of any such relationships to their own
24                  advantage; or (iv) making any disparaging remarks about SMD
                    or any of its owners, employees or affiliates, except that the
25                  requested Order shall not prohibit Dunn and Athletes First from
                    doing business with such clients or prospective clients when it
26                  can be demonstrated by Dunn that the confidential information
                    was obtained solely through public sources (and not in whole or
27                  in part through documents or information obtained from SMD
                    or during Dunn's employment with SMD) or with such clients
28                  or prospective clients who initiated contact with Dunn to

                                            60

1    engage in such business;

2    Retaining any trade secret, confidential client information or
     any other proprietary information about athletes and/or entities
3    in the professional sports industry acquired from SMD or
     acquired as a result of Dunn's employment with SMD, or any
4    documentation or information derived from or based on such
     information of SMD, including but not limited to (i) any
5    contract or information about any contract of an existing SMD
     client, including contracts entered into following Dunn's
6    purported resignation from SMD; (ii) any confidential
     information provided to SMD by any client, prospective client
7    or third-party; (iii) any confidential information obtained by
     SMD from any professional sports franchise, or owner,
8    executive or representative of such franchise, regarding any
     professional sports franchise or any professional athlete; and
9    (iv) any other SMD property in Dunn's or Athletes First's
     possession, all of which shall be returned to SMD within three
10   (3) days of the entry of the requested Order (after a complete
     search for confidential information of all of Dunn's and
11   Athletes First's records and files are conducted); and

12   Using, possessing, disclosing, copying or transmitting any
     documents or information acquired as a result of Dunn's
13   employment with SMD, including but not limited to the names,
     addresses, phone and facsimile numbers, and individual contact
14   information, of any client or prospective client of SMD.

15          140.    SMD also is entitled to full restitution for Dunn and Athletes First's

16   acts of unfair competition and violations of law. SMD is informed and believes that Dunn

17   and/or Athletes First have already received profits as a result of his acts and conduct

18   alleged above. Accordingly, SMD seeks restitution in the form of disgorgement of all

19   profits earned by Dunn and/or Athletes First as a result of their conduct in violation of the

20   California Business & Professions Code Section 17200 *et seq*.

21                      **EIGHTH CLAIM FOR RELIEF**
                        (Misappropriation Of Trade Secrets)
22                       (Against Dunn and Athletes First)

23          141.    SMD realleges, and incorporates herein by this reference, the

24   allegations of paragraphs 1 through 140, inclusive.

25          142.    SMD was in possession of trade secrets as described above, which

26   included confidential information related to client athletes, non-client athletes, client files,

27   representation agreements and related documents, notes, correspondence and memoranda,

28   and the manner in which that information is assimilated, compiled, analyzed and presented,

1    as well as other confidential client information, including the names, addresses, and phone
2    numbers of individual SMD clients, and confidential and sensitive information regarding
3    the business needs or requirements of other participants in the professional sports business,
4    including athletes and professional sports franchises.

5           143.    SMD devotes, and has devoted, substantial personnel time, and
6    resources to the acquisition, development, servicing and growth of its trade secrets and
7    proprietary and confidential information. The process of acquiring this information is
8    laborious, expensive and time-consuming. The data contained in SMD's reservoirs of
9    confidential information has been gathered over many years, and is the product of the hard
10   work and dedication to providing a high level of service to its clients that SMD and its
11   employees have displayed since the inception of the enterprise. The sports agency business
12   is largely driven by referrals from existing clients and relationships formed with
13   prospective clients through close association with athletes and sports agents who have
14   stature in the industry. SMD's principals, Mr. Steinberg and Mr. Moorad, have developed
15   such relationships and possess such stature in the industry. Solely through Dunn's
16   employment at SMD, Dunn was cloaked with a similar stature, and as a result of his
17   association with SMD, he had unfettered access to existing clients, prospective clients and
18   executives or representatives of professional sports franchise in need of the services of
19   professional athletes, and the trade secrets and other confidential information described
20   above. This access is unique and invaluable as a means of procuring future client
21   relationships with professional athletes.

