

FILED
CLERK, U.S. DISTRICT COURT

DEC 23 2002
2002

CENTRAL DISTRICT OF CALIFORNIA
BY

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

STEINBERG MOORAD & DUNN, INC., a California corporation,

Plaintiff,

v.

DAVID L. DUNN, an individual; ATHLETES FIRST, LLC, a Delaware corporation; DAVID C. HUNNEWELL, an individual; CENTURION CAPITAL MANAGEMENT, LLC, a Massachusetts limited liability corporation; PLATINUM EQUITY, LLC, a Delaware limited liability company; DONALD HOUSMAN, an individual; BROAD OPPORTUNITY YIELD SYSTEM, LLC (a/k/a B.O.Y.S.), a New Jersey limited liability company; and DOES 1-10, inclusive,

Defendants.

CASE NO. 01-07009 RSWL (RZx)

[Revised ~~PROPOSED~~] FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: DEFENDANT PLATINUM EQUITY, LLC'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF STEINBERG, MOORAD & DUNN, INC.'S CLAIMS

[Fed. R. Civ. P. 56(b) and 56(c); C.D. Cal. Local Rule 56-1]

Summary Judgment Hearing
Date:       August 19, 2002
Time:       9:00 a.m.
Ctrm:       21 - Hon. Ronald S.W. Lew

DEC 26 2002

960

:ODMA\MHODMA\LADOCS;480246;1

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: DEFENDANT PLATINUM EQUITY, LLC'S MSJ

On July 29, 2002, defendant Platinum Equity, LLC filed a Motion for
Summary Judgment on all claims for relief asserted against it in plaintiff
Steinberg, Moorad & Dunn's ("SMD") Second Amended Complaint in this
action.  This Court heard that Motion on August 19, 2002 and, having fully
considered the papers, argument, and evidence submitted in connection with that
Motion, hereby makes the following findings of fact and conclusions of law,
pursuant to Fed. R. Civ. P. 56(b) and this Court's Local Rule 56-1:

## FINDINGS OF FACT

### *Background re Platinum*

1.     Platinum acts as a holding company through which it acquires high
technology divestitures.

*(Antoine Decl., ¶ 5, 3:20-21.)*

2.     Platinum's acquisitions are usually divisions or subsidiaries of
distressed high technology companies.

*(Antoine Decl., ¶ 5, 3:22-23.)*

3.     With few exceptions, Platinum acquires 100% ownership interest in
the high technology companies it acquires.

*(Antoine Decl., ¶ 5, 3:23-24;Gores Depo., 16:7-24, 19:4-8, 19:20-20:3.[1])*

4.     Upon acquisition of a high technology company, Platinum selects or
approves its own management team, and otherwise takes an active role in
managing the entity and attempting to make it more efficient to increase its value.

[1]All references to deposition excerpts are attached as Exhibits to the Roman
Declaration.

1   *(Antoine Decl., ¶ 5, 3:25-27;Antoine Depo., 32:10-35:12.)*

2

3   .   5.   Platinum currently owns a 100% interest in approximately 24

4   companies, all in the technology or telecommunications area.

5   *(Gores Depo., 16:7-24, 19:4-8, 19:20-20:3.)*

6

7   6.   Platinum does have one investment in the high technology area in

8   which it owns a 49% interest in the company.

9   *(Gores Depo., 19:23-20:3.)*

10

11   7.   Platinum itself is a privately held company, and its CEO and

12   President Tom Gores owns a 100% of the company.

13   *(Gores Depo., 10:24-11:7.)*

14

15   ***The potential investment in Athletes First***

16   ***First call***

17   8.   Tom Gores is a big football fan.

18   *(Gores Depo., 25:21-26:5, 30:9-17.)*

19

20   9.   Lawrence Antoine has been employed by Platinum since 1999, and

21   his current position is Vice President, Mergers and Acquisitions, and his duties are

22   to perform financial analysis and due diligence in regard to acquisitions

23   contemplated by Platinum.

24   *(Antoine Decl., ¶ 1, 1:5-8; ¶ 5, 3:20.)*

25

26   10.   Before working for Platinum, Mr. Antoine worked for approximately

27   4 years for PricewaterhouseCoopers, where he spent two years in its accelerated

28   partnership program and obtained enough experience to be a licensed as a certified

1  public accountant and then two years in its Transaction Services Group

2  performing financial due diligence for firm clients.

3      *(Antoine Decl. ¶ 4, 3:7-12.)*

4

5      11.    Joby Branion is a principal of Defendant Athletes First, LLC.

6  *(Antoine Decl., ¶ 17, 9:9; Exh. G Antoine Decl., p. 129.)*

7

8      12.    Lawrence Antoine and Joby Branion were classmates at UCLA's

9  Anderson Graduate School of Management between 1992 and 1994, each

10 graduating with an MBA in 1994.

11     *(Antoine Decl., ¶ 2, 2:16-18; ¶ 8, 5:3-5.)*

12

13     13.    After Mr. Antoine and Mr. Branion graduated from UCLA's

14 Anderson Graduate School of Management in 1994, they stayed in periodic

15 contact.

16     *(Antoine Decl., ¶ 8, 5:3-5.)*

17

18     14.    In the first week of April, 2001, Mr. Branion informed Mr. Antoine

19 that he (Mr. Branion) and others had left Plaintiff Steinberg, Moorad & Dunn

20 ("SMD") two months earlier and had started their own sports agency for NFL

21 players.

22     *(Antoine Decl., ¶ 9, 5:11-12.)*

23

24     15.    During this call, Mr. Branion explained that he, David Dunn, and

25 Brian Murphy were in the process of seeking investors to help in the start-up of

26 the new firm called Athletes First.

27     *(Antoine Decl., ¶ 9, 5:16-18.)*

28

16.    Mr. Antoine agreed he would look at the potential investment and requested that Mr. Branion send materials relating to the potential investment.

*(Antoine Decl., ¶ 10, 5:22-24.)*

### *Preliminary qualification of the potential investment*

17.    Mr. Antoine received an investment packet totaling 31 pages that described the potential investment in Athletes First (the "Investment Packet").

*(Antoine Decl., ¶ 10, 5:24-25; Exh. A. Antoine Decl.)*

18.    In conjunction with receipt of the Investment Packet, and at the request of Athletes First, Mr. Antoine signed a confidentiality agreement relating to the Investment Packet, and that confidentiality agreement was similar to those signed by Mr. Antoine and others at Platinum as a regular business practice upon request when presented a business plan or investment memoranda to review and evaluate.

*(Antoine Decl., ¶ 10, 5:27-6:5; Exh B. Antoine Decl.)*

19.    Mr. Antoine  understood that he was to use the Investment Packet and information contained therein only for the purposes of evaluating the potential investment in Athletes First.

*(Antoine Decl., ¶ 10, 6:5-7.)*

20.    Mr. Antoine learned that Athletes First was seeking an investor willing to commit as much as three million dollars over a period of time in return for which the investor would be repaid its capital with guaranteed interest payments of 8% and would also  receive 15% of the equity of the company.

*(Antoine Decl., ¶ 11, 6:9-14; Exh. A. Antoine Decl., pp. 56-63.)*

21.    Mr. Antoine also learned that since the Athletes First principals had left SMD two months earlier, they had signed a couple NFL players as clients and a number of others had expressed strong interest in Athletes First.

*(Antoine Decl., ¶ 11, 6:14-16.)*

22.    Mr. Antoine also learned that Athletes First had no permanent offices or equipment in April, 2001, and needed capital to fund its startup.

*(Antoine Decl., ¶ 11, 6:17-18.)*

23.    Mr. Antoine reviewed the Investment Packet upon receipt, in particular the *pro forma* cash flow projections, and performed some very rough financial analysis of the projections and concluded that the investment looked interesting but, as with most investment memoranda, additional financial analysis and scrutiny of the projections would be necessary.

*(Antoine Decl., ¶ 13, 7:10-16.)*

24.    Mr. Antoine also found the description of the business and backgrounds of the Athletes First principals interesting and worthy of further consideration.

*(Antoine Decl., ¶ 13, 16-18.)*

25.    Over the course of his employment with Platinum, Mr. Antoine's duties included performing financial analysis and reviewing investment memoranda in regard to acquisitions and investments being pitched to Platinum with the purpose of determining whether the proposed acquisition or investment might be of some interest to Platinum and was worthy of further investigation and analysis.

*(Antoine Decl., ¶ 6, 2-6; ¶ 7, 16-18.)*

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: DEFENDANT PLATINUM EQUITY, LLC'S MSJ

26.     Platinum receives countless business plans and investment memoranda from individuals and entities seeking to interest Platinum in acquiring or investing in a business or venture, typically in the high technology area, but the majority of these business plans and investment memoranda are rejected after an initial review.

*(Antoine Decl., ¶ 6, 6-10.)*

27.     The plans and memoranda that have some promise based on an initial review are presented to more senior people at Platinum, and if then approved for further investigation, a due diligence process is commenced.

*(Antoine Decl., ¶ 6, 10-14.)*

### *Antoine's initial thoughts on the potential investment*

28.     Mr. Antoine's initial thought after learning of the potential investment in Athletes First was not that the investment would be of interest to Platinum or its owner Tom Gores, but rather it might have an interest to Mr. Gores' brother, Sam Gores, because he is a principal with a talent agency called, Paradigm Talent & Literary Agency.

*(Antoine Decl., ¶ 12, 6:21-25.)*

29.     Mr. Antoine had in the past worked on special projects with Paradigm, including one a year earlier when he as asked to evaluate a potential acquisition of a sports agency called the Beverly Hills Sports Council ("BHSC") by Sam Gores and Paradigm.

*(Antoine Decl., ¶ 12, 6:26-7:3.)*

30.     Sam Gores did not end up purchasing the agency, but Mr. Antoine did perform a financial analysis in regard to the proposed acquisition that included

1  reviewing and evaluating information presented by BHSC about its business and

2  other sports agencies.

3       *(Antoine Decl., ¶ 12, 7:5-8.)*

4

5       31.    Based on his initial, rough financial analysis and his independent

6  knowledge of the industry, Mr. Antoine determined that it would be appropriate to

7  bring the potential investment to the attention of Tom Gores and inquire whether

8  he should present it to his brother, Sam Gores for further review.

9       *(Antoine Decl., ¶ 13, 7:13-21.)*

10

11      ***First discussion with Tom Gores regarding potential investment***

12      32.    Within a few days after Mr. Antoine reviewed the Investment Packet,

13 he presented the potential investment to Tom Gores and asked him if the

14 investment opportunity should be presented to his brother Sam Gores.

15      *(Antoine Decl., ¶ 14, 7:26-8:1.)*

16

17      33.    Tom Gores informed Mr. Antoine that he, Mr. Gores, might be

18 interested in the investment given his interest in football.

19      *(Antoine Decl., ¶ 14, 8:2-3;Gores Depo, 30:5-17)*

20

21      34.    Mr. Gores told Mr. Antoine to further investigate the potential

22 investment.