22          144.    At all times relevant to this complaint, SMD has maintained the
23   information described above, to the extent it is extant in tangible form, in protected files,
24   which are and have been accessible only by SMD employees who have access to those
25   files. As to the information described above that exists only in the intangible form, SMD
26   has maintained that information in the strictest confidence. This confidential and
27   proprietary information about athletes, their representation agreements and about
28   professional sports franchises, and the manner in which that information is assimilated,

62

1    compiled, analyzed and presented, is SMD's most important asset and is essential to

2    SMD's, business.

3          145.    The highly confidential and proprietary client and industry information

4    described above is neither commonly known nor easily discoverable by SMD's

5    competitors. SMD has only been able to compile, combine and present the information

6    through great time, effort, and expense, and this information gives SMD a significant and

7    valuable competitive advantage in the marketplace. Thus, the detailed, Proprietary

8    Information that SMD has gathered about participants in the professional sports industry

9    constitutes extremely valuable and proprietary trade secrets.

10          146.    Dunn misappropriated the above-described trade secrets of SMD, and

11    Dunn and Athletes First are wrongfully using this information to their competitive

12    advantage. Dunn and Athletes First's actions were, and still are, willful and malicious.

13          147.    SMD did not discover such unlawful acts and the identity of Dunn as a

14    participant in those wrongful acts until February 2001. SMD did not discover the identity

15    of Athletes First until May 2001. Dunn and Athletes First's wrongful conduct continues to

16    this day, as the Defendants continue to retain and use SMD's client lists, representation

17    agreements, and other confidential information regarding existing or prospective clients

18    and/or other people or entities in the professional sports industry.

19          148.    The aforementioned acts of Dunn and Athletes First constitute willful

20    and malicious misappropriation of trade secrets, in violation of the California Uniform

21    Trade Secrets Act, California Civil Code Section 3426 *et seq*.

22          149.    Dunn and Athletes First have been and are making profits as a result of

23    their wrongful misappropriation and deprivation of SMD of relationships and profits that it

24    otherwise would be making were it not for the acts of Dunn and Athletes First. SMD,

25    therefore, is entitled to recover damages for the actual amount of profits earned by Dunn

26    and Athletes First, and the actual amount of loss caused by the Defendants' acts, pursuant

27    to the Uniform Trade Secrets Act, California Civil Code Section 3426.3. Furthermore,

28    SMD's damage is in an amount not presently known nor fully ascertainable, and thus SMD

63

**COMPLAINT**

1    also is entitled to damages for unjust enrichment caused by the misappropriation, and its

2    reasonable attorneys' fees, pursuant to the Uniform Trade Secrets Act, California Civil

3    Code Sections 3426.3 and 3426.4. Among other unfair advantages, Dunn and Athletes

4    First have had, and now have, access to a ready-made list of clients and their specific

5    contract terms and needs, to prospective clients and to other important industry contacts,

6    which has taken SMD years of dedication, effort and expense to compile.

7         150.   In doing the acts herein alleged, Dunn and Athletes First acted

8    willfully and maliciously, and SMD is entitled to an award of punitive damages and/or

9    double damages pursuant to the Uniform Trade Secrets Act, California Civil Code Section

10   3426.3(c), appropriate to punish and make an example of Dunn and Athletes First.

11        151.   Unless restrained and enjoined pursuant to California Civil Code

12   Section 3426.2, Dunn and Athletes First will continue to take unfair advantage of SMD's

13   trade secrets now in their possession and cause irreparable future injury to SMD.

14   Therefore, Dunn, Athletes First, and all those acting in concert or participation with them,

15   including but not limited to all their agents, representatives, partners, employees and

16   attorneys should be preliminarily and permanently enjoined pursuant to an order of the

17   Court in substantially the form requested above.

18                         **NINTH CLAIM FOR RELIEF**
                     (Intentional Interference With Contract)
19                        (Against Dunn and Athletes First)

20        152.   SMD realleges, and incorporates herein by this reference, the

21   allegations of paragraphs 1 through 151, inclusive.