23      *(Antoine Decl., ¶ 15, 8:9;Antoine 30(b)(6) Depo., 66:15-67:9.)*

24

25      35.    Mr. Antoine understood Mr. Gores' instruction to mean that he

26 viewed this as more of a potential personal investment outside of Platinum's core

27 business and that (i) he did not want resources needed for the core business

28 diverted to this project and (ii) the amount of the proposed investment was

1   relatively small compared to Platinum's acquisitions of high technology
2   divestitures.
3       *(Antoine Decl., ¶ 14, 8:2-7.)*
4
5       ***Due diligence effort in regard to the potential investment***
6       36.    Platinum, through Mr. Antoine, proceeded to conduct due diligence
7   regarding the potential investment in Athletes First starting after the first
8   conversation with Mr. Gores in the first week in April 2001 lasting until through
9   the signing of the term sheet between Platinum and Athletes First on April 24,
10  2001 (the "Term Sheet").
11      *(Antoine Decl., ¶ 15, 8:11-20;Antoine 30(b)(6) Depo., 82:7-16, 83:12-84:5,*
12      *101:5-102:4; 105:18-106:9.)*
13
14      ***Meeting with David Dunn and Athletes First***
15      37.    A focus of Platinum's efforts during the due diligence period was to
16  confirm the independent information Mr. Antoine possessed regarding David
17  Dunn.
18      *(Antoine Decl., ¶ 16, 8:22-23; Foltz Decl., ¶ 4, 2:13-19 .)*
19
20      38.    Prior to learning of the Athletes First investment, Mr. Antoine was
21  aware of Mr. Dunn's prominence in the sports representation industry.
22      *(Antoine Decl., ¶ 15, 8:14-17; ¶ 16, 8:27-9:1.)*
23
24      39.    For Platinum to make the proposed investment in Athletes First, it
25  was important that both Mr. Gores and Mr. Antoine felt comfortable with and had
26  confidence in Mr. Dunn because Platinum would essentially be investing in Mr.
27  Dunn and his company with no control over management – a very different
28  *scenario* from Platinum's core business acquisitions of high tech divestitures.

1    *(Antoine Decl., ¶ 16, 9:4-6;Gores Depo., 49:23-50:16)*

2

3    40.    There was a meeting in early April, 2001 between the principals from

4    Athletes First, David Dunn, Joby Branion, and Brian Murphy on the one hand, and

5    Tom Gores and Lawrence Antoine, on the other hand, the primary purpose of

6    which was for Mr. Dunn and Mr. Gores to meet and determine if they felt

7    comfortable with each other and want to consider doing business together.

8        *(Antoine Decl., ¶ 17, 9:8-13.)*

9

10    41.    During the first meeting with Athletes First's principals, they

11    described their experiences in the sports industry and the formation of their new

12    company.  The Athletes First principals specifically referenced that they were

13    looking for an investor with whom they would feel comfortable, because

14    Mr. Dunn has an easy-going demeanor and wanted to feel comfortable "having a

15    beer" with their investor.

16        *(Antoine Decl., ¶ 17, 9:13-16; ¶ 18, 9:19-25.)*

17

18    42.    As a result of the meeting, it was determined that there was a

19    personality fit between Mr. Dunn and the other principals of Athletes First, on the

20    one hand, and Mr. Gores and Mr. Antoine, on the other hand.

21        *(Antoine Decl., ¶ 18, 9:27-10:3.)*

22

23    ### *Antoine's prior knowledge of Dunn and Steinberg*

24    ### *Randy Gordon*

25    43.    During each of his two years at UCLA Business School  Mr. Antoine

26    attended a speech given by Mr. Steinberg, including Mr. Antoine's second year in

27    business school when he personally met and then introduced Mr. Steinberg as the

28    speaker and observed what he considered were inconsistencies in Mr. Steinberg's

1   speech from the prior year.

2       *(Antoine Decl., ¶ 30, 15:15-18; ¶ 31, 15:20-16:6.)*

3

4       44.     One of Mr. Antoine's acquaintances from UCLA Business School is

5   Randy Gordon who graduated in 1993, a year ahead of Mr. Antoine, but they were

6   both active in the UCLA Sports Business Association.

7       *(Antoine Decl., ¶ 30, 15:12-15.)*

8

9       45.     Mr. Antoine stayed in contact with Mr. Gordon after his graduation

10  from UCLA Business School in 1993, and learned that Mr. Gordon went to work

11  as a special consultant for SMD in their role as a marketing agent for the 1994

12  United States World Cup Soccer team.

13      *(Antoine Decl., ¶ 32, 16:8-11.)*

14

15      46.     Both during and shortly after Mr. Gordon's tenure with SMD,

16  Mr. Gordon informed Mr. Antoine of the opinions and views he developed

17  regarding some of the individuals he had met and worked with at SMD.

18      *(Antoine Decl., ¶ 32, 16:11-13.)*

19

20      47.     Mr. Gordon made some very unflattering statements about

21  Mr. Steinberg to Mr. Antoine and told Mr. Antoine that based on his experience at

22  SMD he (Mr. Gordon) had a very low opinion of Mr. Steinberg and did not respect

23  Mr. Steinberg.

24      *(Antoine Decl., ¶ 32, 16:13-15; ¶ 33, 16:19-20.)*

25

26      48.     On the other hand, Mr. Gordon raved to Mr. Antoine about Dave

27  Dunn, stating how much he liked Mr. Dunn, that Mr. Dunn had integrity, that he

28  greatly respected Mr. Dunn, that the players, *i.e.,* SMD's clients, really liked Mr.

1  Dunn, and used the phrase "He's the man" when describing Mr. Dunn.

2      *(Antoine Decl., ¶ 33, 16:17-22.)*

3

4                 ***IMG***

5      49.    During the summer of 1993 while in business school, Mr. Antoine

6  worked as an intern for International Management Group ("IMG"), which was one

7  of the largest sports and entertainment representation firms in the country.

8      *(Antoine Decl., ¶ 3, 2:22-26;Antoine Depo., 25:14-17, 26:21-23.)*

9

10      50.    Mr. Antoine had a very strong interest in the sports industry during

11  business school, and he has continued to follow the sports industry after

12  graduating from business school.

13      *(Antoine Decl., ¶ 3, 2:27-3:3.)*

14

15      51.    During his internship at IMG, Mr. Antoine met and assisted one of

16  IMG's financial agents, John Palgutta, who was responsible for managing the

17  finances the some of the high net-worth sports clients of IMG.

18      *(Antoine Decl., ¶ 35, 17:8-12.)*

19

20      52.    On one occasion, Mr. Palgutta introduced Mr. Antoine to Ken

21  Kremer, a football agent employed by IMG, and Mr. Palgutta and Mr. Kremer

22  expressed negative views and opinions of Leigh Steinberg describing him as all

23  hype, among other things.

24      *(Antoine Decl., ¶ 35, 17:12-17.)*

25

26               ***Joby Branion***

27      53.    During business school, Mr. Branion and Mr. Antoine took a number

28  of the same classes, had a number of common friends and even worked as partners

1  on a marketing project for one of their classes.

2          *(Antoine Decl., ¶ 36, 17:25-18:1.)*

3

4          54.    After they graduated from business school, Mr. Branion and Mr.

5  Antoine stayed in periodic contact.

6          *(Antoine Decl., ¶ 36, 18:1-2.)*

7

8          55.    Based on their long term friendship, Mr. Antoine liked and respected

9  Mr. Branion.

10         *(Antoine Decl., ¶ 39, 19:9-11.)*

11

12         56.    On one occasion in the late-1990s, Mr. Antoine visited Mr. Branion

13  at SMD's office in Newport Beach, and received a tour of the office.

14         *(Antoine Decl., ¶ 37, 18:6-9.)*

15

16         57.    During the tour of SMD's office,  Mr. Branion briefly introduced Mr.

17  Antoine to Dave Dunn, who was casually practicing his golf swing in his bare feet,

18  and Mr. Branion expressed a very positive view of Mr. Dunn.

19         *(Antoine Decl., ¶ 37, 18:9-12.)*

20

21         58.    That same evening as the tour of SMD's office, Mr. Branion and Mr.

22  Antoine had dinner during which Mr. Branion explained his complaints towards

23  his job and in particular Leigh Steinberg.

24         *(Antoine Decl., ¶ 38, 18:17-18.)*

25

26         59.    The primary complaint Mr. Branion expressed to Mr. Antoine was

27  that Mr. Steinberg gave little credit or appreciation for the work performed by

28  Mr. Branion, and that Mr. Steinberg would take a great deal of credit *within the*

1   *SMD* organization for Mr. Branion's effort in recruiting athletes.

2       *(Antoine Decl., ¶ 38, 18:18-22.)*

3

4       60.    Mr. Branion also explained to Mr. Antoine that Mr. Steinberg was

5   always complaining and whining about matters ranging from issues related to

6   SMD and its business to private issues in Mr. Steinberg's life that had nothing to

7   do with Mr. Branion.

8       *(Antoine Decl., ¶38, 18:24-27.)*

9

10      61.    That evening at dinner, Mr. Branion described for Mr. Antoine the

11  flaws of Mr. Steinberg that were in contrast to the image of the "superagent" that

12  Mr. Steinberg portrayed publicly.

13      *(Antoine Decl., ¶ 38, 18:27-19:1.)*

14

15      62.    As part of his due diligence regarding the potential investment in

16  Athletes First, Mr. Antoine contacted an acquaintance in the sports representation

17  industry, Cory Clemetson, to inquire of David Dunn's reputation within the

18  industry.

19      *(Antoine Decl., ¶ 28, 14:5-7;Antoine 30(b)(6) Depo., 103:15-104:1; Antoine*

20      *Depo., 101:14-102:6, 103:12-23 .)*

21

22      ***Additional diligence regarding Dave Dunn***

23      62.    Mr. Antoine and Mr. Clemetson met during Mr. Antoine's internship

24  at IMG, and Mr. Antoine knew that Mr. Clemetson had some experience in

25  representing football players but currently had a sports agency representing

26  professional soccer players.

27      *(Antoine Decl., ¶ 28, 14:5-10.)*

28

63.    Mr. Antoine was told by Mr. Clemetson that, "Dave Dunn had the most integrity" in compared to other agents listed by Mr. Antoine, that Mr. Dunn negotiates "ok" contracts that were neither the best nor worst in the industry, but he is well-respected in the industry.

*(Antoine Decl., ¶ 29, 14:20-23;Antoine Depo., 102:4-6, 104:12-15.)*

64.    The information regarding Dave Dunn's reputation in the industry confirmed prior information already possessed by Mr. Antoine.

*(Antoine Decl., ¶ 29, 15:4-6.)*

65.    Regarding SMD and Leigh Steinberg, Mr. Clemetson expressed the opinion to Mr. Antoine that Mr. Steinberg was a fraud, meaning he was not the "superagent" that is portrayed by the media and that this was well known within the industry.

*(Antoine Decl., ¶ 29, 14:23-26;Antoine Depo., 103:6-8.)*

### *Private meeting between Mr. Dunn and Mr. Gores*

67.    There was a private meeting between Mr. Gores and Mr. Dunn, which was a private meeting between the two of them so that Mr. Gores could affirm his comfort and confidence in doing business with Mr. Dunn.

*(Antoine Decl., ¶ 19, 10:8-9;Gores Depo., 48:3-25, 50:4-17.)*

68.    As a result of the private meeting with Mr. Dunn, Mr. Gores confirmed his positive views of Mr. Dunn and his willingness to due business with him.

*(Antoine Decl., ¶ 19, 10:9-12;Gores Depo., 48:3-25, 50:5-16.)*

### *Conclusions regarding Dave Dunn*

69.    Mr. Antoine's conversation with Mr. Clemetson, Mr. Antoine's own conversations with Mr. Dunn, Mr. Gores' conversations with Mr. Dunn, the prior industry information Mr. Antoine had, and Mr. Dunn's close association with Mr. Branion, all served to confirm positive views and opinions of Mr. Dunn and support doing business with him.

*(Antoine Decl., ¶ 39, 19:7-11.)*

70.    The less than flattering information Mr. Antoine had received about Mr. Steinberg over the years and in his call with Mr. Clemetson confirmed to some degree in Mr. Antoine's mind the motivations expressed by Messrs. Dunn, Branion, and Murphy for leaving SMD and starting their own firm.

*(Antoine Decl., ¶ 39, 19:11-14.)*

### *Legal opinion from outside counsel*

71.    In the early discussions with Athletes First, it informed Platinum of threatened legal action by SMD and/or its parent company, Assante Corporation, stemming from the departure of Athletes First principals from SMD, two months earlier in February of 2001.