22        153.   At all relevant times herein, SMD possessed contractual relations with

23   its clients, including but not limited to representation agreements with more than 86 NFL

24   athletes, providing for a variety of services to be rendered by SMD. These clients agreed to

25   provide SMD with consideration and compensation in exchange for SMD's services.

26        154.   Dunn and Athletes First had actual knowledge of the existence of

27   SMD's contractual relationships, including its relationships with these NFL athletes.

28        155.   SMD is informed and believes, and based thereon alleges, that Dunn,

                                          64

                                    **COMPLAINT**

1  both prior to and following his purported resignation of employment with SMD, schemed

2  to compete with SMD. While he was in SMD's employ, Dunn, and/or Murphy acting at

3  Dunn's direction, even went so far as to create spreadsheets and "pro forma" financial

4  statements depicting expected revenues of his new competing venture to be derived from

5  clients stolen from SMD. Such pro forma financial statements reflect actual committed fee

6  revenues that are due to SMD. SMD is further informed and believes that Dunn, and/or

7  Murphy acting at Dunn's direction, did so only after having acquired in confidence the

8  trade secrets and proprietary information described above, including the identity of SMD's

9  clients and prospective clients, along with their specific business needs and particular

10  interests and the specific needs and interests of other entities in the professional sports

11  industry, various NFL franchises, all of which was acquired only as a result of his

12  employment with SMD.

13        156.    SMD is further informed and believes, and based thereon alleges, that

14  Dunn and Athletes First, while acting in concert with others, through the actions described

15  above, induced one or more of SMD's clients to terminate his relationship with SMD,

16  thereby breaching that player's contract, or those players' contracts, with SMD, and

17  induced the transfer of that business to Athletes First.

18        157.    As a direct and proximate result of Dunn's and Athletes First's acts as

19  alleged herein, SMD has suffered and continues to suffer damage in the form of lost

20  revenue and consideration due to the loss of clients' business, as well as in the form of

21  damage to SMD's goodwill and client relations, unjust enrichment to Dunn and Athletes

22  First and other damages, in an amount to be proven at the time of trial.

23        158.    SMD has no adequate remedy at law to protect itself from Dunn and

24  Athletes First's intentional interference, which is continuing, and which is subjecting SMD

25  to immediate an irreparable harm. Accordingly, SMD is entitled to injunctive relief and an

26  order of the court substantially in the form described above prohibiting Dunn and Athletes

27  First and anyone acting in concert with them from committing further acts of intentional

28  interference, including further solicitation of SMD's existing clients and disparagement of

65

**COMPLAINT**

1   SMD to these clients.

2   159.   In undertaking the course of conduct alleged herein, Dunn has acted

3   with fraud, oppression and malice in that he, acting on his own behalf, deliberately

4   concealed his competitive activities from SMD both before and after the purported

5   termination of his employment with SMD. Dunn and Athletes First further misled SMD

6   about his their true intentions, provided misleading information to SMD and its clients, and

7   deliberately undermined the business SMD was engaged in with its clients, including but

8   not limited to causing the loss of many NFL athletes as clients, all for Dunn's and Athletes

9   First's financial gain. SMD is therefore entitled to punitive damages in an amount

10   sufficient to punish Dunn and Athletes First and to deter them from engaging in such

11   conduct in the future.

12   **TENTH CLAIM FOR RELIEF**
    (Intentional Interference With Prospective Economic Advantage)
13   (Against Dunn and Athletes First)

14   160.   SMD realleges, and incorporates herein by this reference, the

15   allegations of paragraphs 1 through 159, inclusive.