*(Antoine Decl., ¶ 20, 10:15-19.)*

72.    David Dunn's lawyer, Gerald Sauer, Esq. gave Mr. Antoine a brief explanation of the threatened claims, including that there was a threat that SMD or Assante may seek to enjoin Mr. Dunn from working as a sports agent based on an employment contract he had signed with SMD or Assante.

*(Antoine Decl., ¶ 21, 10:24-11:3.)*

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: DEFENDANT PLATINUM EQUITY, LLC'S MSJ

73.  To assist in the legal due diligence, Platinum retained outside legal counsel, Walter Cochran Bond, Esq. of Cochran-Bond, Connon & Ben-Zvi, whose practice is focused on employment counseling and litigation.

*(Antoine Decl., ¶ 22, 11:15; Cochran-Bond Decl., ¶ 4, 4:26-5:6;Cochran-Bond Depo., 21:8-22:8.)*

74.  Mr. Cochran-Bond's assignment was to advise Platinum on how the threatened claims made by SMD and Assante against Athletes First and David Dunn that might affect Platinum's potential investment in Athletes First.

*(Cochran-Bond Decl., ¶ 4, 4:26-5:2;Cochran-Bond Depo., 45:20-25.)*

75.  Mr. Cochran-Bond's evaluation and analysis was based on the information provided by Mr. Dunn's legal counsel, Gerald Sauer, Esq. including: (a) a lengthy telephone conference call in which Mr. Sauer described the facts and circumstances surrounding Mr. Dunn's departure from SMD; (b) a copy of an employment contract between Mr. Dunn and Steinberg & Moorad; and (c) a copy of a legal memorandum prepared by the law firm of Ropes & Gray which analyzed legal aspects of the departure of Mr. Dunn and the other principals of Athletes First from SMD.

*(Cochran-Bond Decl., ¶ 5, 5:8-18;Cochran-Bond Depo., 60:1-25.)*

76.  Mr. Sauer told Mr. Cochran-Bond that Mr. Dunn had been a non-equity partner with SMD prior to his departure.

*(Cochran-Bond Decl., ¶ 6, 5:25-26;Cochran-Bond Depo., 50:5-6, 158:1-7.)*

77.  Mr. Sauer told Mr. Cochran-Bond that the Athletes First principals had been counseled not to take anything when leaving SMD including their rolodex and client information, and they followed that advice.

1    *(Cochran-Bond Decl., ¶ 6, 6:15;Cochran-Bond Depo., 51:5-10, 90:5-*
2    *93:11.)*

3

4        78.    Mr. Sauer told Mr. Cochran-Bond that the Athletes First principals
5    were given a script to follow by legal counsel to announce their departure from
6    SMD, and they followed that script and did not solicit SMD clients when
7    announcing their departure.
8        *(Cochran-Bond Depo., 91:2-92:3.)*

9

10        79.    Mr. Sauer told Mr. Cochran-Bond that NFL players had volunteered
11    to go with Mr. Dunn when he announced his departure per instructions from legal
12    counsel and that players had initiated contact with Athletes First after the
13    departure spread by word of mouth through the NFL.
14        *(Cochran-Bond Depo., 95:25-96:23.)*

15

16        80.    Mr. Sauer told Mr. Cochran-Bond that information about NFL players
17    and their contracts is publicly available, and certainly available to competing
18    agents.
19        *(Cochran-Bond Depo., 65:15-70:11, 67:2-10, 159:20-25.)*

20

21        81.    Mr. Antoine similarly was told directly by Athletes First principals
22    that they did not take anything from SMD when they left and did not solicit SMD
23    clients, but rather the clients initiated contact with Athletes First as news of the
24    departure from SMD spread by word of mouth among NFL players.
25        *(Antoine Decl., ¶ 24, 12:8-13;Antoine Depo., 144:17-145:1, 207:22-208:1.)*

26

27        82.    Mr. Cochran-Bond concluded and informed Platinum that it was
28    unlikely that SMD would be able to enjoin Mr. Dunn from working as a sports

1  agent and competing with SMD based on Mr. Dunn's former status with SMD as a

2  non-equity partner because the non-competition provisions of Mr. Dunn's

3  employment contract were likely not enforceable.

4     *(Cochran-Bond Decl., ¶ 6, 5:23-6:1;Cochran-Bond Depo., 159:3-160:14.)*

5

6     83.    Mr. Cochran-Bond also informed Platinum that it was significant to

7  his conclusion that an injunction was not likely because even though NFL player

8  information was likely to be considered trade secrets, that Athletes First principals,

9  including Mr. Dunn, were nonetheless advised by counsel not even to take their

10 rolodexes or client lists with them when they departed from SMD, and that

11 Athletes First principals had been counseled not to solicit the clients of SMD, but

12 rather to announce their departure from SMD and allow players to initiate contact.

13    *(Cochran-Bond Decl., ¶ 6, 6:2-12;Cochran-Bond Depo., 96:4-9,159:3-*

14    *160:14.)*

15

16    84.    Mr. Cochran-Bond also told Platinum that not only were Athletes

17 First and Mr. Dunn not likely to be enjoined from competing with SMD, but also

18 that there was a low probability of any legal exposure to Athletes First and Mr.

19 Dunn relative to his departure from SMD.

20    *(Cochran-Bond Depo., 168:2-169:4.)*

21

22    85.    Mr. Cochran-Bond had no discussion with Mr. Antoine concerning

23 potential legal exposure to Platinum, and Mr. Cochran-Bond did not ever suggest

24 to Platinum or even consider this fact based on the facts he knew.

25    *(Cochran-Bond Decl., ¶ 7, 6:21-27.)*

26

27    86.    At no time during his representation of Platinum relating to its

28 potential investment in Athletes First did Mr. Cochran-Bond ever conclude that

1 | there was a potential or viable claim that could be asserted against Platinum.

2 |     *(Cochran-Bond Decl., ¶ 8, 7:1-4.)*

3 |

4 |     87.   During the due diligence period lasting until the signing of the Term

5 | Sheet, Mr. Antoine was told by the Athletes First principals that they were in

6 | discussions with SMD and Assante in an attempt to resolve the threatened

7 | litigation.

8 |     *(Antoine Decl., ¶ 27, 13:17-19.)*

9 |

10 |     88.   Mr. Antoine was never told by Athletes First principals that they had

11 | or were threatening to use salacious information about Leigh Steinberg, or anyone

12 | else with SMD, to obtain a settlement from SMD and Assante.

13 |     *(Antoine Decl., ¶ 27, 13:19-22.)*

14 |

15 |     89.   Mr. Antoine was told by Athletes First principals that Assante had

16 | made an offer for Mr. Dunn to return, but that Mr. Dunn had rejected the offer.

17 |     *(Antoine Decl., ¶ 27, 13:22-23.)*

18 |

19 |     90.   Mr. Antoine was told that Assante had told Athletes First that they

20 | have a war chest for litigation with which it was attempting to pressure Mr. Dunn

21 | into returning to Assante.

22 |     *(Antoine Decl., ¶ 27, 13:24-25.)*

23 |

24 |     91.   Mr. Antoine ultimately concluded based on the advice of Mr.

25 | Cochran-Bond and Assante's attempt to pressure Dunn into returning based on the

26 | expense of litigation that Assante's litigation threats seemed rather specious.

27 |     *(Antoine Decl., ¶ 27, 13:27-14:2.)*

28 |

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: DEFENDANT PLATINUM EQUITY, LLC'S MSJ

### *Financial due diligence and analysis*
### *Revenue projections*

92.    Based on Mr. Antoine's review of the Investment Packet and discussions early in the due diligence process with Athletes First's principals, Mr. Antoine understood that Athletes First had signed some clients, including one significant client in Drew Bledsoe.

*(Antoine Decl., ¶ 40, 19:19-21.)*


93.    After reviewing the Investment Packet, Mr. Antoine requested additional information that would support the revenue projections made in the Investment Packet.

*(Antoine Decl., ¶ 40, 19:21-24.)*


94.    Brian Murphy faxed and e-mailed to Mr. Antoine a spreadsheet listing contract values with revenue projections for unnamed NFL players (the "Projections").

*(Antoine Decl., ¶ 40, 19:24-26; Exh. D, pp. 75-78.)*


95.    Mr. Antoine was told by Mr. Murphy that the listing of unnamed players in the Projections was not intended to represent actual clients of Athletes First, but rather a universe of potential clients, so that the Projections and the values of the contracts for unnamed players represented future, potential revenue.

*(Antoine Decl., ¶ 40, 20:1-5;Antoine 30(b)(6) Depo., 115:4-116:17.)*


96.    Mr. Murphy and Mr. Dunn explained to Antoine that the agent's commission was a maximum of 3% of the player's salary and bonus, and that the agent of record for a player at the time the player signs a contract receives commission on the contract for the entire length of contract, even if the player

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: DEFENDANT PLATINUM EQUITY, LLC'S MSJ

1  changes agents during the term of the contract.

2      *(Antoine Decl., ¶ 41, 20:7-12.)*

3

4      97.    Mr. Antoine was told that Athletes First would only earn revenue on

5  new contracts signed by its clients, but Athletes First principals stated that they

6  were nonetheless optimistic about their business.

7      *(Antoine Decl., ¶ 41, 20:12-14.)*

8

9              ***Expenses projected by Athletes First***

10     98.    Mr. Antoine understood the expenses and other information set forth

11  in the financial projections in the Investor Packet was the combined best estimate

12  of Mr. Murphy, Mr. Dunn, and Mr. Branion based on their knowledge and

13  experiences of having worked in the industry.

14     *(Antoine Decl., ¶ 42, 20:20-23.)*

15

16     99.    Mr. Antoine never asked for or required specific information from

17  Athletes First's principals about SMD in order to evaluate the potential investment,

18  but rather he sought "ballpark" estimates consistent with general industry

19  standards for the purpose of testing their estimates and projections.

20     *(Antoine Decl., ¶ 42, 20:23-27.)*

21

22     100.   Mr. Antoine did not accept as true the statements and numbers from

23  the financial projections contained in the Investor Packet, but instead challenged,

24  questioned, and critiqued the numbers, and he created his own projections and

25  relied on his own industry information.

26     *(Antoine Decl., ¶ 43, 21:1-14:Antoine 30(b)(6) Depo., 82:7-16; 83:12-*

27     *84:5.)*

28

1       101.  Mr. Antoine understood that the ordinary or standard business

2  expense items, including office supplies, travel, and client expenses, were

3  estimated based on the general knowledge of Athletes First's principals as well as

4  their past experiences at SMD and actual estimates they had obtained..

5       *(Antoine Decl., ¶ 43, 21:9-13.)*

6

7       102.  Mr. Antoine created his own spreadsheets and made adjustments to

8  the projections and estimates of Athletes First where he deemed it appropriate and

9  necessary.

10      *(Antoine Decl., ¶ 43, 21:14-17; Exh F. Antoine Decl.)*

11

12      103.  Mr. Antoine applied prior industry knowledge to his analysis and

13  conclusions.

14      *(Antoine Decl. ¶ 44, 21:20-21.)*

15

16      104.  Mr. Antoine had a year earlier reviewed and analyzed a proposed

17  acquisition of a sports agency that represents baseball players, the BHSC, on

18  behalf of Tom Gores' brother, Sam Gores.

19      *(Antoine Decl., ¶ 44, 21:21-23.)*

20

21      105.  Mr. Antoine did not review the information from the proposed BHSC

22  acquisition while evaluating the potential Athletes First investment, but he did

23  recall and apply from that experience that a reasonable estimate of the percentage

24  rate of return on revenue for a sports agency was from the high thirties to low

25  forties.