16   161.   SMD is informed and believes, and based thereon alleges, that Dunn

17   personally and on behalf of Athletes First intentionally interfered with SMD's

18   advantageous relationships with athletes and others in the professional sports industry by

19   commencing an on-going campaign of soliciting SMD's clients and prospective clients in

20   an effort to induce clients to terminate their existing relationships with SMD and to

21   establish new relationships with Athletes First, and to induce prospective clients (those

22   athletes who were considering a relationship with SMD) to disregard SMD and establish

23   relationships with Athletes First instead.

24   162.   SMD is informed and believes, and based thereon alleges, that Dunn

25   and Athletes First have interfered with, and intend to and will continue to interfere with,

26   unless enjoined therefrom by order of the court, SMD's existing, and prospective client

27   relationships, and will by unfair and unlawful means divert the benefit of such client

28   relationships to his own exclusive commercial advantage.

66

163.    SMD has no adequate remedy at law to protect itself from Dunn and Athletes First's intentional interference, which is continuing, and which is subjecting SMD to immediate and irreparable harm.  Accordingly, SMD is entitled to injunctive relief and an order of the court substantially in the form described above prohibiting Dunn and Athletes First and anyone acting in concert with them from committing further acts of intentional interference, including further solicitation of SMD's prospective clients and disparagement of SMD to these prospects.

164.    SMD did not discover such unlawful acts and the identity of Dunn as a participant in those wrongful acts until February 2001.  SMD did not discover the identity of Athletes First until May 2001.  Dunn's and Athletes First's wrongful interference continues to this day, as Dunn and Athletes First continue to retain and use SMD's client lists, representation agreements, and other confidential information regarding existing or prospective clients and/or other people or entities in the professional sports industry.

165.    As a direct and proximate result of the conduct alleged above, SMD has suffered actual damages for loss of valuable information, loss of competitive advantage gained by said information, loss of relationships, clients and profits, lost management time, and legal costs and expenses.  SMD is entitled to damages in an amount to be proven at trial.

166.    The aforementioned acts were fraudulent, malicious and oppressive and constitute conduct designed solely to benefit Dunn's and Athletes First's own interests and improper purposes in conscious disregard of SMD's rights.  SMD is therefore entitled to punitive damages appropriate to punish and make an example of Dunn and Athletes First.

## ELEVENTH CLAIM FOR RELIEF
(Breach Of Fiduciary Duty)
(Against Dunn)

167.    SMD realleges, and incorporates herein by this reference, the allegations of paragraphs 1 through 166, inclusive.

168.    As a trusted employee of SMD, and at all times while employed by

67

COMPLAINT

SMD, Dunn owed to SMD a fiduciary duty to act toward SMD fairly and honestly, in good faith, with undivided loyalty, to avoid conflicts of interest, to maintain the confidentiality of SMD's trade secrets and all other proprietary, confidential information and to refrain from any act, or omission to act, calculated or likely to: (a) injure SMD; (b) interfere with SMD's advantageous existing or prospective economic relationships; (c) disclose SMD's trade secrets or other confidential, proprietary information to third parties; or (d) misappropriate to his personal advantage SMD's trade secrets or other confidential, proprietary information.

169.    Following Dunn's purported resignation, or unilateral termination of his employment agreement, Dunn thereafter continued to owe a duty to SMD to refrain from any act, or omission to act, calculated or likely to (1) disclose to third parties SMD's trade secrets or other proprietary or confidential information acquired during the course of his employment by SMD, or (2) misappropriate to his personal advantage any corporate opportunities of SMD, or utilize in competition with SMD, SMD's trade secrets or other proprietary or confidential information, or any other property or information belonging to SMD.

170.    Dunn intentionally and knowingly breached his fiduciary duties to SMD by, among other things, secretly and surreptitiously preparing, while in SMD's employ, to commence active, unfair competition with SMD following his tender of his purported resignation from such employment, by commencing competitive activities prior and subsequent to tender of his purported resignation from his employment with SMD by means of the unauthorized and unlawful use of SMD's trade secrets, the intentional interference with SMD's existing and prospective client relationships and prospective economic advantage, the misappropriation of SMD's opportunities in the marketplace, and by soliciting and attempting to divert SMD's employees, clients and prospective clients to himself.