26      *(Antoine Decl., ¶ 44, 21:23-26.)*

27

28

1    106.   Mr. Antoine viewed a talent agency as a similar business to a sports

2    agency, and Sam Gores confirmed with Mr. Antoine that in a talent agency a

3    reasonable rate of return on revenue was between the high thirties to low forties

4    percentile.

5         *(Antoine Decl., ¶ 44, 21:27- 22:2.)*

6

7    107.   Based on Mr. Antoine's independently gained industry knowledge, he

8    concluded that Mr. Murphy estimated rate of return of 45 to 50%, based on what

9    Mr. Antoine understood was Mr. Murphy's knowledge of the industry and his

10   experiences at SMD, was optimistic but not far off the mark what Athletes First

11   might be expected to return once it was established.

12        *(Antoine Decl., ¶ 44, 22:2-6.)*

13

14   108.   Mr. Antoine's independently gained industry knowledge on the rate of

15   return for sports or talent representation firms, not the estimate from Mr. Murphy,

16   governed his decision to recommend that Platinum make the investment in

17   Athletes First.

18        *(Antoine Decl., ¶ 44, 22:7-9;Antoine 30(b)(6) Depo., 81:5-82:6.)*

19

20   109.   Mr. Antoine independently looked up the fact that last year Steinberg,

21   Moorad & Dunn was purchased for a reported $125 million by Assante

22   Corporation.

23        *(Antoine 30(b)(6) Depo., 209:3-25.)*

24

25   110.   Mr. Antoine never understood or had reason to believe that the

26   information contained in the documents supplied by Athletes First, *i.e.,* the

27   Investor Packet and the Projections, contained confidential proprietary information

28   or trade secrets of SMD or anyone else.

*(Antoine Decl., ¶ 45, 22:11-13.)*

111. Neither Mr. Antoine nor anyone else at Platinum has ever disseminated or used any information provided by Athletes First , *i.e.*, the Investor Packet, the Projections, and conversations with Athletes First principals pertaining thereto, for any purpose other than to test the veracity of that information provided by Athletes First and evaluate the potential investment in Athletes First.

*(Antoine Decl., ¶ 45, 22:15-18.)*

### Second meeting with Tom Gores

112. After performing the industry, legal, and financial due diligence, Mr. Antoine discussed the potential investment with Tom Gores in mid-April 2001 and informed him it appeared that the investment was worth further pursuing.

*(Antoine Decl., ¶ 46, 22:24-27.)*

113. Mr. Gores instructed Mr. Antoine to present the potential investment to Platinum's Chief Financial Officer Bill Foltz for his review.

*(Antoine Decl., ¶ 46, 23:1.)*

### Discussion and analysis with Bill Foltz

114. Prior to becoming Platinum's CFO, Bill Foltz worked for 9 years in the sports industry as part of the financial management team of the Los Angeles Dodgers baseball organization, the last 3 years of which Mr. Foltz was the CFO of the Dodgers.

*(Foltz Decl., ¶ 2, 1:15-18.)*

115. Including 4 years with Ernst & Young, Mr. Foltz has 18 years experience as an accountant or in a financial management position.

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: DEFENDANT PLATINUM EQUITY, LLC'S MSJ

1    *(Foltz Decl., ¶ 2, 1:13-15.)*

2

3    116.   In mid April 2001, Mr. Foltz had several discussions with Mr.

4    Antoine regarding the potential investment in Athletes First during which they

5    discussed and reviewed (i) Mr. Antoine's financial analysis in regard to the

6    investment, (ii) the legal opinion Mr. Antoine had received from an outside

7    counsel regarding certain legal risks Athletes First might face, (iii) the information

8    Mr. Antoine had gathered or otherwise possessed about the sports agency industry,

9    and (iv) the face-to-face meetings that took place between Mr. Antoine and Mr.

10   Gores and the principals of Athletes First.

11   *(Foltz Decl., ¶ 3, 2:1-8.)*

12

13   117.   In discussing the outside legal opinion Mr. Antoine received

14   concerning the potential investment, Mr. Foltz commented to Mr. Antoine that

15   even when there is no merit to a complaint companies often file lawsuits when

16   they lose a valuable employee and customers or clients follow that employee to a

17   competing business.

18   *(Antoine Decl., ¶ 47, 23:4-11.)*

19

20   118.   After Mr. Antoine had detailed for Mr. Foltz the results of his due

21   diligence, Mr. Foltz concluded that the decision whether to invest came down to

22   whether the entity will be able to attract sufficient customers and revenue needed

23   to sustain itself.

24   *(Foltz Decl., ¶ 4, 2:10-13.)*

25

26   119.   Mr. Antoine explained to Mr. Foltz that industry sources were

27   consistently positive about David Dunn, his reputation, and his integrity, and Mr.

28   Antoine therefore believed that Mr. Dunn would be able to develop a sufficient

1    client base and generate the necessary revenue.

2        *(Foltz Decl., ¶ 4, 2:13-17.)*

3

4        120.   Because Platinum would have only a small passive, minority interest

5    with no ability to run or control the entity, Mr. Dunn's reputation and integrity

6    within the sport representation industry were highly significant to Mr. Foltz in

7    making a decision on the investment.

8        *(Foltz Decl., ¶ 6, 3:4-9.)*

9

10       121.   Mr. Foltz viewed the proposed investment as a hybrid in which

11   Platinum would be repaid a portion of its capital contribution plus interest –

12   thereby acting akin to a lender – but would still retain a small amount of equity in

13   the business.

14       *(Foltz Decl., ¶ 5, 2:21-26.)*

15

16       122.   Based on the proposed structure, Mr. Foltz  concluded that the

17   investment was not likely to produce a significant return but also appeared to have

18   a limited downside with the likelihood of providing a small return for Platinum.

19       *(Foltz Decl., ¶ 5, 2:26-3:2.)*

20

21       123.   Protecting the downside, as opposed to seeking extraordinary returns,

22   is a key tenet of Platinum and Tom Gores' business strategy for acquisitions and

23   investments.

24       *(Gores Depo., 142:14-144:8.)*

25

26       124.   Mr. Gores believes that if you protect the downside by focusing on

27   the worst case scenario so that the company is assured not losing its capital, in the

28   long run the company will make money because some of the investments will

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: DEFENDANT PLATINUM EQUITY, LLC'S MSJ

1    provide a high return.

2         *(Gores Depo., 143:23-144:8.)*

3

4         125.   Platinum's decision to invest in Athletes First was based on the

5    conclusion that it was a sound financial investment with limited risk, even though

6    it was not likely to produce a spectacular gain.

7         *(Foltz Decl., ¶ 6, 3:12-15.)*

8

9         126.   Mr. Gores, Mr. Foltz, and Mr. Antoine had a high interest in the

10   sports industry and football in particular, but the recommendation by Mr. Foltz

11   and Mr. Antoine to Mr. Gores to invest in Athletes First was made only after

12   finding a compelling business reason to do so.

13        *(Foltz Decl., ¶ 6, 3:15-18.)*

14

15        127.   The Term Sheet signed on April 24, 2001 by Platinum and Athletes

16   First proposed that Platinum make capital contributions in increments that total $2

17   million by January of 2002 and commit to make additional capital contributions of

18   another $1 million if called by Athletes First over a period of five years.  In return,

19   Platinum's capital was to be repaid by Athletes First over a five year period, with

20   interest, and Platinum was to receive a 15% interest in Athletes First.

21        *(Antoine Decl., ¶ 48, 23:26-24:4; Exh. C, Antoine Decl., pp. 67-74.)*

22

23                    ***Structure and Terms of Investment***

24        128.   The terms of the investment as set forth in the Term Sheet were then

25   formalized by the respective attorneys for Platinum and Athletes First, and the deal

26   closed with the execution of an Amended and Restated LLC Agreement and

27   related documents in May, 2001.

28        *(Antoine Decl., ¶ 49, 24:6-9.)*

1      129.  During this formalization of the Termsheet, Athletes First's counsel

2  provided Platinum's counsel with a written representation that Athletes First had

3  not engaged in trade secret misappropriation.

4       *(DuRocher Decl., ¶ 6, 38:15-39:1, Exh. B, DuRocher Decl., p. 40.)*

5

6      130.  A Second Amended and Restated LLC Agreement (the "LLC

7  Agreement") and related documents were then executed by Platinum and Athletes

8  First in June, 2001 to incorporate the agreement between Athletes First and its

9  initial investor, defendant Broad Opportunity Yield Systems, LLC ("BOYS").  The

10  LLC Agreement includes an indemnity from Athletes First to Platinum for any

11  claims brought by SMD or Assante.

12       *(Antoine Decl., ¶ 49, 24:9-14; Exh. G, Antoine Decl.)*

13

14      131.  The LLC Agreement is the operative agreement between Athletes

15  First, Platinum, and BOYS.

16       *(Antoine Decl., ¶ 49, 24:12-14; Exh. G, Antoine Decl.)*

17

18  ***Athletes First start-up assistance***

19      132.  After Platinum agreed to invest in Athletes First and signed the Term

20  Sheet on April 24, 2001, Platinum provided some initial financial assistance to

21  Athletes First by purchasing computers and other equipment needed by Athletes

22  First and supplying its principals credit cards so it had necessary funds to conduct

23  its business.

24       *(Antoine Decl., ¶ 50, 24:17-21.)*

25

26      133.  Some of this financial assistance occurred prior to the formal closing

27  of the deal between Platinum and Athletes First in May, 2001, as no capital was

28  paid in by Platinum until the deal formally closed.

1    *(Antoine Decl., ¶ 50, 24:21-23.)*

2

3    134.   It was agreed and understood by Athletes First and its principals that

4    the purchases, credit card charges, and other financial assistance provided to

5    Athletes First would be reimbursed in full once the business was firmly

6    established.

7    *(Antoine Decl., ¶ 50, 24:23-26.)*

8

9    135.   Platinum later billed Athletes First for all of these purchases and

10    credit card charges.

11    *(Antoine Decl., ¶ 50, 24:26-27.)*

12

13    136.   Athletes First has reimbursed Platinum for all credit card statements

14    paid by Platinum, including all travel expenses on the statements, and Athletes

15    First's principals no longer have Platinum company credit cards.

16    *(Antoine Decl., ¶ 51, 25:15-18.)*

17

18    137.   Athletes First is obligated to reimburse Platinum for all of the

19    purchases advanced by Platinum, and Platinum expects full reimbursement when

20    Athletes First has the financial means to do so.

21    *(Antoine Decl., ¶ 50, 25:1-3.)*

22

23    138.   Platinum also advanced payment for certain public relations work and

24    marketing consulting needed by Athletes First at its startup, and Athletes First is

25    obligated to repay Platinum for the services provided by the public relations and

26    marketing firms when Athletes First has the financial means to do so.

27    *(Antoine Decl., ¶ 52, 26:1-3; ¶ 53, 26:13-17; ¶ 54, 27:1-5.)*

28

***Platinum has no role in Athletes First's management***

139.  Platinum has one of the five seats on Athletes First's Board of Managers, while Athletes First's principals, Mr. Dunn, Mr. Murphy, and Mr. Branion, having a majority of three of the five seats.

*(Antoine Decl., ¶ 64, 31:14-16; Exh. G, Antoine Decl., ¶ 7.3, p. 146.)*

140.  Platinum has no ability to control or appoint Athletes First's management because the LLC Agreement states that Platinum's representative on the board has only 2 of the 13 total votes on the board, with Athletes First's principals controlling 10 of the 13 votes, thereby giving Platinum no ability to overrule or outvote Athletes First's principals.

*(Antoine Decl., ¶ 65, 32:6-11; Exh. G, Antoine Decl., ¶ 7.5, pp. 146-148.)*

141.  Platinum has had no role in the day to day operations of Athletes First and no role in managing Athletes First.

*(Antoine Decl., ¶ 65, 32:11-12.)*

142.  Mr. Antoine acts as Platinum's board designee on Athletes First's board, and Mr. Antoine requests and receives from Athletes First's principals updates regarding the company via telephone conversations and occasional in person meetings in order to keep track of Platinum's investment, but that is the extent of Platinum's involvement with Athletes First's business.