171.    SMD did not discover such unlawful acts and the identity of Dunn as a participant in those wrongful acts until February 2001. The wrongful conduct of Dunn

68

1    continues to this day, as Dunn continues to retain and use SMD's client lists, representation

2    agreements, and other confidential information regarding existing or prospective clients

3    and/or other people or entities in the professional sports industry.

4            172.    As a direct and proximate result of Dunn's unlawful conduct, SMD

5    has suffered and continues to suffer actual damages in an amount which is presently

6    unknown to it, as well as irreparable harm to its business reputation and goodwill.  Dunn is

7    making profits from the wrongful retention and use of this information and SMD is being

8    deprived of clients, relationships and profits that it otherwise would have made or would be

9    making, but for the acts of Dunn.  SMD is entitled to compensation in an amount to be

10   proven at trial for Dunn's breach of fiduciary duty.

11           173.    The aforementioned acts of Dunn were fraudulent, malicious and

12   oppressive and constitute conduct designed solely to benefit Dunn's own interests and

13   improper purposes in conscious disregard of SMD's rights.  SMD is therefore entitled to

14   punitive damages appropriate to punish and make an example of Dunn.

15                               **TWELFTH CLAIM FOR RELIEF**
                                       (Accounting)
16                            (Against Dunn and Athletes First)

17           174.    SMD realleges, and incorporates herein by this reference, the

18   allegations in paragraphs 1 through 173, inclusive.

19           175.    SMD is informed and believes that, between the time of Dunn's

20   purported resignation of his employment with SMD and the date of this complaint, Dunn,

21   Athletes First, and/or those acting in concert with them have entered into numerous

22   contracts with both existing (now former), and prospective, clients whose identities were

23   made known, and thus the contracts made possible, through the use of SMD's confidential

24   information.  SMD is informed and believes that Dunn and/or Athletes First have therefore

25   received money as a result of their misconduct at SMD's expense, and that some or all of

26   such money is rightfully due to SMD.

27           176.    Dunn occupied a fiduciary relationship with respect to SMD.  The

28   amount of money due from Dunn and Athletes First to SMD is unknown to SMD and

                                              69

1     cannot be ascertained without an accounting of the income and gross profits obtained by

2     Dunn and Athletes First through their use of SMD's confidential information. SMD

3     therefore is entitled to a full accounting.

4

**THIRTEENTH CLAIM FOR RELIEF**
(Misleading Advertising in Violation of California
Business & Professions Code § 17500)
(Against Dunn and Athletes First)

5

6

7          177.   SMD realleges and incorporates herein by this reference each and

8     every allegation contained in paragraphs 1 through 176 above as though set forth in full

9     herein.

10          178.   SMD is informed and believes, and on that basis alleges, that Dunn

11     and Athletes First commercially advertised by describing their services, list of charities

12     they supports, list of clients, and other factual maters. Dunn and Athletes First advertising

13     is false and misleading because it takes credit for SMD's services achievements, and other

14     conduct.

15          179.   Dunn and Athletes First's false statements have actually deceived or

16     have the tendency to deceive a substantial segment of their audience and the public.

17     Defendants' deception is material, in that it is likely to influence a player's decision to

18     terminate their relationship with SMD and retain Defendants' services. Defendants' false

19     statements have also been willful.

20          180.   Dunn and Athletes First have profited and gained a business advantage

21     from the use of this false advertising, all at the expense of SMD's business, goodwill and

22     reputation.

23          181.   In making and disseminating the statements herein alleged, Defendants

24     knew, or by the exercise of reasonable care should have known, that the statements were

25     untrue and misleading and so acted in violation of Section 17500 of the California Business

26     Code.

27          182.   Unless restrained by this Court, SMD will continue to be irreparably

28     harmed and Defendants will continue to engage in untrue and misleading advertising as

OCOLIB1\GG2\
240492.04
(55KC041.DOC)

1   alleged above in violation of § 17500 of California Business & Professions Code , thus

2   tending to render judgment in the instant action ineffectual. SMD has no adequate remedy

3   at law in that Defendants will continue to engage in untrue and misleading advertising in

4   violation of California Business and Professions Code § 17500, thus engendering a

5   multiplicity of judicial proceedings in connection with such conduct.