*(Antoine Decl., ¶ 64, 31:14-21.)*

143.  Platinum agreed in making the investment in Athletes First that Athletes First's principals would retain control of and manage the company, thereby placing the fate of Platinum's investment in the hands of Athletes First's principals.

1    *(Antoine Decl., ¶ 65, 32:12-15.)*

2

3    **General Industry Knowledge and Public Disclosure of SMD's Trade**

4    **Secrets**

5        144.   Richard Berthelsen is General Counsel of the National Football

6    League Players Association ("NFLPA").

7        *(Roman Decl., ¶ 5, Exh. A, p. 8.)*

8

9        145.   According to the NFLPA, there is nothing secret about the things a

10   sports agent needs to do or to know to be successful.

11       *(Berthelsen Depo., 340:22-341:7.)*

12

13       146.   To assist Certified Contract Advisors in their negotiations with NFL

14   teams, the NFLPA provides several resources to all Certified Contract Advisors

15   via the NFLPA's website at <http://www.nflpa.org>.

16       *(Roman Decl., ¶ 5, Exh. A, p. 9.)*

17

18       147.   The reports and information posted thereon are prepared by the

19   NFLPA's research department in the regular course of the NFLPA's business and

20   are frequently updated to reflect current information.

21       *(Roman Decl., ¶ 5, Exh. A, p. 9.)*

22

23       148.   The NFLPA routinely posts material on the NFLPA's website to assist

24   Certified Contract Advisors in their negotiations with NFL teams.

25       *(Roman Decl., ¶ 5, Exh. A, p. 9.)*

26

27       149.   Information routinely posted on the NFLPA's website includes:

28   Player Profiles, which include a player's position, current team, home town, year

1 drafted, round drafted, position drafted, and the player's salary history detailing the

2 player's salary per year for the remaining term of any current contract.

3      (*Roman Decl., ¶ 5, Exh. A, p. 9.*)

4

5      150.   Information routinely posted on the NFLPA's website includes:

6 Player and Agents Report, which details every player in the NFL, what team he

7 plays for, and the name and phone number of the player's agent.

8      (*Roman Decl., ¶ 5, Exh. A, pp. 9-10.*)

9

10      151.   Information routinely posted on the NFLPA's website includes:

11 Top5/Top10 Salary Report, which details the top five and top ten salary amounts

12 at each position in the NFL.  This report allows the reader to determine the amount

13 of the tender which a franchise player or a transition player would receive under

14 the NFL/NFLPA Collective Bargaining Agreement.

15      (*Roman Decl., ¶ 5, Exh. A, p. 10.*)

16

17      152.   Information routinely posted on the NFLPA's website includes:

18 League Wide Salary Cap Room Report, which displays Salary Cap Expenditures

19 and Available Room left for NFL teams, including the current value in Salary Cap

20 dollars of club expenditures, the current Salary Cap dollar room available, and the

21 percentage of the club's Salary Cap limit that is still unspent.

22      (*Roman Decl., ¶ 5, Exh. A, p. 10.*)

23

24      153.   Information routinely posted on the NFLPA's website includes:  Team

25 Salary Report, which displays the individual amount that players' contracts count

26 against a club's Salary Cap during a specified season.  The report includes both

27 players on current rosters and players not currently active but with contracts

28 affecting the specified season's Salary Cap.

1    *(Roman Decl., ¶ 5, Exh. A, p. 10.)*

2

3    154.   Information routinely posted on the NFLPA's website includes:

4    Player Salary Details, which detail Salary Cap component values for each player's

5    contract for a given year.

6    *(Roman Decl., ¶ 5, Exh. A, p. 10.)*

7

8    155.   Information routinely posted on the NFLPA's website includes:

9    Rookie Pool Cap Room Report, which displays Rookie Pool Allocations for each

10   club for those seasons starting in 1994 when the Rookie Pool took effect.  For the

11   current season the report shows the allocation level, the value of rookie contracts

12   against that allocation and the amount of rookie pool room still available.

13   *(Roman Decl., ¶ 5, Exh. A, p. 10.)*

14

15   156.   Information routinely posted on the NFLPA's website includes:

16   Rookie Player Salary Report, which displays for any selected club how much each

17   rookie contract counts against that club's Rookie Pool Allocation [for the current

18   season].

19   *(Roman Decl., ¶ 5, Exh. A, pp. 10-11..)*

20

21   157.   Information routinely posted on the NFLPA's website includes:

22   Draftee Analyses, which include reports with detailed salary data for every player

23   drafted from the 1995 season through the current season, information about the

24   fate of all underclass players who declared draft eligibility since 1990, a listing of

25   current season draftees and their agents, and important pointers and analysis of

26   draftee signing bonuses.

27   *(Roman Decl., ¶ 5, Exh. A, p. 11.)*

28

1    158.   Information routinely posted on the NFLPA's website includes:  2001

2  Minimums and Tenders Report, which details the NFL League minimum salaries

3  for all players of varying experience levels, and the minimum tender offer amount

4  for players at each experience level.

5    *(Roman Decl., ¶ 5, Exh. A, p. 11.)*

6

7    159.   Information routinely posted on the NFLPA's website includes:  NFL

8  Economics Primer 2001, which contains an explanation of the Salary Cap system.

9    *(Roman Decl., ¶ 5, Exh. A, p. 11.)*

10

11    160.   Information routinely posted on the NFLPA's website includes:  Key

12  Contacts, which is a list of all key personnel of every NFL team, including the

13  designation of the team's chief contract negotiator.

14    *(Roman Decl., ¶ 5, Exh. A, p. 11.)*

15

16    161.   Information routinely posted on the NFLPA's website includes:  Key

17  Dates, which explains all of the key calendar dates that affect a player's NFL

18  status.

19    *(Roman Decl., ¶ 5, Exh. A, p. 11.)*

20

21    162.   Information routinely posted on the NFLPA's website includes:

22  Recent Signings Reports, which detail all recent signings of Franchise Players,

23  Transition Players, Exclusive Rights Players, Restricted Free Agent Players, Street

24  Free Agent Players, Undrafted Free Agent Players, Undrafted Rookie Players, and

25  recently renegotiated contracts.

26    *(Roman Decl., ¶ 5, Exh. A, p. 11.)*

27

28    163.   In addition to the information available on its website, the NFLPA

1  provides copies of any NFL Player Contract to Certified Contract Advisors.

2  Certified Contract Advisors may obtain this information by making a telephonic

3  request to the NFLPA and/or by making an appointment to review contracts at the

4  NFLPA's office in Washington, D.C.

5      *(Roman Decl., ¶ 5, Exh. A, p. 12.)*

6

7      164.   In addition to the information available on its website, the NFLPA

8  provides sports agents with information that they need to negotiate the most

9  favorable deals for their players at seminars that the agents are required to attend

10  each year.

11      *(Berthelsen Depo., 294:14-296:24, 304:20-25.)*

12

13      165.   The NFLPA also has people available on its staff to answer questions,

14  give advice, and provide information to sports agents about salary caps and

15  negotiation techniques and other information relating to player deals.

16      *(Berthelsen Depo., 305:8-18.)*

17

18      166.   NFL player salary and contract information is also published on

19  ESPN's website located at http://www.espn.com.

20      *(Roman Decl., ¶ 6.)*

21

22      167.   The contract terms and the identity of a player's agent is information

23  available to the sports representation industry.

24      *(Parker 30(b)(6) Depo., 212:9-16.)*

25

26      168.   The maximum amount an NFL sports agent can charge for

27  commission is 3%.

28      *(Bollman 30(b)(6) Depo., 295:21-296:2.)*

1    169.   SMD admits that a certified contract advisor can obtain contract

2    information on NFL player contracts from the NFLPA website.

3       *(Parker 30(b)(6) Depo., 214:12-215:23.)*

4

5    170.   SMD believes that the NFLPA website is "a pretty useful overview

6    site" and that it is a "pretty useful resource for obtaining general contract

7    information."

8       *(Parker 30(b)(6) Depo., 259:20-260:10.)*

9

10    171.   Any agent in the sports representation industry who wants to present

11    a compelling case on the quality of its client would know or look into obvious

12    factors such as a player's age, experience, statistics, the ability of his team, the

13    team's success, and honors the player has achieved for purposes of projecting a

14    player's future income stream.

15       *(Parker 30(b)(6) Depo., 260:11-265:2.)*

16

17    172.   Scott Parker used his own understanding of math and algebraic

18    principles to create SMD's trade secret "formulas."

19       *(Parker 30(b)(6) Depo., 61:17-20.)*

20

21    173.   It is possible for somebody with sufficient knowledge of the salary

22    cap, of the various rules, and of algebra to replicate SMD's trade secret "formulas."

23       *(Parker 30(b)(6) Depo., 56:25-58:20.)*

24

25    174.   Financial information for Assante Corporation is publicly disclosed

26    on Assante Corporation's website located at http://www.assante.com.  The

27    financial information that is disclosed includes revenue and expense information

28    for Assante Corporation overall and for its business segments, including its sports

1  and entertainment business of which SMD is part.

2      *(Roman Decl., ¶ 7, Exh. B.)*

3

4      175.   The amount Assante Corporation paid to acquire Steinberg, Moorad

5  & Dunn has been publicly disclosed.

6      *(Roman Decl., ¶ 8, Exh. C.)*

7

8      176.   Assante Corporation and/or SMD provided Athletes First personnel

9  with SMD's financial projections, margins, percentages of revenues and expenses,

10  as well its rosters, rolodex, cardlist, and telephone logs, after these personnel had

11  submitted their resignations to SMD.

12      *(Bollman 30(b)(6) Depo., 50:10-14, 80:18-24, 143:5-14.)*

13

14      177.   SMD created financial projections each year.  SMD's financial

15  projections and other documents that reflect SMD's accounting practices were

16  created by Todd Bollman with input from David Dunn, Scott Parker and others at

17  SMD regarding projected client contracts from which SMD could project client

18  fees for the next several years.  Client fee information was used to prepare the

19  revenue projections while SMD's expense projections were based on an

20  understanding of the business.

21      *(Bollman 30(b)(6) Depo., 68:2-69:1, 94:11-16, 94:22-97:11.)*

22

23  **_Timing of departure and investment_**

24      178.   Athletes First personnel David Dunn, Brian Murphy, Erin Bohrnstedt,

25  Domenic Mantella, Carmen Wallace, and Joby Branion submitted their

26  resignations to SMD on or about February 16, 2001.

27      *(Bollman 30(b)(6) Depo., 306:19-308:24; 453:25-455:1.)*

28

1    179.   Platinum's first contact with anyone from Athletes First occurred in

2    April, 2001.

3        *(Antoine Decl., ¶ 9, 5:11-12.)*

4

5    180.   Platinum signed the Term Sheet with Athletes First on April 24,

6    2001, and then formally closed the deal with Athletes First in May, 2001.

7        *(Antoine Decl., ¶ 15, 8:19-20; ¶ 50, 24:20.)*

8

9    ***Representations re non-solicitation***

10    181.   Mr. Antoine and Walter Cochran-Bond, Esq. were told by Athletes

11    First principals and their counsel during the due diligence process was that

12    Athletes First had received legal advice by Ropes & Gray and had not solicited

13    players who were under contract to other agents, and in particular SMD, had

14    merely announced to players that they had left SMD, and as a result of the

15    announcements players made inquiries to Athletes First resulting in some of them

16    switching agents and others requesting additional information from Athletes First.