6   **FOURTEENTH CLAIM FOR RELIEF**
      (Conspiracy)
7     (Against All Defendants)

8       183.    SMD realleges and incorporates herein by this reference each and

9   every allegation contained in paragraphs 1 through 182 above as though set forth in full

10  herein.

11      184.    Beginning as early as April and May 1999, Defendant, and each of

12  them, knowingly and willingly conspired and agreed among themselves to

13  (a) misappropriate SMD's Proprietary Information, (b) intentionally interfere with SMD's

14  contracts with its clients' (c) unfairly compete with SMD,(d) engage in false and

15  misleading adverting; (e) engage in extortion and blackmail, and (f) otherwise injure and

16  harm SMD by virtue of tortuous and improper conduct.

17      185.    Defendants did the acts and things herein alleged pursuant to, and in

18  furtherance of, the conspiracy.

19      186.    As a direct and proximate result of Defendants' actions, SMD has been

20  damaged in an amount in excess of $25 million.

21  **FIFTEENTH CLAIM FOR RELIEF**
      (Unjust Enrichment)
22    (Against All Defendants)

23      187.    SMD realleges and incorporates herein by this reference each and

24  every allegation contained in paragraphs 1 through 186 above as though set forth in full

25  herein.

26      188.    By virtue of Defendants' wrongful acts detailed above, Defendants

27  have been unjustly enriched by retaining SMD's profits, gains, and advantages between

28  February 17, 2001 and the present.

71

1       189.    SMD is entitled to restitution and recovery of the amount Defendants

2    have been unjustly enriched between February 16, 2001 and the present.

3                          **SIXTEENTH CLAIM FOR RELIEF**
                                    (Constructive Trust)

4
                                (Against All Defendants)
5

6       190.    SMD realleges and incorporates herein by this reference each and

7    every allegation contained in paragraphs 1 through 189 above as though set forth in full

8    herein.

9       191.    California Civil Code Section 2224 provides:

10          "One who gains a thing by fraud, accident, mistake, undue
            influence, the violation of trust, or other wrongful act, is, unless
11          he or she has some other and better right thereto, an involuntary
            trustee of the thing gained, for the benefit of the person who
12          would otherwise have had it."

13      192.    By virtue of Defendants' wrongful acts detailed above, they hold

14   SMD's profits, gains and advantages as a constructive trustee for the benefit of SMD.

15   Defendants also hold SMD's trade secrets, confidential and Proprietary Information as a

16   constructive trustee for the benefit of SMD.

17                       **SEVENTEENTH CLAIM FOR RELIEF**
                      (Aiding and Abetting a Breach of Fiduciary Duty)
18
                         (Against All Defendants Except Dunn)
19

20      193.    SMD realleges and incorporates herein by this reference each and

21   every allegation contained in paragraphs 1 through 192 above as though set forth in full

22   herein.

23      194.    Defendants Athletes First, Hunnewell, Centurion, PEH, Housman, and

24   B.O.Y.Z. actively participated in Dunn's breach of fiduciary duty by aiding and abetting

25   Dunn's efforts to form a sports agency which would unfairly and illegally compete against

26   SMD through extortion, the misappropriation of SMD's valuable trade secrets, and other

27   criminal activity detailed above.

28      195.    Defendants Athletes First, Hunnewell, Centurion, PEH, Housman, and

72

1   B.O.Y.Z. participated in Dunn's breach of fiduciary duty for the purpose of advancing their

2   own interests.