17        *(Antoine Decl., ¶ 55, 27:6-15;Antoine Depo., 144:17-145:1, Cochran-Bond*

18        *Decl., ¶6, 6:2-12; Cochran-Bond Depo., 90:5-93:1.)*

19

20    182.   There were a few occasions after Platinum agreed to invest in

21    Athletes First that its principals asked Mr. Antoine if they could introduce an NFL

22    player to him or others at Platinum.

23        *(Antoine Decl., ¶ 56, 27:17-19.)*

24

25    183.   Based on representations from Athletes First principals, Mr. Antoine

26    understood that any player introduced to him by Athletes First had either already

27    selected Athletes First as his agent or had contacted Athletes First and expressed

28    interest in retaining Athletes First as his agent.

1     *(Antoine Decl., ¶ 56, 27:20-24.)*

2

3     **Tony Gonzalez**

4     184.  Tony Gonzalez, a player for the Kansas City Chiefs, was introduced

5 by Athletes First to Mr. Antoine in May, 2001 and that same day shook Tom

6 Gores' hand.

7     *(Gonzalez Depo., 80:24-81:4; Gores Depo., 189:2-9; Antoine Decl., 57,*

8     *27:26-28:1.)*

9

10     185.  At the time Tony Gonzalez was introduced to Mr. Antoine and Mr.

11 Gores in May, 2001, Mr. Gonzalez was in the process of seeking a new agent, and

12 had been considering seeking a new agent even before learning of David Dunn's

13 departure from SMD.

14     *(Gonzalez Depo., 45:1-7, 55:22-56:3, 67:8-16, 95:5-22.)*

15

16     186.  Mr. Gonzalez was seeking a new agent because his agent, Leigh

17 Steinberg, was unreachable, busy, not paying enough attention to Mr. Gonzalez,

18 and Mr. Gonzalez wanted better endorsement and marketing opportunities.

19     *(Gonzalez Depo., 45:15-46:4.)*

20

21     187.  According to NFLPA rules, a sports agent (contract advisor) can

22 communicate with any player about the services that agent can provide, even if the

23 player is already signed with another agent, once that player has initialed the

24 communication.

25     *(Berthelsen Depo., 317:20-320:7.)*

26

27     188.  As part of Tony Gonzalez' search for a new agent, the meeting in

28 May, 2001was arranged so that David Dunn of Athletes First could describe the

1    services his new firm had to offer.

2        *(Gonzalez Depo., 97:25-98:6.)*

3

4        189.   During the May, 2001 meeting, no one asked Mr. Gonzalez to

5    terminate his relationship with Leigh Steinberg or SMD.

6        *(Gonzalez Depo., 82:5-10.)*

7

8        190.   Platinum had no involvement in arranging the meeting with Mr.

9    Gonzalez and no knowledge of the conversations between Mr. Gonzalez and

10    Athletes First prior to the meeting.

11        *(Antoine Decl., ¶ 57, 28:3-6.)*

12

13        191.   Neither Mr. Antoine nor anyone else from Platinum made any

14    presentation to Mr. Gonzalez at the meeting held in May, 2001, and Mr. Gonzalez

15    does not recall Mr. Antoine saying anything.

16        *(Gonzalez Depo., 86:19-22, 102:22-103:18.)*

17

18        192.   Mr. Gonzalez recalls no discussion of Platinum's services during his

19    May, 2001 meeting.

20        *(Gonzalez Depo., 104:4-14.)*

21

22        193.   Mr. Gonzalez had no other contact with Platinum.

23        *(Antoine Decl., ¶ 57, 28:6.)*

24

25        194.   Mr. Gonzalez did not choose SMD or Athletes First as his agent in

26    2001, but instead chose Tom Condon of IMG.

27        *(Gonzalez Depo., 95:23-25.)*

28

*Corey Dillon*

195.   Corey Dillon, a player for the Cincinnati Bengals, terminated Leigh Steinberg and SMD as his (Mr. Dillon's) agent on April 25, 2001, and thereafter retained Athletes First as his agent.

(*Dillon Decl., ¶¶ 1-2, 34:5-35:3; Exh. A., Dillon Decl.*)

196.   As of April 25, 2001, Mr. Dillon had never met or had contact with anyone from Platinum.

(*Dillon Decl., ¶ 2, 34:11-15.*)

197.   Platinum played no role in Mr. Dillon's decision to terminate Mr. Steinberg and SMD and hire Athletes First.

(*Dillon Decl., ¶ 2, 34:18-35:3.*)

198.   In approximately May or June of 2001, Mr. Antoine received a call from an Athletes First's principal asking if they could introduce him to Mr. Dillon.

(*Antoine Decl., ¶ 58, 28:8-10.*)

199.   Mr. Dillon did visit Platinum's office and meet Mr. Antoine and Mr. Gores in May or June of 2001, approximately one month after retaining Athletes First as his agent.

(*Dillon Decl., ¶ 2, 34:15-17.*)

200.   During Mr. Dillon's visit to Platinum's office, there was no discussion of Leigh Steinberg, SMD, or Mr. Dillon's prior termination of his relationship with Mr. Steinberg and SMD.

(*Dillon Decl., ¶ 2, 34:15-35:1.*)

1    201.   Mr. Dillon's visit to Platinum's office was his only contact with
2    Platinum.
3         *(Dillon Decl., ¶ 2, 35:1-3.)*
4
5    **Chris Redman**
6    202.   Chris Redman, a player for the Baltimore Ravens, terminated Leigh
7    Steinberg and SMD as his (Mr. Redman's) agent on May 9, 2001, and thereafter
8    retained Athletes First as his agent.
9         *(Redman Decl., ¶¶ 1, 32:5-18,  and 2, Exh. A, Redman Decl.)*
10
11   203.   As of May 9, 2001, Mr. Redman had never met or had contact with
12   anyone from Platinum.
13        *(Redman Decl., ¶ 2, 32:10-14.)*
14
15   204.   Platinum played no role in Mr. Redman's decision  to terminate Mr.
16   Steinberg and SMD and hire Athletes First.
17        *(Redman Decl., ¶ 2, 32:17-18.)*
18
19   205.   In late June, 2001, Mr. Antoine was introduced to Mr. Redman by
20   Athletes First at a social and golf outing in Las Vegas, after which they developed
21   a social friendship.
22        *(Antoine Decl., ¶ 61, 29, 22:-30:6; Redman Decl., ¶ 2, 32:14-18.)*
23
24   **Danny Farmer**
25   206.   Danny Farmer, a player for the Cincinnati Bengals, terminated Leigh
26   Steinberg and SMD as his (Mr. Farmer's) agent on or about May 22, 2001, and
27   thereafter retained Athletes First as his agent.
28        *(Farmer Decl., ¶¶ 1 and 2, 48:5-6, 48:11-14.)*

207.   As of May 22, 2001, Mr. Farmer had never met or had contact with anybody from Platinum.

*(Farmer Decl., ¶ 2, 48:14-15.)*

208.   Platinum played no role in Mr. Farmer's decision to terminate Mr. Steinberg and SMD and to hire Athletes First.

*(Farmer Decl., ¶ 2, 48:17-19.)*

209.   Sometime after May 22, 2001, a representative of Athletes First introduced Mr. Farmer to Lawrence Antoine of Platinum.  Since that time, Mr. Antoine and Mr. Farmer have become friends.

*(Farmer Decl., ¶ 2, 48:15-18.)*

***Kordell Stewart***

210.   In early June, 2001, Mr. Antoine received a call from Mr. Branion of Athletes First asking if he could introduce Mr. Antoine to Kordell Stewart, a player for the Pittsburgh Steelers.

*(Antoine Decl., ¶ 59, 28:20-22;Antoine Depo., 173:25-174:6.)*

211.   Mr. Branion explained to Mr. Antoine that Mr. Stewart would also be meeting with someone from Paradigm Talent & Literary Agency that day to discuss possible opportunities in the entertainment field after his playing career.

*(Antoine Decl., ¶ 59, 28:22-24;Antoine Depo., 176:22-25.)*

212.   Mr. Antoine had no advance notice of the meeting with Mr. Stewart, and Mr. Antoine does not know how it was arranged.

*(Antoine Decl., ¶ 59, 28:24-26.)*

1      213.  Mr. Stewart did visit Platinum's office that same day of his meeting at

2  Paradigm in early June, 2001.

3      *(Stewart Depo., 51:10-15, 70:6-18.)*

4

5      214.  Mr. Stewart understood that the purpose of his meeting with Platinum

6  and Paradigm was to discuss possible opportunities in Hollywood and the

7  entertainment field, and he particularly interested in opportunities in television.

8      *(Stewart Depo., 48:22-49:15,54:25-55:11.)*

9

10      215.  Mr. Antoine did not know Mr. Stewart was a client of SMD when Mr.

11  Stewart visited Platinum.

12      *(Antoine Depo., 180:22-25.)*

13

14      216.  Through his career in the NFL, Mr. Stewart has always had a

15  marketing agent separate from his football agent.

16      *(Stewart Depo., 33:18-34:20.)*

17

18      217.  Mr. Stewart understood that the only reason he was visiting Platinum

19  was to discuss opportunities in television and entertainment, and that is all he

20  recall that was discussed during the meeting.

21      *(Stewart Depo., 54:11-15, 54:25-55:16, 61:12-62:2.)*

22

23      218.  During the Paradigm meeting, Mr. Stewart discussed his desire to be

24  on the Steve Harvey Show and other possibilities for getting involved in

25  television.

26      *(Stewart Depo., 56:13-21.)*

27

28

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: DEFENDANT PLATINUM EQUITY, LLC'S MSJ

1      219.   Mr. Stewart's meeting with Paradigm was longer than his meeting at

2 Platinum.

3      *(Stewart Depo., 57:6-10.)*

4

5      220.   Mr. Stewart understood that the meetings with Platinum and

6 Paradigm did not have anything to do with who his football agent was.

7      *(Stewart Depo., 62:3-7.)*

8

9      221.   During Mr. Stewart's meeting at Platinum there was no discussion of

10 Leigh Steinberg or who his football agent was.

11      *(Stewart Depo., 54:16-20.)*

12

13      222.   During Mr. Stewart's meetings at Platinum and Paradigm there was

14 no discussion of Athletes First representation of football players and negotiation

15 of contracts.

16      *(Stewart Depo., 63:13-17.)*

17

18      223.   During Mr. Stewart's meetings at Platinum and Paradigm, there was

19 no reference to Leigh Steinberg, and no one stated that he should terminate his

20 relationship with Leigh Steinberg.

21      *(Stewart Depo., 54:16-20, 64:11-17.)*

22

23      224.   Mr. Stewart does not know whether anyone in attendance at those

24 meeting from Platinum and Paradigm knew who his football agent was.

25      *(Stewart Depo., 67:15-25.)*

26

27      225.   During that same visit to Los Angeles by Mr. Stewart in early June,

28 2001, Mr. Branion informed Mr. Antoine that Mr. Stewart had asked if a round of

1   golf could be arranged.

2       *(Antoine Decl., ¶ 60, 29:10-11.)*

3

4       226.   Mr. Antoine did arrange a round of golf for Mr. Stewart and Mr.

5   Branion, and Mr. Antoine and Mr. Foltz joined them.

6       *(Antoine Decl., ¶ 60, 29:15-17.)*

7

8       227.   Both Mr. Stewart and Mr. Antoine understood it was a social outing,

9   and Mr. Stewart enjoyed watching Mr. Branion and Mr. Antoine lose golf balls.

10      *(Stewart Depo, 63:18-23; Antoine Decl., ¶ 59, 29:17-18.)*

11

12      228.   During the round of golf, there was some talk of Mr. Stewart's

13  opportunities in the entertainment field.

14      *(Stewart Depo., 62:19-21.)*

15

16      229.   During the round of golf, there was no discussion regarding who Mr.