3   **PRAYER FOR RELIEF**

4   WHEREFORE, SMD prays for Judgment against Defendants as follows:

5       1.    In the First and Second Claims for Relief in connection with

6   Defendants' violation of the Racketeer and Influenced and Corrupt Organizations Act,

7   treble damages against all Defendants, jointly and severely, in an amount to be proved at

8   trial, together with pre-judgment interest and attorneys' fees and costs;

9       2.    In the Third Claim for Relief, for damages in an amount to be proven

10   at trial and for a preliminary and permanent injunction against Dunn and Athletes first and

11   their officers, directors, agents, servants, and employees, and all those acting by or through

12   them, or at their direction, enjoining Dunn and Athletes First from further false advertising;

13       3.    In the Fourth Claim for Relief, a declaratory judgment that SMD may

14   validly enter into a contract with a Contract Advisor in which the Contract Advisor agrees

15   to represent only certain players, or no players at all, if he so chooses; and SMD's claims

16   do not refer to, implicate, or require the interpretation of the collective bargaining

17   agreement between the NFL Management Council and the NFL Players Association;

18       4.    For the Fifth Claim for Relief, specific performance of the contractual

19   terms to the extent permissible at law;

20       5.    For the Fifth Claim for Relief, provisional and permanent injunctive

21   relief in the form of an order providing that:

22   Dunn shall not, at any time prior to December 31, 2004, directly

23   or indirectly, either individually or in partnership or jointly or in conjunction with any person or persons as principal, agent,

24   shareholder, or in any other manner whatsoever (other than as a passive investor of up to 5% of a publicly traded company in

25   respect of which Dunn is not employed or engaged to provide services), carry on or be engaged in or associated with, advise,

26   tend money to or grant the right to use Dunn's name or any part thereof to be used or employed by any person engaged in or

27   associated with, any business which is the same as or similar to or competitive with SMD's business of providing management

28   services to professional athletes;

73

**COMPLAINT**

1          6.    For the Fifth claim for relief, further injunctive relief in the form of an

2    order mandating that Dunn, Athletes First and all those acting in concert with Dunn and/or

3    Athletes First, including but not limited to his or their agents, representatives, partners,

4    employees and attorneys:

5              absolutely and irrevocably assign and waive in favor of SMD
          all present and future rights and privileges (legal and equitable)
6              in and to all client representation agreements with any
          professional athlete who was a client of SMD as of
7              February 16, 2001, including, without limitation, all legal
          rights, rights to cash flow, and rights to fees, whether such
8              rights are presently held in Dunn's name, or in the name of
          Athletes First, LLC, or in the name of any person or entity
9              acting in concert with Dunn or Athletes First;

10             absolutely and irrevocably assign and waive in favor of SMD
          all present and future rights and privileges (legal and equitable)
11             in and to all client representation agreements with any
          professional athlete entered into by Dunn, Athletes First, LLC,
12             or any agent or employee of Dunn and/or Athletes First, LLC,
          entered into at any time as a result of Dunn's employment with
13             SMD, including, without limitation, all legal rights, rights to
          cash flow, and rights to fees;
14

15             to the extent that any of them has come into receipt or
          possession of any revenues derived from the representation of
          any professional athlete who was a client of SMD as of
16             February 16, 2001, or whose representation after February 16,
          2001 resulted in any way from Dunn's employment with SMD,
17             hold any amounts paid to Dunn, Athletes First, LLC and/or
          those acting in concert with Dunn or Athletes First, LLC, in
18             trust for the benefit of SMD;

19         7.    For the Fifth and Seventh through Tenth Claim for Relief, provisional

20   and permanent injunctive relief enjoining and restraining Dunn, Athletes First, and all those

21   acting in concert or participation with them or having knowledge of this order, including

22   but not limited to their agents, art representatives, partners, employees and attorneys, from

23   engaging in or performing any of the following acts:

24             (i) Soliciting, directly or indirectly, orally or in writing, any
          business of any kind from any client or prospective client of
25             SMD whose name appears on any of the records or files
          obtained by Dunn from SMD during his employment with
26             SMD; (ii) interfering in any way with SMD's existing client
          relationships; (iii) making any effort to divert the benefit of any
27             such relationships to their own advantage; or (iv) making any
          disparaging remarks about SMD or any of its owners,
28             employees or affiliates, except that the requested Order shall

74
**COMPLAINT**

1

not prohibit Dunn and Athletes First from doing business with such clients or prospective clients when it can be demonstrated that the confidential information was obtained solely through public sources (and not in whole or in part through documents or information obtained from SMD or during Dunn's employment with SMD) or with such clients or prospective clients who initiated contact with Dunn to engage in such business.