17  Stewart's football agent was, nor about Athletes First, nor did anyone suggest that

18  Mr. Stewart terminate his relationship with Leigh Steinberg.

19      *(Stewart Depo., 62:22-63:2, 63:24-64:10.)*

20

21      230.   Mr. Stewart did not have the impression that anyone from Platinum or

22  Paradigm was attempting to recruit him for Athletes First or solicit business from

23  him, and he did not think that Platinum or Paradigm did anything that violated his

24  agreement with SMD.

25      *(Stewart Depo., 66:7-14, 213:13-214:8.)*

26

27      231.   After meeting with Platinum and Paradigm, Mr. Stewart never

28  terminated his relationship with Leigh Steinberg and SMD, and his relationship

1   with them did not change.

2       *(Stewart Depo., 221:3-7.)*

3

4   **Athletes First's alleged false advertising**

5       232.   Platinum has had no involvement in regard to the creation and

6   content of Athletes First's player "packets" or other marketing materials.

7       *(Antoine Decl., ¶ 64, 32:1-2.)*

8

9       233.   Mr. Antoine has never seen any of Athletes First player "packets,"

10  except when he was presented one by SMD's counsel during his deposition in this

11  case.

12      *(Antoine Decl., ¶ 64, 32:2-4;Antoine Depo., 282:17-21.)*

13

14  **Athletes First's alleged extortion**

15      234.   In 2001, Platinum began using Fleishman-Hillard for its own public

16  relations services.

17      *(Barnhill Depo., 31:21-32:25, 24:6-13, 20:20-21:4.)*

18

19      235.   Once Platinum had agreed to invest in Athletes First, it introduced

20  Athletes First to Fleishman-Hillard in or around June of 2001 so that Athletes First

21  could begin publicizing its new company.

22      *(Barnhill Depo., 58:11-60:7, 89:25-90:21.)*

23

24      236.   At the first meeting at which Platinum introduced Fleishman-Hillard

25  to Athletes First, Jamie Ludowitz, Mark Barnhill, and Corey Olfert attended on

26  behalf of Fleishman, Alanna Chaffin and Lawrence Antoine attended on behalf of

27  Platinum, and Joby Branion and Carmen Wallace attended on behalf of Athletes

28  First; additionally, Alonzo Byrd attended on behalf of Fleishman-Hillard.

1    *(Barnhill Depo., 22:1-22:5.)*

2

3        237.   Alonzo Byrd was attending the introductory meeting with Athletes

4    First as he was a sports marketing specialist and that was the intended focus of the

5    meeting, but in advance of the meeting it was known that there was a legal dispute

6    and that litigation support may be necessary so, for that reason, Mark Barnhill was

7    asked to participate in the introductory meeting.

8        *(Barnhill Depo., 94:12-95:10, 19:18-20:7.)*

9

10       238.   During the introductory meeting, Joby Branion explained in regard to

11   litigation support, Athletes First had been frustrated because the media coverage to

12   date had been very one-sided and that Athletes First's court filings would be the

13   first chance they have to explain their side of the story; there was concern that

14   Athletes First's side would not be told because of Steinberg and his relationship

15   with the press; and they expressed concern about helping manage the press and

16   point reporters to the substantive relevant issues.

17       *(Barnhill Depo., 115:10-116:8.)*

18

19       239.   Barnhill recalls no discussion during the introductory meeting or any

20   time concerning pressuring SMD into abandoning the litigation.

21       *(Barnhill Depo., 142:11-143:11.)*

22

23       240.   During the introductory meeting, both Alanna Chaffin and Lawrence

24   Antoine of Platinum said very little.

25       *(Barnhill Depo., 116:19-117:19.)*

26

27       241.   At no time did Platinum express interest in the subject of publicity

28   impacting the litigation nor did they participate in any conversations on that issue.

1    *(Barnhill Depo., 151:17-21.)*

2

3        242.   After the introductory meeting, there were no meetings between

4    Fleishman and Platinum in which the Athletes First matter was discussed.

5        *(Barnhill Depo., 128:14-25.)*

6

7        243.   In regard to the litigation support work done by Fleishman in this

8    case, it was for Athletes First, not Platinum; it consisted of managing media

9    inquiries for potential coverage making sure people who Fleishman thought would

10   cover the story and access to filings and making sure people covering the story

11   understood the important business issue from Athletes First's perspective, namely,

12   that there was a contract dispute which the NFLPA should intervene as it related

13   to the athlete's right to chose his own representation.

14       *(Barnhill Depo., 60:25-61:17.)*

15

16       244.   Platinum had no other involvement with Fleishman-Hillard's services

17   on behalf of Athletes First, other than advancing payment of Fleishman-Hillard's

18   fees.

19       *(Barnhill Decl., ¶ 4, 43:4-11.)*

20

21       245.   Platinum did not direct, control, or advise any of the services

22   Fleishman-Hillard performed for Athletes First.

23       *(Barnhill Decl., ¶ 4, 43:4-6.)*

24

25       246.   During the engagement Fleishman had been directed by David Dunn,

26   Brian Murphy, and Joby Branion, along with Athletes First's legal counsel, Andy

27   Kim and Matt Nelson.

28       *(Barnhill Depo., 53:12-54:16, 55:8-21, 60:13-24.)*

1   247.   The engagement with Athletes First ended because there was no more

2   work for Fleishman-Hillard to do because they were receiving no more directives

3   from Athletes First principals.

4   *(Barnhill Depo., 53:12-54:16, 55:8-21, 60:13-24.)*

5

Platinum

6   248.   ~~SMD~~ does not know of any information about SMD that it considers

7   to be embarrassing.

8   *(Bollman 30(b)(6) Depo., 546:2-9.)*

9

10   CONCLUSIONS OF LAW

11   1.   The Court has jurisdiction of this action pursuant to 15 U.S.C. § 1125

12   (a).

13

14   2.   Summary judgment, or partial summary judgment of a claim, is

15   appropriate where there is no genuine issue of material fact and the movant is

16   entitled to judgment as a matter of law.  A defendant is entitled to summary

17   judgment if the plaintiff cannot present sufficient evidence to establish each

18   element of its claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548,

19   91 L.Ed.2d 265 (1986).

20

21   3.   Under California Civil Code § 3426, indirect trade secret

22   misappropriation requires proof that:  (1) Plaintiff is the owner of a valid trade

23   secret; (2) Defendant acquired the trade secret from someone other than Plaintiff

24   and:  (a) knew or had reason to know before the use or disclosure that the

25   information was a trade secret and knew or had reason to know that the disclosing

26   party had acquired it through improper means or was breaching a duty of

27   confidentiality by disclosing it; or (b) knew or had reason to know it was a trade

28   secret and that the disclosure was a mistake; (3) Defendant used or disclosed the

1    trade secret without Plaintiff's authorization; (4) Plaintiff suffered harm as a direct

2    and proximate result of Defendant's use or disclosure of the trade secret, or

3    Defendant benefitted from such use or disclosure.

4

5        4.    Information that is generally known to the public or to persons in the

6    relevant industry is not trade secret. *See American Paper & Packaging Prods.,*

7    *Inc. v. Kirgan*, 183 Cal. App. 3d 1318, 1326, 228 Cal. Rptr. 713 (1986).

8

9        5.    Information is not trade secret if it has been publicly disclosed by the

10   owner or someone acting on its behalf. *Cal. Civ. Code* § 3426.

11

12       6.    A defendant who receives trade secret information from someone

13   other than the plaintiff is not liable for trade secret misappropriation unless the

14   plaintiff can show the defendant knew or had reason to know that the information

15   was trade secret and that the disclosure was unlawful. *Cal. Civ. Code* § 3426.

16

17       7.    SMD cannot, as a matter of law, present sufficient evidence to

18   establish the essential elements of its trade secret misappropriation claim against

19   Platinum.  The trade secrets Platinum is alleged to have misappropriated are

20   generally known to either the public or to persons in the sports representation

21   industry, and have also been publicly disclosed by SMD or its parent corporation

22   Assante Corporation.  Platinum did not know or have reason to know that any

23   information it received from Athletes First was trade secret or that Athletes First

24   did not have the authority to disclose it.  SMD presented no evidence that

25   Platinum used or disclosed the trade secrets.  Finally, SMD presented no evidence

26   that the information it claimed as trade secret derived independent economic value

27   from not being generally known to the public or to other persons who can obtain

28   economic value from its disclosure or use.  Platinum is entitled to summary

1    judgment on the trade secret misappropriation claim.

2

3         8.     Intentional interference with a contract or with prospective economic

4    advantage requires proof of the following: (1) The existence of a valid contract or

5    economic relationship between plaintiff and the third party; (2) defendant's

6    knowledge of the existence of the contract or relationship; (3) defendant

7    intentionally engaged in acts or conduct that was intended to disrupt the

8    contractual or economic relationship; (4) Actual disruption of the relationship or

9    breach of the contract; (5) plaintiff suffered damages as a result. *See Ramona*

10   *Manor Convalescent Hosp. v. Care Enterprises*, 177 Cal. App. 3d 1120, 1130, 225

11   Cal. Rptr. 120, 124 (1986).

12

13        9.     Intentional interference with a prospective economic advantage also

14   requires evidence of an economic relationship with a probability of future

15   economic benefit, and some additional wrongful conduct other than the alleged

16   interference is required. *See J.A. Savage v. Pacific Gas and Elec. Co.*, 21 Cal.

17   App. 4th 434, 448, 26 Cal. Rptr. 2d 305, 314 (1994).

18

19        10.    SMD cannot, as a matter of law, present sufficient evidence to

20   establish the essential elements of its intentional interference with contract and

21   intentional interference with prospective economic advantage claims against

22   Platinum. Platinum did not knowingly engage in any conduct with the intent of

23   inducing any SMD clients to terminate any valid contracts or economic

24   relationships they had. Platinum did not know or have reason to know that any of

25   the NFL players introduced to it by Athletes First had valid contracts or existing

26   relationships with SMD. The undisputed evidence showed that Platinum knew or

27   reasonably believed that the players it was introduced to were no longer SMD

28   clients. Platinum's meeting with these players did not induce them to terminate

1    their relationship with SMD.  One player Platinum met did not terminate his

2    relationship with SMD.  Platinum engaged in no additional wrongful conduct as

3    required for intentional interference with prospective economic advantage.  SMD

4    cannot show the requisite probability of its prospective economic advantage.

5    Platinum is entitled to summary judgment of SMD's intentional interference with

6    contract and intentional interference with prospective economic advantage claims.

7

8         11.    A breach of a fiduciary duty requires evidence that the breaching

9    party owed the plaintiff a fiduciary duty and breached that duty.  The fiduciary

10   duties owed by officers and directors terminates upon their leaving the company.

11   *See John F. Matull & Assocs., Inc. v. Cloutier*, 194 Cal. App. 3d 1049, 1053 n.3

12   (1987).

13

14        12.    SMD cannot establish an essential element of its aiding and abetting

15   breach of fiduciary duty claim. David Dunn, Brian Murphy, Joby Branion,

16   Domenic Mantella, Erin Borhnstedt, and Carmen Wallace, terminated their

17   employment with SMD before engaging in any discussions or business with

18   Platinum.  Thus, Platinum could not have aided and abetted any alleged breach of

19   fiduciary duty owed to SMD by these individuals.  Platinum is entitled to summary

20   judgment of SMD's aiding and abetting breach of fiduciary duty claim.

21

22        13.    SMD cannot establish the essential elements of its claims against

23   Platinum for False advertising in violation of 15 U.S.C. § 1165(a) and misleading

24   advertising in violation of *California Business & Professions Code* § 17500.