2

3

4

5

Retaining any trade secret, confidential client information or any other proprietary information about athletes and/or entities in the professional sports industry acquired from SMD or acquired as a result of Dunn's employment with SMD, or any documentation or information derived from or based on such information of SMD, including but not limited to (i) any contract or information about any contract of an existing SMD client, including contracts entered into following Dunn's purported resignation from SMD; (ii) any confidential information provided to SMD by any client, prospective client or third-party; (iii) any confidential information obtained by SMD from any professional sports franchise, or owner, executive or representative of such franchise, regarding any professional sports franchise or any professional athlete; and (iv) any other SMD property in the possession of Dunn and/or Athletes First, all of which shall be returned to SMD within three (3) days of the entry of the requested Order (after a complete search for confidential information of all of Dunn's and Athletes First's records and files are conducted); and

6

7

8

9

10

11

12

13

14

15

Using, possessing, disclosing, copying or transmitting any documents or information acquired as a result of Dunn's employment with SMD, including but not limited to the names, addresses, phone and facsimile numbers, and individual contact information, of any client or prospective client of SMD;

16

17

18

19    8.    For the Sixth Claim for Relief, for damages according to proof at trial;

20    9.    For the Seventh and Eighth Claims for Relief, for restitution and

21    disgorgement equal to the amount that Dunn and/or Athletes First have been unjustly

22    enriched as a result of their acts of unfair competition , in an amount according to proof at

23    trial;

24    10.    For the Fifth and Eighth through Eleventh Claims for Relief of action,

25    for general damages, in an amount according to proof at trial;

26    11.    For the Eighth through Eleventh claims for Relief, for exemplary and

27    punitive damages appropriate to punish and make an example of Dunn and Athletes First;

28    12.    For the Eighth Claim for Relief, for double damages according to

1    statute;

2         13.   For the Twelfth Claim for Relief, for an accounting of Dunn and

3    Athletes First and for the imposition of a constructive trust for the benefit of SMD as to

4    profits owed to SMD that were wrongfully diverted to the possession of Dunn and/or

5    Athletes First;

6         14.   For the Thirteenth Claim for Relief, for damages in an amount to be

7    proven at trial and for a preliminary and permanent injunction against Dunn and Athletes

8    first and their officers, directors, agents, servants, and employees, and all those acting by or

9    through them, or at their direction, enjoining Dunn and Athletes First from further false

10   advertising;

11        15.   For the Fourteenth Claim for relief, for damages in an amount to be

12   proven at trial;

13        16.   For the Fifteenth Claim for Relief, for restitution equal to the amount

14   of profits made by Defendants that were derived from their acts of fraud, unfair

15   competition, misappropriations of trade secrets, and for their other violations of law;

16        17.   For the Sixteenth Claim for Relief, for an accounting by Defendants,

17   and each of them, and for the imposition of a constructive trust for the benefit of SMD as to

18   gains, profits and advantages that were derived from their acts of fraud, unfair competition,

19   misappropriations of trade secrets, and for their other violations of law;

20        18.   For the Seventeenth Claim for Relief, for damages according to proof

21   at trial,

22        19.   For disgorgement of profits and restoration of amounts by which Dunn

23   and/or Athletes first were unjustly enriched;

24        20.   For prejudgment interest as provided by law;

25        21.   For SMD's costs of suit, including its attorneys' fees; and

26   ///

27   ///

28   ///

OCOLIB1\GG2\
240492.04
(55KC04!.DOC)