25   Platinum had no involvement in the creation of the contents of any Athletes First

26   materials that SMD alleges contain false or misleading advertising.  Platinum had

27   no knowledge of and had not seen the disputed materials prior to Platinum's

28   deposition in this case, and therefore had no knowledge about the challenged

1 statements, and in particular, their falsity. *People v. Bostline Prods., Inc., 61*
2 *Cal.App. 3d 879* (1976) (requiring knowledge of falsity of statements). Platinum
3 is entitled to summary judgment of SMD's false advertising pursuant to 15 U.S.C.
4 § 1165(a) and misleading advertising pursuant to *California Business &*
5 *Professions Code* § 17500.

6

7        14.    To the extent SMD's unfair competition claim is predicated upon the
8 other causes of action against Platinum for which summary judgment has been
9 granted, summary judgment is also proper for SMD's unfair competition.

10

11        15.    To the extent SMD predicates its unfair competition claim on the
12 allegations of extortion and/or obstruction of justice, SMD cannot present
13 sufficient evidence to establish the essential elements of this claim. Platinum had
14 no involvement in and no knowledge of any threats allegedly made to SMD by
15 Athletes First personnel. ~~The alleged threats do not constitute extortion because~~
16 ~~neither Platinum nor Athletes First obtained money, or any other benefit as a result~~
17 ~~of the threats, from SMD. *See Leeper v. Beltrami*, 53 Cal. 2d 195, 203-04 (1959).~~
18 ~~Platinum had no control or direction over the activities of Fleishman-Hillard on~~
19 ~~behalf of Athletes First. Fleishman-Hillard's activities did not constitute extortion~~
20 ~~or obstruction of justice.~~ Platinum is entitled to summary judgment of SMD's
21 unfair competition claim.

22

23        16.    SMD has not presented sufficient evidence to establish the essential
24 elements of its claim for conspiracy. Conspiracy is only a cause of action when
25 the complaint alleges the commission of an underlying civil wrong that causes
26 damage. *See Okun v. Superior Court*, 29 Cal. 3d 442, 454 (1981). A plaintiff
27 must present sufficient evidence to establish these underlying causes of action, or
28 no basis for liability under the theory of conspiracy exists. *See Diodes, Inc. v.*

1   *Franzen*, 260 Cal. App. 2d 244, 256 (1968); *Continental Car-Na-Var Corp. v.*

2   *Moseley*, 24 Cal. 2d 104, 112 (1944). SMD has not presented sufficient evidence

3   to establish any underlying cause of action against Platinum.

4

5         17.   Conspiracy requires evidence of: "(1) the formation and operation of

6   the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the

7   damage resulting from such act or acts." *See Chicago Title Ins. Co. v. Great*

8   *Western Financial Corp.*, 69 Cal. 2d 305, 316 (1968). The "formation" of an

9   alleged conspiracy depends on projected joint action. *See Wetherton v. Growers*

10   *Farm Labor Ass'n.*, 275 Cal. App. 2d 168, 176 (1969). The plaintiff must prove

11   that the defendant <u>shares</u> a common purpose with another person, that the

12   defendant actually united, cooperated with, or knowingly participated with the

13   other person in inflicting a wrong on the plaintiff. *See Mox Incorporated v.*

14   *Woods*, 202 Cal. 675, 677-78 (1927); *Loeb v. Kimmerle*, 215 Cal. 143, 150-51

15   (1932). Mere suspicion or knowledge of the other person's private purpose will

16   not suffice. *See Harris v. Capitol Records*, 64 Cal. 2d 454, 462 (1966). Absent

17   evidence that the defendant agreed with the other defendants to participate in any

18   scheme with knowledge of its unlawful purpose, no conspiracy exists. *See Black*

19   *v. Sullivan*, 48 Cal. App. 3d 557, 566, 122 Cal. Rptr. 119 (1975). SMD has

20   presented no evidence of the formation or operation of a conspiracy between

21   Platinum and Athletes First or any other defendants. Platinum is entitled to

22   summary judgment of SMD's conspiracy claim.

23

24         18.   SMD has not established the requisite elements for its declaratory

25   relief cause of action. Platinum is entitled to summary judgment of SMD's

26   declaratory relief claim because SMD cannot, as a matter of law, establish the

27   essential elements of this requested relief.

28

19.    SMD has not established the requisite elements for its unjust enrichment cause of action.  Platinum is entitled to summary judgment of SMD's unjust enrichment claim because SMD cannot, as a matter of law, establish the essential elements of this claim.

20.    SMD has not established the requisite elements for its constructive trust cause of action.  Platinum is entitled to summary judgment of SMD's constructive trust claim because SMD cannot, as a matter of law, establish the essential elements of this requested relief.

21.    SMD has not presented sufficient evidence to establish liability under a theory of investor/director liability.  Under California law, shareholders and directors of corporations cannot be held *vicariously* liable for the corporation's torts merely by reason of their official position.  *See United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*, 1 Cal. 3d 586, 595, 83 Cal. Rptr. 418, 423 (1970); *Frances T. v. Village Green Owners Assoc.*, 42 Cal. 3d 490, 503, 229 Cal. Rptr. 456, 463 (1986).  The California Supreme Court has pronounced directors and shareholders can be liable to third persons only if they injure third persons by *their own* tortious conduct.  *Frances T.*, 42 Cal. 3d at 503.  They are not liable for the corporation's torts in which they do not personally participate, of which they have no knowledge, or to which they have not knowingly consented.  *Frances T.*, 42 Cal. 3d at 503.  The director or shareholder must actively participate in some *meaningful sense* in the tortious conduct, or knowingly direct or authorize that it be done before liability can attach.  *Frances T.*, 42 Cal. 3d at 503-04, 506.  Finally, it must be shown that an ordinarily prudent person, knowing what the director knew at that time, would *not* have acted similarly under the circumstances.  *Haidinger-Hayes.*, 1 Cal. 3d at 595; *Dwyer v. Lanan & Snow Lumber Co.*, 141 Cal. App. 2d 838, 841, 297 P.2d 490, 493 (1956).

1      22.    Platinum did not exercise control over Athletes First. Platinum did

2  not authorize or direct any of the alleged wrongful conduct by Athletes First.

3  Platinum had no knowledge or reason to know that Athletes First had engaged in

4  any actual wrongful conduct. Platinum had affirmative representations from

5  Athletes First that it had not engaged in the alleged wrongful conduct. Platinum

6  conducted a reasonable due diligence investigation during which it learned

7  nothing to lead it or an ordinarily prudent person to conclude that Athletes First

8  had engaged in wrongful conduct. Before investing, Platinum obtained an expert

9  opinion from its attorney, Walter Cochran-Bond, Esq. that SMD had a low

10  probability of success on any of its claims against Athletes First. SMD presented

11  no evidence to establish that Platinum authorized, controlled, directed, or

12  meaningfully participated in any of Athletes First's alleged wrongful conduct.

13  SMD also presented no evidence to establish that Platinum knew of or had reason

14  to know of Athletes First's alleged wrongful conduct. SMD presented no evidence

15  that an ordinarily prudent person, knowing what Platinum knew, would not have

16  acted similarly. Platinum presented undisputed evidence that preclude SMD from

17  establishing these elements. Finally, Platinum reasonably relied on the expert

18  opinion of Walter Cochran-Bond, Esq. SMD cannot establish this theory of

19  liability against Platinum to defeat summary judgment.

20

21      23.    For an award of punitive damages, it must be proven by clear and

22  convincing evidence that the defendant is guilty of oppression, fraud or malice.

23  *West's Ann. Cal. Civ. Code § 3294(a)*; *Waits v. Frito-Lay, Inc.,* 978 F. 2d 1093

24  (9th Cir. 1992), *cert. denied,* 506 U.S. 1080, 113 S. Ct. 1047 (1993). SMD has

25  presented no evidence to established that Platinum acted with oppression, fraud or

26

27

28

1  malice. Platinum is entitled to summary judgment of SMD's request for punitive

2  damages because SMD cannot, as a matter of law, establish the essential elements

3  of this requested relief.

4

5

6  DATED: August __, 2002

                  **RONALD S.W. LEW**

7  _____
   The Honorable Ronald S.W. Lew
   Judge of the United States District Court

8

9

10  Submitted by:

11  RIORDAN & McKINZIE
      A Professional Law Corporation
12  DONALD J. KULA
    TRACY R. ROMAN
13  SONA D. RANDERIA

14  By:_____
15       Sona D. Randeria
    Attorneys for Defendant
16  PLATINUM EQUITY, LLC

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: DEFENDANT PLATINUM EQUITY, LLC'S MSJ

**PROOF OF SERVICE BY EXPRESS MAIL OR OTHER EXPRESS SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the county aforesaid; I am over the age of 18 years and not a party to the within action; my business address is 300 South Grand Avenue, Twenty-Ninth Floor, Los Angeles, California 90071-3109.

On August 26, 2002, I served the foregoing document(s) described as [*Revised PROPOSED*] **FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: DEFENDANT PLATINUM EQUITY, LLC'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF STEINBERG, MOORAD & DUNN, INC.'S CLAIMS** on interested parties in this action by placing a true copy thereof in a sealed envelope or other package designated by the express service carrier, at Los Angeles, California, addressed and numbered as follows:

Franklin Brockway Gowdy, Esq.
BROBECK, PHLEGER & HARRISON LLP
One Market - Spear Street Tower
San Francisco, CA 94105
*Attorneys for Plaintiff*

Kent R. Raygor, Esq.
SHEPPARD MULLIN RICHTER & HAMPTON LLP
333 South Hope Street, 48th Floor
Los Angeles, CA 90071-1448
*Attorneys for Defendant*
*Donald Housman, B.O.Y.Z. (Local Counsel)*

Joe Wolfson, Esq.
STEVENS & LEE
One Glenhardie
Corporate Center
1275 Drummers Lane, Suite 202
Wayne, PA 19087
*Attorneys for Defendant*
*Donald Housman, B.O.Y.Z. (Lead Counsel)*

Lee J. Hutton, Esq.
DUVIN, CAHN & HUTTON
1301 East 9th Street, 20th Floor
Cleveland, OH 44114
*Attorneys for Defendant Athletes First*
*Attorneys for Defendant David L. Dunn*

Andrew Kim, Esq.
ALSCHULER, GROSSMAN, STEIN & KAHAN, LLP
1620 26th Street, 4th Floor
Santa Monica, CA 90404-4060
*Attorneys for Defendant Athletes First*
*Attorneys for Defendant David L. Dunn*
*Attorneys for Third-Party Brian Murphy*

Alan Posner, Esq.
RUBIN & RUDMAN
50 Rowes Wharf
Boston, MA 02110
*Attorneys for Defendants*
*David C. Hunnewell, an individual, and*
*CENTURION CAPITAL MANAGEMENT, LLC*

Ronald D. Reynolds, Esq.
KAYE SCHOLER, LLP
1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067-6048
*Attorneys of Intervenor*
*NATIONAL FOOTBALL LEAGUE PLAYERS ASSN., INC.*

Aaron C. Gundzik
COTTON & GUNDZIK LLP
725 South Figueroa Street, 34th Floor
Los Angeles, CA 90017
*Attorneys for David C. Hunnewell & Centurion Capital Management, LLC*

··ODMA\MHODMA\LADOCS;480412;1

1

Jeffrey Kessler, Esq.                          Salvatore Picariello, Esq.
2    WEIL, GOTSHALL & MANGES LLP                BROBECK, PHLEGER & HARRISON
767 Fifth Avenue                               38 Technology Drive
3    New York, NY 10153                         Irvine, CA 92618-5301
*Attorneys for NFLPA*                          *Attorneys for Plaintiff*

4

5        I am readily familiar with this firm's practice of collection and processing correspondence
for mailing and overnight delivery. Under that practice, it would be deposited on that same day
6    in the ordinary course of business at Los Angeles, California.

7        Executed on August 26, 2002, at Los Angeles, California.

8        I declare that I am employed in the office of a member of the bar of this Court at whose
direction the service was made.

9

10

11                                                    Pattie Tierce

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

..ODMA\MHODMA\LADOCS,480412,1